UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
_____
JAMES A. ROGERS,                     )
                                     )
            Plaintiff,               )
                                     )
      v.                             )
                                     )   CIVIL ACTION NO.  04-11190-RCL
NSTAR ELECTRIC and                   )
KIMBERLY WHITNEY                     )
                                     )
            Defendants.              )
_____)
```

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS**

LINDSAY, DISTRICT JUDGE

### I.  INTRODUCTION

This case involves claims by the plaintiff, James A. Rogers ("Rogers" or the "plaintiff"), that his former employer, defendant NSTAR Electric & Gas Corporation ("NSTAR"),[1] and a former NSTAR co-worker, defendant Kimberly Whitney ("Whitney"), committed various common law torts and contractual violations against him.  The gravamen of the complaint is that NSTAR unlawfully terminated the plaintiff because he made harassing calls to Whitney in her office.

Rogers asserts ten state law claims against the defendants: count I alleges wrongful termination and a breach of the implied covenant of good faith and fair dealing; count II alleges misrepresentation, fraud, and deceit; count III alleges intentional interference with a contractual relationship; count IV alleges intentional interference with an advantageous business relationship;

---

[1] The docket caption misidentifies NSTAR as NSTAR Electric.

count V alleges intentional infliction of emotional distress; count VI alleges negligent infliction of emotional distress; count VII alleges negligent breach of contract duty; count VIII alleges negligent misrepresentation; count IX alleges breach of employment contract; and count X alleges slander and libel.

After removing this action from a Massachusetts superior court to this court, the defendants moved to dismiss the complaint, pursuant to Fed. R. Civ. P. 12(b)(6), on the ground that plaintiff's claims are preempted by the provisions of the Labor Management Relations Act ("LMRA"). They further contend that certain of plaintiff's claims fail to state a claim. For the reasons stated below, I GRANT the defendants' motion to dismiss in part and DENY it in part.

## II.  FACTUAL BACKGROUND

The following facts, except where otherwise indicated, are derived from the complaint. On a motion to dismiss, I must assume the truth of the facts alleged in the complaint, and I must indulge, in the plaintiff's favor, all reasonable inferences from the facts alleged. *Rossiter v. Potter,* 357 F.3d 26, 27 (1st Cir. 2004). Dismissal of a claim is not appropriate unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

The plaintiff commenced working for NSTAR on April 28, 1986. Compl. at ¶ 1. On or about August 30, 2000, an unidentified person called Whitney at work and said "Hi Kim, how are you" and "No, Kim, don't hang up now." *Id.* at ¶ 2. The same person called Whitney four more times between December 2000 and March 2001. *Id.* at ¶¶ 4-9. During a call in February 2001, Whitney claimed that she heard the unidentified caller masturbating in the background. *Id.* at ¶ 6.

Whitney complained to the Wareham Police Department. The police, with the aid of the telephone carrier, Verizon, placed a tap on Whitney's work phone. *Id.* at ¶¶ 7-8. Whitney received another phone call from the caller on March 30, 2001. *Id.* at ¶ 9. As soon as Whitney recognized the caller, she activated the phone tap and notified NSTAR security personnel, who contacted the Wareham Police Department. *Id.* at ¶ 10. The police traced the telephone call to plaintiff's phone.[2] *Id.* at ¶ 11.

On May 11, 2001, Whitney, accompanied by counsel for NSTAR, attended a show cause hearing before the clerk magistrate in Wareham District Court, pursuant to an official complaint against the plaintiff for annoying phone calls and criminal harassment. *Id.* at ¶ 14. The clerk magistrate dismissed the complaint, because Whitney provided insufficient proof of the identity of the plaintiff as the harassing caller. *Id.* at ¶ 15. Although Whitney sought redress from this ruling with a district court judge, the Plymouth County District Attorney's Office declined to prosecute, based on a lack of evidence. *Id.* at ¶ 16.

Despite the dismissal of Whitney's complaint, NSTAR nevertheless terminated the plaintiff's employment on May 18, 2001, based on that complaint. *Id.* at ¶ 18. At the time of his termination, the plaintiff was employed, pursuant to a collective bargaining agreement (the "CBA") between NSTAR and the Utility Workers Union of America, A.F.L.- C.I.O., and Local No. 369, U.W.U.A., A.F.L.- C.I.O. *Id.* at ¶ 39; Exhibit B to Memorandum in Support of

---

[2]Rogers claims that he did not know Whitney. Compl. at ¶ 13. NSTAR's telephone system often routed telephone calls to the wrong destination and this trace was the only trace by NSTAR to Rogers's phone. *Id.* at ¶ 13.

3

Defendants' Motion to Dismiss ("Defendants' Mem.").[3]  After his termination, the plaintiff exhausted the administrative remedies under the CBA "without result."  Compl. at ¶ 19.  Nevertheless, the plaintiff claims "all the benefits and protections under contract law afforded to anyone also is employed pursuant to a written contract."  *Id.*

The CBA grants NSTAR the authority to "suspend, discipline, demote, or discharge" employees so long as it does not exercise this authority in an "unjust or unreasonable manner."  CBA, Article V.  It also sets forth grievance and arbitration procedures in instances where the local union, on behalf of the employee, alleges that NSTAR acted unjustly or unreasonably.  *Id*.

### III.  DISCUSSION

**A.     Preemption**

The principal issue that the defendants advance in their motion to dismiss is that section 301 of the LMRA preempts all of the plaintiff's state law claims because the court will be required to interpret the CBA in resolving those claims.  Defendants' Mem., pp. 4 - 11.  The plaintiff, by contrast, characterizes his dispute with Whitney as a personal dispute that is completely unrelated to, and independent from, the CBA.  Plaintiff James A. Roger's [sic] Memorandum in Opposition to Defendants' Motion to Dismiss ("Plaintiff's Opp."), pp. 8 - 11.

Section 301(a) of the LMRA provides as follows: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting

---

[3]Because Rogers specifically references the CBA in his complaint, *see, e.g.,* Compl. at ¶¶ 21, 39, I may consider that agreement without converting the defendants' motion to dismiss to a motion for summary judgment. *See Clorox Co. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 32 (1st Cir. 2000) (stating that when reviewing a motion to dismiss, a court "may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment") (citations and internal quotations omitted).

commerce as defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a).

For over forty years, the Supreme Court has held that section 301 preempts state law claims arising from or involved analysis of collective bargaining agreements and that federal courts should apply federal common law in resolving such claims. *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202 (1985) (citing *Teamsters Local 174 v. Lucas Flour Co.*, 369 U.S. 95 (1962)); *Beneficial Nat'l. Bank v. Anderson*, 539 U.S. 1, 7 (2003) (noting "the unusually powerful pre-emptive force of § 301") (internal quotation marks omitted).[4]  Section 301 preempts inconsistent state law actions and remedies because "[t]he possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of collective agreements." *Lucas Flour Co.*, 369 U.S. at 103.

Before its decision in the *Lueck* case, the Supreme Court had limited the "preemptive effect" of section 301 to state law claims in which a plaintiff alleged a violation of a collective bargaining agreement. *See Lueck,* 471 U.S. at 209-210 (citing *Lucas Flour Co.*, 369 U.S. at 103-104, 82).  In *Lueck*, however, the Court expanded the preemptive reach of section 301 to instances where a plaintiff's state law claims are "substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract . . . ." 471 U.S. at 220.  The

---

[4]Defendants were able to remove this case to a federal forum because section 301 is one of the few federal statutes that "not only pre-emp[ts] state law but also authoriz[es] removal of actions that [seek] relief only under state law." *Beneficial*, 539 U.S. at 6-7 (*citing Avco Corp. v. Aero Lodge No. 735,* 390 U.S. 557 (1968)).

5

Court later summarized the preemption rule in the following manner:

> [I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles - - necessarily uniform throughout the Nation - - must be employed to resolve the dispute.

*Lingle v. Norge Div. of Magic Chef, Inc*, 486 U.S. 399, 405-406 (1988).

The First Circuit has interpreted the *Lingle* rule to mean that "section 301 preempts a state-law claim, whether founded upon the state's positive or common law, if a court, in passing upon the claim, would be required to interpret the collective bargaining agreement. In practice, this test boils down to whether the asserted state-law claim plausibly can be said to depend upon the meaning of one or more provisions within the collective bargaining agreement." *Flibotte v. Pennsylvania Truck Lines, Inc.*, 131 F.3d 21, 26 (1st Cir. 1997) (*citing Lingle*, 486 U.S. at 405-406). There are two ways in which a state law claim "depends" on the interpretation of a collective bargaining agreement: first, if the claim alleges a breach of duties arising under that agreement, *Flibotte,* 131 F.3d at 26 (*citing United Steelworkers v. Rawson*, 495 U.S. 362, 369, (1990)), and second, "if its resolution arguably hinges upon an interpretation of the collective bargaining agreement," *Flibotte,* 131 F.3d at 26 (*citing Allis-Chalmers Corp.,* 471 U.S. at 220.

Naturally, the rule is not boundless. For one thing, it does not apply to purely factual questions regarding an employee's conduct. *Flibotte,* 131 F.3d at 26. Also, "when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." *Livadas v. Bradshaw,* 512 U.S. 107, 124 (1994) (citation omitted); *see also Lingle*, 486 U.S. at 407 (holding that a state-law retaliatory discharge claim is not preempted by

section 301 because it was independent of the collective bargaining agreement). In addition, section 301 does not affect an employee's nonnegotiable rights guaranteed by state law. *Flibotte*, 131 F.3d at 26. For example, cases involving disputes brought under state anti-discrimination laws do not, by definition, rely on collective bargaining agreement and are therefore not preempted by section 301. *Ralph v. Lucent Techs., Inc.,* 135 F.3d 166, 171 (1st Cir. 1998). Finally, state law claims are subject to section 301 preemption only if the parties are engaged in a "real interpretive dispute." *Lydon v. Boston Sand & Gravel Co.*, 175 F.3d 6, 11 (1st Cir. 1999) (*citing Martin v. Shaw's Supermarkets, Inc.*, 105 F.3d 40, 42 (1st Cir. 1997)).

With the foregoing principles in mind, I examine each of the claims in the complaint to determine whether it depends on an interpretation of the CBA.

    1.    <u>Count I: Wrongful Termination and Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

Count one of the complaint, alleging wrongful termination and breach of the implied covenant of good faith and fair dealing, is clearly preempted by section 301. As a basis for this claim, the plaintiff states that he had a written contract with NSTAR and that "in all employment contracts pursuant to the appropriate law that there is an implied covenant of good faith and fair dealing." Compl. at ¶ 21. Rogers alleges that he suffered damages because of NSTAR's breach of the covenant of good faith and fair dealing. *Id.* The CBA authorizes the termination of an NSTAR employee so long as it does so in a manner that is not unjust or unreasonable. CBA, Article V. Thus, it is Article V of CBA that informs the review of any conduct by NSTAR alleged to violate the implied covenant of good faith and fair dealing; that is to say, it is the meaning of that Article that must be determined when one is deciding whether the implied

covenant of good faith and fair dealing has been breached.  *See Mulvihill v. Spalding Sports Worldwide, Inc.*, 184 F. Supp. 2d 99, 103 (D. Mass. 2002) (stating that "[i]t is hard to see how a claim for breach of an implied covenant of good faith could be resolved without an analysis of, or the determination of the meaning of, 'proper cause' in the employment agreement").

The plaintiff's argument that he can assert a viable claim for breach of the CBA in this count and in counts VII and IX discussed *infra*, is entirely meritless.  In support of this argument, he cites to *Balsavich v. Local 170, Int'l Bhd. of Teamsters,* 371 Mass. 283, 286, (1976), where the Massachusetts Supreme Judicial Court stated, in dicta, that a plaintiff *can* bring a claim for breach of a collective bargaining agreement.  *Balsavich* is not relevant to the preemption question here because the SJC in *Balsavich* never addressed the preemption issue, but instead merely reiterated the firmly-established principle that a state court has concurrent jurisdiction to decide disputes brought under the LMRA.  *Id.* (*citing Humphrey v. Moore*, 375 U.S. 335, 343-344 (1964).[5]

This claim also fails for the separate, independent reason that Massachusetts courts have determined that, as a general matter, explicit provisions in the typical collective bargaining agreement give the employee greater protection than the implied covenant.  *See Azzi v. Western Elec. Co.*, 474 N.E.2d 1166, 1169 (Mass. App. Ct. 1985) (noting that because the plaintiff may only be discharged because of "just cause" and "[s]ince [this] . . . explicit contractual provision

---

[5]Likewise, the plaintiff has misstated the law with respect to his argument that his claims here are exempt from preemption under section 301 because that statute does not apply to certain state claims.  Plaintiff's Opp., p. 6.  The case the plaintiff cites for this proposition, *Mass. Elec. Co. v. Mass. Comm'n Against Discrimination*, 375 Mass. 160, 174 (1978), clearly explains that section 301 does not apply to state anti-discrimination cases.  Because plaintiff does not allege discrimination claims in the complaint, this case is of no help to him.

gives the employee greater protection than the implied covenant, there is no need to imply the covenant") (quoting *Bertrand v. Quincy Mkt. Cold Storage & Warehouse Co.*, 728 F.2d 568, 571 (1st Cir. 1984). Accordingly, an agreement that precludes termination when that termination is unjust or unreasonable requires no implied covenant when the issue is whether the termination of the employee was upon a reasonable and just ground.

For the foregoing reasons, count I of the complaint is dismissed.

2.  <u>Count II: Misrepresentation, Fraud, and Deceit</u>

In count II of the complaint, plaintiff alleges that "defendants participated in intentional misrepresentations regarding the conduct of the plaintiff . . . with no evidence to support such claims and further with (sic) in spite of the rejection of aforesaid claims of the defendant Whitney, the Defendant [NSTAR] terminated Rogers based on the aforesaid false statement of Whitney with full knowledge that said accusations had no legal basis since the Defendant, NSTAR provided its own legal counsel to Whitney at the District Court hearing." Compl. at ¶ 23. To establish a cause of action for fraud and deceit under Massachusetts law, a plaintiff must show "that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." *Danca v. Taunton Sav. Bank*, 385 Mass. 1, 8 (1982) (internal quotation marks and citation omitted).

The defendants contend that count II cannot stand because the wrongfulness *vel non* of the termination of the plaintiff depends on whether NSTAR breached the CBA's provisions on discharge, and that determination, in turn, cannot be made except by reference to NSTAR's authority under the CBA.

I agree that count II cannot stand, but not for the reasons asserted by the defendants. The common law claim for fraud and deceit requires that the plaintiff show that *he* relied to his detriment on a false representation of a material fact by the defendants. At best, the complaint can be read only as suggesting that the plaintiff was fired because NSTAR relied on false representations in its decision to terminate the plaintiff. Because the plaintiff did not rely on these representations, he has no claim under Massachusetts common law for fraud, misrepresentation and deceit. Accordingly, count II is dismissed.

3.   Count III: Intentional Interference with Contractual Relations

In count three of the complaint, plaintiff alleges that Whitney interfered with his contractual relationship with NSTAR. Compl. at ¶¶ 24-25.

To state a claim for intentional interference with contractual relations in Massachusetts, a plaintiff must show that: (1) he has a contract with a third party; (2) the defendant knowingly and improperly induced the third party to breach the contract; and (3) the plaintiff's injury was caused by the third party's breach. *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 812, 816 (1990).

There is no question that section 301 also preempts this claim. To decide whether Whitney interfered with plaintiff's contractual relationship with NSTAR, the court must determine whether NSTAR breached its contract with plaintiff. That, in turn, requires a determination whether NSTAR had just cause, under the contract, to terminate Rogers. *See Magerer v. John Sexton & Co.*, 912 F.2d 525, 530-31 (1st Cir. 1990) (concluding that plaintiff's claim for interference with contractual relations is preempted because "the determination of

whether [the third party] induced [the company] to break its employment contract with plaintiff would require the court to decide whether [the company] was entitled to discharge plaintiff under the terms of the collective bargaining agreement").

    4.    <u>Count IV:   Intentional Interference with Advantageous Business Relationships</u>

Count four of the complaint alleges that Whitney wrongfully and intentionally interfered with plaintiff's advantageous relationship. A plaintiff claiming interference with an advantageous business relationship has to show that: (1) it had a business relationship for economic benefit with a third party; (2) the defendant knew of the relationship; (3) the defendant interfered with the relationship through improper motive or means; and (4) the plaintiff suffered a loss of advantage resulting directly from the defendant's conduct. *See Kurker v. Hill*, 689 N.E.2d 833, 838 (Mass. App. Ct. 1998).

This claim presents a close question. At first blush, the only relevance of the CBA to the claim of a tortious interference with an advantageous business relationship appears to be the fact that the CBA is evidence of the existence of that relationship. On closer examination, however, I note that part of the plaintiff's burden is to prove that the offending party, in this case Whitney, interfered with the plaintiff's advantageous relationship with NSTAR through improper motive or means. Article V, §2 of the CBA sets forth the acknowledgment of NSTAR and the Union that they "recognize the responsibility of the employees to comply with reasonable rules, regulations and practices prescribed by the company. Thus, a determination of whether Whitney wrongfully interfered with an advantageous business relationship between the plaintiff and NSTAR might require an interpretation of this provision of the CBA in the light of the conduct of Whitney. It is conceivable that, at the time of the events in question in this case, NSTAR had in place rules,

11

regulations and practices that required Whitney to report to the company her claim of wrongful conduct on the part of the plaintiff.  Indeed, one could imagine that such rules, regulations and practices might create a kind of privilege for the reporting done by Whitney.  On the other hand, I do not have now before me any indication that such rules, regulations or practices exist.  I cannot determine, therefore, whether interpretation of Article V, §2 or any other provision of the CBA would be required to resolve the claim against Whitney of an interference with advantageous business relationship.

The defendants argue that the resolution of this claim necessarily requires an interpretation of NSTAR's authority to discharge an employee under the CBA.  I disagree.  The claim in count IV focuses on the conduct of Whitney.  It is a claim that Whitney, employing improper means or having an improper motive, interfered with the employment relationship between NSTAR and the plaintiff to the plaintiff's disadvantage.  The validity of that claim does not depend on whether NSTAR had a right to discharge the plaintiff, but upon the alleged conduct of Whitney in procuring the discharge by NSTAR.

As to the claim in count IV that Whitney is liable for a tortious interference with an advantageous business relationship of the plaintiff, I cannot say that there exists no set of facts entitling the plaintiff to relief.  Because the plaintiff has sufficiently alleged the claim, the motion to dismiss count IV is denied.

     5.    <u>Count V:  Intentional Infliction of Emotional Distress</u>
             <u>Count VI: Negligent Infliction of Emotional Distress</u>

In counts V and VI of the complaint, plaintiff alleges, respectively, claims of intentional infliction of emotional distress and negligent infliction of emotional distress against the defendants.  The common law claims of intentional infliction of emotional distress and negligent

infliction of emotional distress are both barred by the exclusivity provisions of the Massachusetts Workers Compensation Act. Mass. Gen. Laws Ch. 152, §24; *Doe v. Purity Supreme,* 422 Mass. 563 (1996). Accordingly, both count V and count VI of the complaint are dismissed.

      6.      <u>Count VII: Negligent Breach of Contract Duty</u>

This claim is clearly preempted. The "contract duty" is defined by the CBA. To determine the scope of the "duty" requires an interpretation of the CBA. *See Flibotte*, 131 F.3d at 26 (explaining that section 301 preempts a state law claim that alleges a breach of duties arising under a collective bargaining agreement) (citations omitted). Count VII is dismissed.

      7.      <u>Count VIII: Negligent Misrepresentation</u>

The plaintiff alleges, in count eight of the complaint, that NSTAR failed to exercise reasonable care in relying upon Whitney's false claims against him and in deciding to terminate his employment. Compl. at ¶ 35. To recover on a claim for negligent misrepresentation, the plaintiffs must establish that defendants (i) negligently made a false statement of material fact, (ii) to induce action by the plaintiffs, (iii) on which the plaintiffs relied to their detriment. *See McEneaney v. Chestnut Hill Realty Corp*., 650 N.E.2d 93, 96 (Mass. App. Ct. 1995).

Given these elements of a claim of negligent misrepresentation, it is difficult to see how such a misrepresentation is stated against NSTAR. Missing is the allegation that NSTAR misrepresented a material fact. Missing as well is the allegation that the plaintiff relied on a negligently misrepresented fact. Indeed, the complaint makes NSTAR a victim of an alleged misrepresentation by Whitney. Accordingly, the claim against NSTAR is dismissed.

As to a negligent misrepresentation claim against Whitney, the claim fails because the allegations do not meet the third element of a negligent misrepresentation claim, namely that the

plaintiff relied to his detriment on the alleged misrepresentations. Accordingly, the claim against Whitney in count VIII is dismissed.

8. Count IX: Breach of Employment Contract

In count nine, plaintiff alleges that NSTAR violated the CBA by terminating him. Compl. at ¶¶ 36-40. I need not consider this claim at length. It is beyond cavil that an examination of the breach of employment contract claim requires the court to interpret the terms of the CBA. This claim is preempted and this count is dismissed. *See Flibotte*, 131 F.3d at 26.

9. Count X: Slander and Libel

In count ten of the complaint, plaintiff asserts that "Defendant did knowingly state and publish false statements accusing the Plaintiff of committing a criminal act, which has detrimentally affected his reputation in his work community and makes reemployment extremely difficult." Compl. at ¶ 42. In addition, plaintiff claims that his "permanent employment record is marred by the false allegations made by the defendants and recorded in plaintiff's Personnel file." *Id.*

To state a defamation claim in Massachusetts, a plaintiff must show that the defendants published a false statement about him to a third party that either caused him economic loss or was of the type that is actionable without proof of economic loss. *See White v. Blue Cross & Blue Shield of Mass., Inc.*, 442 Mass. 64, 66, (2004).

This resolution of the defamation claim as to NSTAR thus requires a determination of whether the defendants stated or published Whitney's accusation against Rogers, whether these statements were false, and whether these statements harmed plaintiff. At first blush, such an inquiry appears to be a purely factual one that does not relate to the CBA. *See Hawaiian*

*Airlines, Inc. v. Norris*, 512 U.S. 246, 251-52 (1994) (reemphasizing *Lingle's* holding that a state-based claim involving "purely factual questions" that do not rely on the terms of a collective-bargaining agreement are not preempted by section 301).

But the inquiry is not "purely factual" because the defamation claim requires an examination of the CBA to determine whether it allows NSTAR, in the course of its business, the conditional privilege to publish comments about plaintiff in his "personnel files" or otherwise during the course of the employment. The CBA provides that NSTAR has the right to discipline employees and "to exercise the . . . customary functions of Management in carrying on its business . . . ." CBA, Article V. Whether that result grants NSTAR a privilege to publish its reasons for discharging the plaintiff of necessity requires a determination of such matters as the limits of NSTAR's power to discipline employees and what the CBA means when it refers to NSTAR's right to exercise the "customary functions of management." Thus, the claim is preempted as to NSTAR.

The defamation claim against Whitney, like the claim of interference with an advantageous business relationship, is a close one. However, as I have stated with respect to the interference claim, the claim of defamation may well require some resort to Article V, §2 to determine whether any rule, regulation or practice of the company created a privilege in Whitney to report what she believed to be wrongful conduct of the plaintiff. Because I do not have a set of such rules, regulations and practices of the company now before me, I cannot say that the plaintiff has no possibility of establishing his defamation claim against Whitney on the basis of the facts alleged in the complaint. Accordingly, the claim for libel and slander against Whitney asserted in count X, like the claim against her in count IV, must abide further proceedings in this case. The motion to

15

dismiss count X, insofar as it asserts a libel and slander claim against Whitney, is DENIED. The motion is GRANTED to the extent that it asserts a libel and slander claim against NSTAR.

### IV.  CONCLUSION

For the reasons stated above, the defendants' motion to dismiss is GRANTED in part and DENIED in part. It is granted as to all counts of the complaint, except count IV and count X to the extent that they assert respectively claims for intentional interference with advantageous business relations against Whitney (count IV) and libel and slander claims against her (count X). Accordingly, counts I, II, III, V, VI, VII, VIII, IX are dismissed as to both defendants with prejudice. Count X is dismissed with prejudice to the extent that it purports to assert a libel and slander claim against NSTAR. The claims asserted against Whitney in counts IV and X may proceed. The clerk will set this matter for a scheduling conference.

SO ORDERED.

　　　　　　　　　　　　　　　　　　　　　　　　 /s/ REGINALD C. LINDSAY
　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

DATED:  September 23, 2005