# In The Matter Of:

*Arbitration between NSTAR and*
*Local 369, Utility Workers Union of America*

---

*Grievance: Termination of J. Rogers*
*Vol. 1, February 14, 2002*

*pp. 1-223*

---

*Jones, Fritz & Sheehan*
*A LegaLink Company*
*210 South Street*
*11th Floor*
*Boston, MA  02111*
*(617) 542-0039   or   (800) 822-3376*

*Original File 0214NSTA.TXT, 223 Pages*
*Min-U-Script® File ID: 1270900283*

**Word Index included with this Min-U-Script®**

Rogers 0001

Arbitration between NSTAR and                pp. 1-223                Grievance: Termination of J. Rogers
Local 369, Utility Workers Union of America                                Vol. 1, February 14, 2002

### Page 1

[1] Volume: I
[2] Pages: 1-223
[3] IN THE MATTER OF ARBITRATION BETWEEN
[4] NSTAR
[5] and
[6] LOCAL 369, UTILITY WORKERS' UNION OF AMERICA
[7] AFL-CIO
[8] Hearing Re: P & M Grievance #6296
[9] Termination of Overhead Line Worker, J. Rogers
[10]
[11]          BOARD OF ARBITRATION:
[12]
[13]    Eric J. Schmertz, Chairperson
[14] Lisa Amber, Company Arbitrator
[15] Phillip A. Trombly, Union Arbitrator
[16]
[17]
[18]    The Hilton at Dedham Place
[19] 25 Allied Drive
[20] Dedham, Massachusetts
[21] Thursday, February 14, 2002
[22] 10:00 a.m.
[23]
[24]    Reporter: Lori-Ann London, RPR

### Page 2

[1] APPEARANCES:
[2]
[3]    MORGAN, BROWN & JOY, LLP
[4]    By Keith H. McCown, Esquire
[5]    One Boston Place
[6]    Boston, Massachusetts 02108-4472
[7]    (617) 523-6666
[8]    Appearing for NSTAR
[9]
[10]   SEGAL, ROITMAN & COLEMAN
[11]   By Paul F. Kelly, Esquire
[12]   11 Beacon Street, Suite 500
[13]   Boston, Massachusetts 02108
[14]   (617) 742-0208
[15]   Appearing for Local 369
[16]
[17] ALSO PRESENT:
[18]
[19]   Chris Horn, Steward, Executive Board
[20]
[21]
[22]
[23]
[24]

### Page 3

[1]                    INDEX
[2]                            PAGE
[3] Opening Statement by Mr. McCown      9
[4] Opening Statement by Mr. Kelly      16
[5]
[6] WITNESSES:
[7]    KIMBERLY WHITNEY             20
[8] Direct Examination by Mr. McCown    21
[9] Cross-Examination by Mr. Kelly      76
[10]
[11]   JoANN MURPHY                111
[12] Direct Examination by Mr. McCown   111
[13] Voir Dire Examination By Mr. Kelly  121
[14] Cross-Examination by Mr. Kelly     132
[15]
[16]   WANDA GOLDEN                138
[17] Direct Examination by Mr. McCown   138
[18]
[19]   JAMES McGUIRE               145
[20] Direct Examination by Mr. McCown   145
[21] Cross-Examination by Mr. Kelly     155
[22]
[23]   JAMES ROGERS                181
[24] Direct Examination by Mr. Kelly    181

### Page 4

[1] Cross-Examination by Mr. McCown    190
[2] Redirect Examination by Mr. Kelly   216
[3]
[4]    JAMES McGUIRE (Rebuttal)
[5] Direct Examination by Mr. McCown   218
[6] Cross-Examination by Mr. Kelly     219
[7] _____X
[8]            EXHIBITS
[9] JOINT
[10] NO.                       PAGE
[11]  1   The Contract            7
[12]  2   Issue as read into the record   7
[13]  3A  Letter of 4/6 to Mr. Rogers     8
[14]  3B  Letter of 4/6 to Mr. Sullivan   8
[15]  4A  Letter of 4/25 to Mr. Rogers    8
[16]  4B  Letter of 4/25 to Mr. Sullivan  8
[17]  5   Letter of 5/7 to Mr. Dorant     9
[18]  6   Letter to Mr. Sullivan dated 10/17  9
[19]
[20] COMPANY
[21] NO.                       PAGE
[22]  1   Joint labor management committee  39
[23]      calendar
[24]  2   Notes of discussion with         56

Rogers 0002

Case 1:04-cv-11190-RCL   Document 27-4   Filed 01/10/2006   Page 3 of 10

Grievance: Termination of J. Rogers       pp. 1-223       Arbitration between NSTAR an[d]
Vol. 1, February 14, 2002                                 Local 369, Utility Workers Union of America

### Page 5

| COMPANY | | |
|---|---|---|
| NO. | | PAGE |
| | Detective Cabral | |
| 3 | Call Trace Document | 58 |
| 4 | Employees' names and addresses | 65 |
| 5 | Daily work summary | 69 |
| 6 | Series of e-mails (9 pages) | 73 |
| 7 | E-mail to Nick Gianturco on 1/2 | 74 |
| 8 | E-mail | 75 |
| 9 | Call Trace results | 121 |
| 10 | Investigative notes | 127 |
| 11 | Map of Plymouth | 129 |
| 12 | Phone numbers | 131 |
| 13 | Company records | 144 |
| 14 | Notes Re: Hearing 4/23 | 152 |
| 15 | Code of Conduct | 154 |
| 16 | Weather Record | 209 |

UNION
| 1 | Dismissal from clerk's hearing | 187 |

### Page 6

**PROCEEDINGS**

[3] MR. SCHMERTZ: Did the company have [4] just cause to discharge James Rogers on or about [5] May 18, 2001? If not, what shall be the remedy? [6] All right, stipulated issues.
[7]      Of course, we'll waive the [8] arbitrator's oath, if one is required in [9] Massachusetts.
[10] MR. KELLY: We have never put our [11] arbitrators under oath, nor have I before waived [12] it, but I'm happy to do so.
[13] MR. SCHMERTZ: I come from a [14] jurisdiction that it's required, unless waived. I [15] don't know what Massachusetts law is.
[16] MS. AMBER: I don't believe we have [17] that.
[18] MR. SCHMERTZ: Okay. But if there [19] is one, it's waived.
[20] MS. AMBER: All right, fair enough.
[21] MR. SCHMERTZ: All right.
[22] MR. McCOWN: And we have just a [23] simple background stipulation as well. Maybe you [24] could just read that into the record,

### Page 7

[1] Mr. Arbitrator, that's the only copy I have.
[2] MR. SCHMERTZ: This is a joint [3] stipulation of fact?
[4] MR. McCOWN: Yes.
[5] MR. SCHMERTZ: NSTAR Electric & Gas [6] Corporation is a Massachusetts public utility [7] engaged in electric and gas transmission and [8] distribution. NSTAR was formed by the merger of [9] BEC Energy (Boston Edison) and COM/Energy (COM [10] Electric, COM Gas, Cambridge Electric) in August [11] of 1999.
[12] MR. McCOWN: Thank you.
[13] MR. SCHMERTZ: All right, facts [14] stipulated. Joint 1, Collective Bargaining [15] Agreement — Joint 1, the contract, and Joint 2, [16] the issue as read in the record. Okay, anything [17] else by the way of joint exhibits at this point?
[18] MR. McCOWN: I just have a series of [19] background correspondence, they're letters, and [20] they tend to be in tandem, one to the grievant, [21] one to the union. So I'll hand them out that way. [22] These are letters dated April 6, 2001.
[23] MR. SCHMERTZ: Make them all joint [24] letters — joint exhibits?

### Page 8

[1] MR. McCOWN: Yes.
[2] MR. SCHMERTZ: All right. Is this [3] the same one? (Indicating.)
[4] MS. AMBER: Um-hm.
[5] MR. McCOWN: Did I — they should [6] be —
[7] MR. KELLY: There are two April [8] 6ths, one is to Mr. Rogers and one is to [9] Mr. Sullivan.
[10] MS. AMBER: They go in tandem, so...
[11] MR. SCHMERTZ: Joint 3A, Joint 3B.
[12] The one to Rogers is Joint 3A.
[13] MR. McCOWN: There should be one [14] to —
[15]      (Discussion off the record.)
[16] MR. SCHMERTZ: All right, Joint 3A [17] is the letter of April 6 to Mr. Rogers. Joint 3B [18] is a letter of April 6 to Mr. Sullivan.
[19] MR. McCOWN: Joint 4A I would [20] propose is a letter of April 25th to Mr. Rogers.
[21] MR. SCHMERTZ: Joint 4A, a letter of [22] April 25 to Mr. Rogers.
[23] MR. McCOWN: And Joint 4B I would [24] propose the letter of April 25th to Mr. Gary

Rogers 0003

Case 1:04-cv-11190-RCL   Document 27-4   Filed 01/10/2006   Page 4 of 10

Arbitration between NSTAR and           pp. 1-223           Grievance: Termination of J. Rogers
Local 369, Utility Workers Union of America                 Vol. 1, February 14, 2002

Page 9

[1] Sullivan.
[2] MR. SCHMERTZ: Joint 4B received.
[3] MR. McCOWN: As Joint 5 I would
[4] propose a letter of May 7th to Mr. David Dorant.
[5] MR. SCHMERTZ: Joint 5, letter of
[6] May 7th to Mr. Dorant.
[7] MR. McCOWN: And Joint 6 I would
[8] propose to be a letter of October 17th to Mr. Gary
[9] Sullivan.
[10] MR. SCHMERTZ: So received is Joint
[11] 6.
[12] MR. McCOWN: And that's it by way of
[13] joint exhibits, and as you can see, what that was,
[14] was the paper trail for the processing of the
[15] grievance.
[16] MR. SCHMERTZ: All right. Is that
[17] it on the joint exhibits at this point?
[18] MR. KELLY: I believe so.
[19] MR. SCHMERTZ: Okay. Opening
[20] statements and discharge case. I'll ask the
[21] employer to go forward.
[22] MR. McCOWN: Thank you,
[23] Mr. Schmertz.
[24] The company discharged Mr. James

Page 10

[1] Rogers —
[2] MR. SCHMERTZ: Let me stop you. I'm
[3] sorry. One other preliminary matter, the court
[4] reporter — I assume, I'm sure I don't have to ask
[5] this — I may use the record that is being
[6] produced by the court reporter as the official
[7] record of the proceedings?
[8] MR. McCOWN: Yes.
[9] MR. KELLY: Yes. We'll waive the
[10] oath, if required.
[11] MR. SCHMERTZ: We're not waiving the
[12] record, however. All right. I'm sorry, I
[13] interrupted you.
[14] MR. McCOWN: That's fine.
[15] The company discharged Mr. Rogers
[16] last spring because there was overwhelming
[17] evidence that he had been placing a series of
[18] harassing calls to a female coworker. I'll give
[19] you an overview of what the company's evidence
[20] will show.
[21] Kim Whitney, sitting to my right,
[22] was the victim of the calls. She will testify
[23] that she received a series of five calls at her
[24] desk phone at work. Four out of the five, as

Page 11

[1] you'll see, were very carefully documented in
[2] terms of date and time and substance of the call.
[3] The second of the five calls was actually a little
[4] less carefully documented; that one caught her
[5] more off guard, and she will testify to all of
[6] those facts.
[7] The calls began on August 30th,
[8] 2000, so a year and a half ago basically. That
[9] was call No. 1. The next call came in on
[10] December 5th or 6th, 2000. That, again, was call
[11] No. 2, the one that was not quite as well pinned
[12] down as all the others. The next one came in on
[13] January 2nd, 2001. That was call No. 3. The next
[14] one came in on February 1st, 2001. That was call
[15] No. 4. And, finally, on March 30th, 2001 call
[16] No. 5 came in, again, to her desk phone at work.
[17] The last call, the 5th call, was
[18] electronically traced through the assistance of
[19] the police and the company security department and
[20] the phone company, of course, to Mr. Rogers'
[21] house, his home telephone number, and that, as you
[22] might guess, is the linchpin of the company's
[23] evidence.
[24] Despite the damning evidence of the

Page 12

[1] traced call, Mr. Rogers apparently denies that he
[2] made that call, although we believe the evidence
[3] will show that he has no reasonable explanation as
[4] to how that call got traced to his home number if
[5] he didn't make it.
[6] So starting with that traced call,
[7] since of course that's denied, the company
[8] obviously has to make out a circumstantial case in
[9] spite of that electronic evidence. So here is the
[10] type and the quality of the circumstantial
[11] evidence that the company will present today that
[12] we contend will overcome Mr. Rogers' denial.
[13] First, Ms. Whitney will testify that
[14] the five calls were all quite similar in nature
[15] and content. So we have that last call, the
[16] traced call, being very similar to the earlier
[17] strain; and, thus, she will testify, quite
[18] credibly, that from all signs she could detect the
[19] same person was making all the calls. That's not
[20] all.
[21] Secondly, the company's evidence
[22] through Ms. JoAnn Murphy and Ms. Wanda Golden, who
[23] are sitting at the other end of the table there,
[24] will show that Mr. Rogers had the opportunity to

Rogers 0004

Case 1:04-cv-11190-RCL   Document 27-4   Filed 01/10/2006   Page 5 of 10

Grievance: Termination of J. Rogers          pp. 1-223          Arbitration between NSTAR and
Vol. 1, February 14, 2002                                       Local 369, Utility Workers Union of America

Page 13

[1] make every one of these five calls to Ms. Whitney
[2] at her desk. Four of the five are easy; they were
[3] either on his days off or they were after work,
[4] sufficiently after work, after the end of his
[5] workday, so that Mr. Rogers could be home, even
[6] though Ms. Whitney was at her desk. So they were
[7] either days off or well enough after work that
[8] there was opportunity.
[9]     One call came in during a workday
[10] where Mr. Rogers was out on the job. He's an
[11] overhead line worker. That was that second call,
[12] the one where the date is not entirely certain.
[13] But even as to those two days, December 5th or
[14] 6th, the company will show that there was
[15] opportunity for Mr. Rogers to have made that call
[16] as well. And as to the other four, numbers one,
[17] three, four and five, there's no doubt that
[18] opportunity was there; namely, he wasn't at work.
[19]     So we have the one traced call,
[20] which we contend the evidence will show he can't
[21] explain at all, and then four others that were for
[22] the most part made while he was off work. And I
[23] guess the company asks how coincidental is that.
[24] But that's not all.

Page 14

[1]     Third, the evidence will show that
[2] Mr. Rogers has been unable to provide a reasonable
[3] alibi for his whereabouts shortly after 4:00 p.m.
[4] on March 30th, 2001 when that traced call was
[5] made, the fifth call was made. We believe the
[6] evidence will show there are problems with any
[7] explanations he's provided that undercut his
[8] credibility badly on that day. And that's not
[9] all.
[10]     In this circumstantial web of
[11] evidence that the company has to put forth, there
[12] is the highly suspicious fact that Mr. Rogers
[13] initially claimed that he had an alibi witness for
[14] that March 30th day, who was identified in a
[15] meeting with the company, and who has then never
[16] come forward when the opportunity was presented.
[17] Now, that occurred at the company's internal
[18] disciplinary hearing where there was a break taken
[19] and an opportunity for this witness to come
[20] forward, who did in fact come to the site but gave
[21] the company no testimony or evidence. And that's
[22] not all.
[23]     Fifth, I mentioned that the evidence
[24] will show that any conclusion that this was

Page 15

[1] someone other than Mr. Rogers is simply
[2] unreasonable. The evidence will show that this
[3] was not a random caller, for example, who was
[4] simply calling company phone numbers and bothering
[5] any person that he happened to hit. There were no
[6] other calls of this type made, at least so far as
[7] internal security is aware, during this time
[8] period to other desk phones around the company.
[9]     The evidence will show that the
[10] caller knew Ms. Whitney's name and that the caller
[11] persisted even after Ms. Whitney changed her
[12] internal phone number.
[13]     And, lastly, after that fifth call,
[14] the one that was traced to Mr. Rogers' house
[15] phone, the calls have stopped. So after five
[16] calls in about seven months, there have been no
[17] new calls in the last practically year, 10 to 11
[18] months, since last March 30th.
[19]     So that's an overview of the major
[20] points I think you'll see in the evidence. The
[21] company believes you will see more nuances and
[22] more circumstantial evidence as the testimony
[23] unfolds. But those are the basic components of
[24] the company's case.

Page 16

[1]     We have this rock-hard fact that
[2] there was a call traced to his house at a time
[3] when he was not at work. It closely resembles the
[4] string of earlier calls, most of which were made
[5] when he was not at work. He has no explanation,
[6] we submit, for how that call got traced to his
[7] house — I mean, why. And we have no
[8] substantiated alibi for that call either. So the
[9] company contends that when you've heard all the
[10] evidence, in addition to this broad outline that I
[11] have given, and seen the witnesses, that the
[12] company will have presented just cause for his
[13] termination.
[14]     MR. KELLY: The — the union I guess
[15] disagrees with the characterization that this case
[16] involves overwhelming evidence. What this case
[17] involves apparently is some sort of electronic
[18] evidence that a particular call was placed to the
[19] victim, Ms. Whitney, on March 30th, and they
[20] traced it back to Mr. Rogers' home phone.
[21]     That evidence caused the termination
[22] of a 15-year employee who never had a warning,
[23] never had a suspension, never had any discipline
[24] at all because a call was traced to his phone on

Rogers 0005

Case 1:04-cv-11190-RCL    Document 27-4    Filed 01/10/2006    Page 6 of 10

Arbitration between NSTAR and　　　　pp. 1-223　　　　Grievance: Termination of J. Rogers
Local 369, Utility Workers Union of America　　　　　　　　　Vol. 1, February 14, 2002

Page 17

[1] March 30th.
[2]   Now, the claim here, and I don't —
[3] I don't minimize the effect of whatever happened
[4] to — to the victim, but this — it seems to me
[5] that this is a case of damages making liability.
[6]   There were apparently phone calls
[7] made that were not traced for which Mr. Rogers is
[8] not responsible on dates prior to March 30th.
[9] They caused Ms. Whitney some upset to be sure, but
[10] that's not enough to fire a 15-year employee
[11] because you traced — and I, frankly, have no
[12] explanation for how the trace of a phone call to
[13] Ms. Whitney on March 30th got back to Mr. Rogers'
[14] house, I don't. But that's the evidence. That is
[15] the evidence. And for that — and apparently
[16] nothing was said on the telephone.
[17]   We have all had the opportunity to
[18] pick up the telephone and say, "Hello. Hello.
[19] Whose there?" You know, how long do you wait and
[20] you listen? Well, in this case she waited 15
[21] seconds and hung up. It transpired in the
[22] fullness of time that the number of Mr. Rogers'
[23] telephone showed up on some tracer, and for that a
[24] 15-year employee with no discipline was fired.

Page 18

[1]   So, you know, our view of this
[2] situation is that — is that there was something
[3] happening to Ms. Whitney for a period of time
[4] apparently before March 30th for which the company
[5] had no explanation and the company may have tried
[6] but not succeeded in assisting her, but ultimately
[7] we come down to the fact that a trace showed
[8] Mr. Rogers' home phone on a particular call in
[9] March and for that he was — he was terminated.
[10]   You know the testimony, and I'm
[11] sure, you know, it's happened to me and maybe it's
[12] happened to others as well, you get a phone call
[13] where nobody responds when you say hello, and if
[14] it happens a couple of weeks later, you're going
[15] to say, "Oh, my goodness, it's the same person,"
[16] and the more it happens, the more concerned you
[17] get, but it does happen. And that's what happened
[18] on — that's what happened on March 30th. And if
[19] something happened on any of those other calls, it
[20] wasn't Mr. Rogers, and to say it was because his
[21] phone was the phone that came up on the — on the
[22] trace on March 30th is not good and just cause for
[23] disciplining him.
[24]   To say that he had the opportunity

Page 19

[1] to make the calls, who has the opportunity to make
[2] the calls? We determined on August 30th, the
[3] company will say, that he either was or wasn't at
[4] work; and, therefore, he could have made a call.
[5] Well, so could everybody else, whether they were
[6] at work or not, have made a call on August 30th
[7] and December 5th or 6th, whichever it was. He had
[8] an opportunity to make a call because he was or
[9] was not at work. That doesn't — that's not
[10] evidence. That's just saying anybody in the world
[11] could have made the phone call on December 5th,
[12] except somebody who was, you know, physically
[13] incapable of making a call.
[14]   So I don't — I don't — I don't see
[15] the — the argument that — that the grievant
[16] happened to be at work on the 5th of December or
[17] on the 6th of February, whatever the dates are, or
[18] he wasn't. I mean, that's not evidence that shows
[19] that you should be firing this man.
[20]   Whether these are — whether these
[21] are random or not we don't know, we don't have any
[22] explanation for them, but we don't feel as though
[23] Mr. Rogers should have the burden of defending
[24] whatever happened on days when there is absolutely

Page 20

[1] no evidence that he did anything. And so we view
[2] this as — as getting the evidence of the
[3] March 30th trace and piling everything that
[4] happened before that on Mr. Rogers' shoulders and
[5] saying to the victim, "We've taken care of you.
[6] We fired the guy." And we don't think at the end
[7] of this case you will be persuaded that the
[8] evidence supports the termination of a 15-year
[9] employee with a clean record.
[10]   MR. SCHMERTZ: All right. Ready for
[11] testimony?
[12]   MR. McCOWN: Yes. Can we just take
[13] a short break?
[14]   MR. SCHMERTZ: Certainly.
[15]   (Off record.)
[16]   MR. SCHMERTZ: Would you please
[17] stand and raise your right hand?
[18]   (KIMBERLY WHITNEY, Sworn.)
[19]   MR. SCHMERTZ: Your full name to the
[20] reporter, please.
[21]   THE WITNESS: Kimberly Whitney.
[22]   MR. SCHMERTZ: And make sure we can
[23] hear what you say, at least the reporter has got
[24] to.

Case 1:04-cv-11190-RCL   Document 27-4   Filed 01/10/2006   Page 7 of 10

ievance: Termination of J. Rogers   pp. 1-223   Arbitration between —
l. 1, February 14, 2002   Local 369, Utility Workers Union of America

Page 21

DIRECT EXAMINATION
BY MR. McCOWN:

Q: Who's your employer, Ms. Whitney?
A: NSTAR Electric & Gas Company.
Q: And what's your current position?
A: I'm currently the field services supervisor for the Cape and Vineyard.
Q: And what are your duties and responsibilities?
A: I oversee the operations of the meter readers and collectors on the Cape and Martha's Vineyard.
Q: And briefly what's your job history?
A: In 1979 I was hired into COM Gas in Southborough, worked there for five years. In the middle of 1984 I had my first son and left the company to raise my family. After relocating to Southeastern Mass., I was rehired back into the company on the COM Electric side as a meter reader for the Cape and Vineyard in 1988. One year later I was promoted into a management position in human resources, then held various jobs starting with payroll and benefits and working my way up through personnel coordinator, labor relations

Page 22

[1] administrative work.
[2]    We merged with Boston Edison in
[3] August of '99, and shortly after that I became —
[4] I had a combined function of employee and labor
[5] relations consultant, and in May of 2001 I went to
[6] the field services job on the Cape.
[7]    Q: All right. So during the period in
[8] which these telephone calls were made which I
[9] mentioned in my opening, so that's August of 2000
[10] through March of 2001, you were working in the
[11] employee and labor relations consulting position;
[12] is that right?
[13]    A: Correct.
[14]    Q: Where was the work location of that
[15] position?
[16]    A: We were — we were located in the
[17] Wareham building due to the fact that it was
[18] centrally located to the three districts that we
[19] covered, New Bedford, Plymouth, and the Cape.
[20]    Q: And the Wareham building is an office
[21] facility, correct?
[22]    A: Yes, office.
[23]    Q: And your current office is in
[24] Yarmouth —

Page 23

[1]    A: Correct.
[2]    Q: — is that right?
[3]    Okay. What I'd like you to do is
[4] before we move to each of the five calls
[5] individually, I'd like you to give a general
[6] description of the five phone calls that began in
[7] August of 2000 and ended in March of 2001.
[8]    MR. KELLY: I guess I would object.
[9] If the — if the witness is going to testify about
[10] phone calls, I don't — I don't think it's
[11] helpful, in fact I think it hurts, it's
[12] prejudicial, to say I'm going to talk about all
[13] five of them.
[14]    There were five calls. The company
[15] is trying to — is trying to ultimately show, as I
[16] understand it, that the five phone calls are from
[17] the same person. I'd like to hear about each one
[18] of them, because I think it's for you, not for the
[19] company or for the witness, to conclude that
[20] there's something the same about all five of them.
[21] So we can — the question — the question, as I
[22] understood it, was tell us about all five phone
[23] calls rather than tell us about any individual
[24] one.

Page 24

[1]    Frankly, I think the evidence in
[2] this case ought to be limited to the fifth phone
[3] call, because that's the one that the company
[4] asserts Mr. Rogers made, and if that one bears a
[5] similarity to the other ones, then, you know, you
[6] can decide whether to go there or not, but I guess
[7] I object to the proposition to testify about all
[8] five of them.
[9]    MR. McCOWN: I think it's fair, and
[10] I can ask it a different way, to have the witness
[11] at least establish whether or not there were
[12] similarities between the five calls as a general
[13] matter.
[14]    MR. SCHMERTZ: Why don't you ask her
[15] that —
[16]    MR. McCOWN: Fine.
[17]    MR SCHMERTZ: — and I'll allow
[18] that, if that's what you're seeking from her —
[19]    MR. McCOWN: Yeah.
[20]    MR. SCHMERTZ: — similarities
[21] amongst the five, and she may testify as to
[22] whether she thinks there were similarities and
[23] what they were.
[24]    MR. McCOWN: And I assure you we

Rogers 0007

Jones, Fritz & Sheehan

Case 1:04-cv-11190-RCL   Document 27-4   Filed 01/10/2006   Page 8 of 10

Arbitration between NSTAR and                pp. 1-223              Grievance: Termination of J. Rogers
Local 369, Utility Workers Union of America                          Vol. 1, February 14, 2002

Page 25

[1] will go through each call —
[2]   MR SCHMERTZ: I'm sure you will.
[3]   MR. McCOWN: — as best the witness
[4] can recall.
[5]   MR. SCHMERTZ: So why don't you
[6] modify your question.
[7]   Q: All right. So before we go through
[8] each call, were there any factors or patterns that
[9] you witnessed or heard that ran among all five
[10] calls?
[11]   A: All five of the calls were made to me
[12] in the Wareham building. Each one of the phone
[13] calls resembled the next with the fact that they
[14] were — they involved heavy, rapid, and escalating
[15] breathing, some whispering of my name and of words
[16] that I couldn't make out. The person basically
[17] made sure that he was never —
[18]   MR. SCHMERTZ: Not made sure. Just
[19] tell us what you think the similarities were.
[20] Made sure is your conclusion.
[21]   A: The person on the other end of the
[22] phone never identified himself but had the same
[23] breathing and muttering, mumbling of words going
[24] on in the background.

Page 26

[1]   Q: And was there any noticeable background
[2] noise with any of the calls, such as where you
[3] might be able to take a guess at where the call
[4] was being made from, that sort of background
[5] noise?
[6]   A: There was no background noise with
[7] respect to traffic or radio or TV running or
[8] anything like that. There was no background noise
[9] along those lines at all in any of them.
[10]   Q: Okay. Let's — let's go now through
[11] the calls. We'll just go straight through the
[12] five calls and what you can recall about each one.
[13] Why don't you start with the August 30th, 2000
[14] call. And let me ask you first, how do you know
[15] it was August 30th, 2000?
[16]   A: Because I — I documented — I
[17] documented all of the calls to the best of my
[18] ability with either e-mails, I wrote notes, the
[19] phone calls I made.
[20]   Q: Okay. So what happened on the
[21] August 30th call?
[22]   A: On August 30th I was in my office in
[23] Wareham doing paperwork. About 9:30 in the
[24] morning the phone rang, and I answered the phone

Page 27

[1] in my usual, "Good morning. Kim Whitney," and the
[2] voice from a male caller on the other end in a
[3] whisper was, "Hi, Kim. How you are you?"
[4]   MR. SCHMERTZ: Excuse me, I can't
[5] hear you.
[6]   MR. McCOWN: She was imitating the
[7] whispering for the record.
[8]   MR. SCHMERTZ: I understand that,
[9] and I want the reporter to note that you're
[10] answering with a whisper that you say you heard —
[11]   THE WITNESS: Okay.
[12]   MR SCHMERTZ: — but I want to hear
[13] the words.
[14]   A: His response was, "Hi, Kim. How are
[15] you?"
[16]   MR. SCHMERTZ: "Hi, Kim. How you
[17] are?"
[18]   THE WITNESS: Um-hm.
[19]   MR SCHMERTZ: Um-hm.
[20]   A: And I said — I whispered back —
[21] thinking that it was one of my male coworkers
[22] kidding around with me, I whispered back and I
[23] said, "Fine. Who's this?" And there was no
[24] response, but I could — I could hear the person

Page 28

[1] on the other end breathing into the phone. Not
[2] thinking too much of that, I figured that maybe he
[3] didn't hear me whispering back, so I repeated it,
[4] and said — I whispered back and I said, "Who's
[5] this?" And there was still no response, but I did
[6] hear the breathing which sounded as if it was —
[7] the phone may have been like tucked under his
[8] chin, it was that close, so I couldn't understand
[9] why he wouldn't respond because I could hear him.
[10] So I again said in a whisper, "I can't hear you."
[11]   And at that time the breathing was
[12] growing heavier, and I started hearing this
[13] mumbling of words in a whisper along with the
[14] breathing. So I responded again in a whisper, but
[15] a little bit louder. I said, "I still can't hear
[16] you," still hoping that it was somebody that I
[17] knew.
[18]   As the breathing continued and this
[19] muttering, whispering of words went on, I
[20] immediately felt uncomfortable. I knew that the
[21] call had gone on too long at this point. If it
[22] were a friend, a coworker, they would have
[23] identified themselves at this point. So I
[24] responded in a real voice and I said, "Who's

Rogers 0008

Case 1:04-cv-11190-RCL    Document 27-4    Filed 01/10/2006    Page 9 of 10

Grievance: Termination of J. Rogers    pp. 1-223    Arbitration between NSTAR and
Vol. 1, February 14, 2002              Local 369, Utility Workers Union of America

Page 29

[1] this?" And there was no answer but I could hear
[2] the breathing getting louder and I immediately was
[3] totally uncomfortable and I said, "If you don't
[4] tell me who you are right now, I'm going to hang
[5] up."
[6]     And at that point he responded back
[7] in a very breathy, gaspy-type whisper and said,
[8] "No, Kim, don't hang up now," and I immediately
[9] slammed the phone down and sat there for a second
[10] trying to collect my thoughts and think about what
[11] had just taken place.
[12]    I got up from my desk. I knew my
[13] boss, Joe Roda, was in his office next door, so I
[14] walked around the corner into Joe's office and
[15] closed the door behind me and sat down, and Joe
[16] looked at me and said, "What's the matter?" And I
[17] said, "I just got a very upsetting phone call. I
[18] can't believe the phone call I just got." And he
[19] said, "What's the matter?" And I said, "I just
[20] had an obscene phone call." And he said, "Oh,
[21] come on. How" — "you know, an obscene phone
[22] call?" I said, "Well, I know it was an obscene
[23] phone call, Joe."
[24]    I explained to him what had taken

Page 30

[1] place. I said it went way beyond the comfort
[2] level and there was a lot of heavy breathing that
[3] was not an unnatural heavy breathing. It was
[4] definitely heavy breathing as though somebody had
[5] just run a mile or upstairs or something, and I
[6] was — I told him that the person never identified
[7] themself and that, you know, he knew my name but
[8] that I didn't know — I didn't know who it was.
[9]     So we sat and tried to figure out —
[10] because of the fact that, you know, I do
[11] disciplinary hearings and go to grievances and do
[12] termination cases in my job, we started scanning
[13] our minds for the possibility that there was
[14] somebody that I had dealt with in an investigation
[15] or any form of labor-type case that was angry with
[16] me. And I said, "But somebody that was angry with
[17] me — I can't imagine somebody that was angry with
[18] me that would do something like this."
[19]    And then he said, "Well" — he just
[20] tried to — we tried to figure out who it was.
[21] Then Joe said, "Well, maybe it was just a random
[22] call, maybe he said your name twice because you
[23] answered the phone, 'Kim Whitney,' but," he said,
[24] "why don't we call the switchboard and find out if

Page 31

[1] the call came through the switchboard, and that
[2] will help us determine whether it was somebody who
[3] knew you by name."
[4]    So I picked up his phone and I
[5] called the switchboard operator there in Wareham.
[6] Nancy answered the phone. I said, "Hi, Nancy." I
[7] said, "This is Kim Whitney." I said, "Have any
[8] calls come through for me this morning?" And I
[9] just left it open and without a time frame,
[10] because really only a few minutes had passed since
[11] this had happened. And she said, "I got a call
[12] about ten minutes ago from a gentleman asking for
[13] your extension, I gave it to him, and then he
[14] asked me to put him through to you." So I said,
[15] "Okay, thank you." And there were no other phone
[16] calls that I had received anywhere inside that
[17] time period other than that call. So we realized
[18] that it was obviously that person; they knew me by
[19] name.
[20]    Joe said, "The best thing for you to
[21] do right now is to contact Nick Gianturco, who is
[22] the head of NSTAR security, and let him know
[23] what's going on," which I did. I picked up the
[24] phone, I called Nick, explained to him what had

Page 32

[1] happened. He basically — I went through the
[2] whole thing with him the way Joe and I had, told
[3] him the switchboard operator had confirmed that a
[4] male caller had asked for me about the time that
[5] that call came through, and we started talking
[6] about the phone system and could there possibly be
[7] a trace or some way of finding out through the
[8] company records if there was any way of
[9] determining where the phone call came from.
[10]    I explained to Nick that it was an
[11] old truncated phone system that we had in Wareham
[12] central; that at one time we were able to trace
[13] calls; but that I would get in touch with Mary Lou
[14] Segreve in telecommunications to find out if
[15] somebody could possibly look into that.
[16]    Q: When you say a truncated phone system,
[17] can you explain that for the arbitrator?
[18]    A: We had a toll-free 1-800 number that
[19] basically if you called that it allowed you to
[20] punch in somebody's extension when the prompt came
[21] up or if you stayed on the line, it would go
[22] through to the call center rep. There was also
[23] the main Wareham number that was a local number,
[24] that if you called that it would come up to — it

Rogers 0009

Case 1:04-cv-11190-RCL   Document 27-4   Filed 01/10/2006   Page 10 of 10

Arbitration between NSTAR and
Local 369, Utility Workers Union of America

pp. 1-223

Grievance: Termination of J. Rogers
Vol. 1, February 14, 2002

Page 33

[1] would allow you to punch in a four-digit extension
[2] just as the 800 number did, but if you didn't
[3] punch in an extension, it would come up to the
[4] switchboard operator and she would direct the call
[5] from that point.
[6]   Q: So in other words, the calls that got
[7] to your desk had to come through a single number
[8] originally — I'm sorry — either the 800 number
[9] or the non-800 number. All incoming calls came
[10] through those two lines —
[11]   A: Right.
[12]   Q: — and then they were distributed
[13] individually internally only?
[14]   A: Right. Exactly.
[15]     So I began the process of calling
[16] telecommunications and asking them if they could
[17] possibly go back to this 9:30 phone call that had
[18] come in that morning and if they could find out if
[19] there was a possibility that we could find out
[20] where the call came from. In the meantime Nick
[21] asked me to write a detailed report on the phone
[22] call and to e-mail it to him, which I did.
[23]     The other thing that came up with
[24] telecommunications, when I got a call back from

Page 34

[1] one of the people in voice operations, I explained
[2] to them that I had a desktop phone that didn't
[3] have any display on it, it was just a single-line
[4] phone, and I mentioned to them that there was a
[5] digital analog phone in a vacant office two doors
[6] down from mine and, you know, if there was some
[7] way we could have that phone switched out with
[8] mine. The only benefit of having that would be if
[9] the call came in — if another call came in and if
[10] it was a phone call that was made from within the
[11] Wareham building, it would come up with a
[12] four-digit extension from that phone in the
[13] building. Other than that, it would come up with
[14] this five-digit truncated number. It was a series
[15] of 708-10 or 11 or whatever, that didn't give you
[16] any indication as to where the call was being made
[17] from outside that building, whether it was from a
[18] pay phone, whether it was from a cell phone,
[19] whether it was from the New Bedford office. It
[20] would come through as that seven-digit number that
[21] wouldn't help you identify where it came from,
[22] but, nevertheless, it was one step towards having
[23] something if another call came through that would
[24] help me make some determination.

Page 35

[1]   Q: Okay. So the bottom line here is that
[2] it was impossible actually to trace calls from
[3] your phone extension the way the setup currently
[4] existed in August of 2000, right?
[5]   A: Yes. Peter Dolan got back to me and
[6] told me it was impossible to do that; that at one
[7] time they could, but they didn't have that
[8] technology in place any longer.
[9]   Q: And the best you could do was get a
[10] digital display that would show only internal
[11] extension numbers but wouldn't give you any
[12] information —
[13]   A: Correct.
[14]   Q: — about outside calls?
[15]   A: Yes, internal in that building.
[16]   Q: Okay. The next call was either
[17] December 5th or 6th, 2000, I believe. Could you
[18] describe that and why it is you're not necessarily
[19] positive as to which day it was.
[20]   A: Towards the end of the year, the three
[21] BUW locals that represented the Cape, New Bedford
[22] and Plymouth were in the process of merging into
[23] the UWUA Local 369. Everyone from HR, employee
[24] and labor relations people, were given assignments

Page 36

[1] to facilitate meetings for the different
[2] departments in the south to try to facilitate — I
[3] mean to try to come up with work practices that
[4] were going to have to change to, you know, mirror
[5] 369 work practices and job descriptions. There
[6] was a lot of work going on.
[7]   Q: Let me ask, for the arbitrator's
[8] benefit you might want to explain the merger of
[9] the company caused issues with respect to the
[10] local union as well.
[11]   A: Right.
[12]   Q: Just so he understands the setting that
[13] you're talking about, could you explain it?
[14]   A: When the COM/Energy system merged with
[15] Boston Edison, Boston Edison had Local 369 and 387
[16] at the time. COM Electric or COM Gas had Local
[17] BUW 333, 339 and 338.
[18]   MS. AMBER: Right.
[19]   A: Out of sight, out of mind. Sorry.
[20]     And because of that, it made it very
[21] difficult to manage all those different labor
[22] contracts, and it made sense for them all to be
[23] under one umbrella. So Local 369 incorporated 387
[24] into their 369 umbrella, and the three BUWs did

Rogers 0010