Case 1:04-cv-11190-RCL   Document 27-5   Filed 01/10/2006   Page 1 of 10

Grievance: Termination of J. Rogers  
Vol. 1, February 14, 2002  
pp. 1-223  
Arbitration between NSTAR and  
Local 369, Utility Workers Union of America

Page 37

[1] the same, and we basically tried to make it work
[2] for each one of the departments.
[3]   Q: And this caused considerable activity
[4] in your job as an employee and labor relations
[5] consultant, correct?
[6]   A: Yes. We had a lot of work. Maureen
[7] Cheesman and I were both assigned to the clerical
[8] committee, and we had a lot of work with
[9] individuals from the three locals down south and
[10] members of 387, 369 to try to identify what all
[11] the differences were in the job duties according
[12] to their job titles and try to somehow meld them
[13] all into some form of workable job description and
[14] to reclassify every one of these clerks from, you
[15] know, Plymouth, New Bedford, and the Cape into the
[16] same job title that 369 people held.
[17]   Q: Okay. Now, in that setting how do you
[18] recall that the next call was December 5th or 6th
[19] of 2000?
[20]   A: Maureen and I had two of these clerical
[21] committee meetings back to back. One — the first
[22] one was on December 5th; the second one was on
[23] December 6th. There was a lot of preparation
[24] going into these two meetings. There was a lot of

Page 38

[1] information that needed to be gathered once we got
[2] into them, and —
[3]   Q: Okay. Let me stop you there, and ask
[4] if you can identify this document.
[5]   (Document exhibited to witness.)
[6]   A: This is the joint labor management
[7] committee calendar that we used to schedule all of
[8] the different departments, and it names the dates
[9] and the facilitators, both facilitators, with the,
[10] you know, the BUW person that would be
[11] representing for the union on these days.
[12]   Q: Okay. Now, at the top there's dates in
[13] the gray spaces, correct?
[14]   A: Um-hm. Yes, there are.
[15]   Q: And that shows down at the bottom under
[16] clerical your name and Maureen Cheesman?
[17]   A: Correct.
[18]   Q: And the times for meetings on
[19] December 5th and 6?
[20]   A: Yes.
[21]   Q: Okay.
[22]   A: And these meetings were held in the
[23] Wareham building in a conference room three floors
[24] above mine.

Page 39

[1]   MR. McCOWN: I'd like to introduce
[2] this as Employer's Exhibit 1.
[3]   MR. KELLY: No objection.
[4]   MR. SCHMERTZ: Okay. Company 1 —
[5]   MR. McCOWN: Company 1.
[6]   MR. SCHMERTZ: — received.
[7]   Q: All right. Could you describe the
[8] telephone call in question at this point in time?
[9]   MR SCHMERTZ: I'm not sure you
[10] answered as to whether it was the 5th or 6th and
[11] why you did not know —
[12]   MR. McCOWN: Oh, that's a —
[13]   MR SCHMERTZ: — and why you did not
[14] know which day it was.
[15]   MR. McCOWN: That's incorporated in
[16] my question, but you might not have understood
[17] that.
[18]   MR. SCHMERTZ: I was waiting for
[19] that. You were busy on both days and there were
[20] meetings on both days, so the call came in at some
[21] point —
[22]   THE WITNESS: Right.
[23]   MR. SCHMERTZ: — but you don't
[24] remember which day it was; is that your point?

Page 40

[1]   A: We were up — no, I don't remember
[2] exactly which day it was, but I do recall that —
[3] I believe that it was December 6th due to the fact
[4] that we were trying to gather as much information
[5] as we could before we broke so that the next time
[6] we met two weeks later we'd have our Ts crossed
[7] and our Is dotted, and when this call, the second
[8] call, came in, I left the meeting room, and this
[9] was just before we were breaking for lunch, so it
[10] was, you know, between 11:30 and 12:30 in the
[11] morning, afternoon. I left the meeting room, went
[12] down three floors to my office to pick up
[13] something else that, you know, was obviously
[14] pertinent to the meetings, and somebody came into
[15] my office, spoke to them for a minute or two.
[16] Just as they were — they were leaving, I was
[17] getting up to go back to the meeting room, and the
[18] phone rang. I reached over and answered the phone
[19] in my usual, you know, "Good morning. Kim
[20] Whitney."
[21]   The response back was no response.
[22] It was breathing and this same muttering,
[23] whispering, muttering that I couldn't make out the
[24] words that he was trying to say, but the minute I

Rogers 0011

Case 1:04-cv-11190-RCL    Document 27-5    Filed 01/10/2006    Page 2 of 10

Arbitration between NSTAR and
Local 369, Utility Workers Union of America

pp. 1-223

Grievance: Termination of J. Rogers
Vol. 1, February 14, 2002

Page 41

[1] answered it and heard that, I immediately knew
[2] that this was the same person that had called me
[3] three months before this.
[4]  Q: Okay. How long did this call go on or
[5] how long did you listen?
[6]  A: I didn't listen very long on this one.
[7] I hung up immediately because I was a little taken
[8] back that the call — that I was actually getting
[9] another call. I hadn't forgotten the first one,
[10] but I had been so busy that I just put it out of
[11] my mind, and when the call came through, I
[12] immediately knew who it was by the breathing and
[13] the noise that was — that came along with it.
[14]  Q: Now, did the caller say your name
[15] during this call?
[16]  A: Yes, that was the only thing that I
[17] heard through — through this whispering, these
[18] utterances, that was the only thing that I heard,
[19] was my name was being repeated to the beat of the
[20] breathing, and that upset me. I slammed the phone
[21] down, looked at the phone, and realized at that
[22] point that telecommunications had never changed-
[23] out the phone. So I had — I hadn't received the
[24] digital analog phone from Joelle's office that I

Page 42

[1] had asked for.
[2]  Q: And, again, that would have only shown
[3] whether it was an internal extension within the
[4] building, right?
[5]  A: That's right. But it still would have
[6] been one more step that Nick Gianturco wanted me
[7] to take. So not having that information because
[8] the phone wasn't installed, I don't remember ever
[9] calling Nick. I did pick up the phone and call
[10] telecommunications right away and told them that
[11] — I reminded them that back in September I had
[12] asked for this phone to be installed, and they
[13] apologized, and I said, "And I need the phone
[14] done" — "I need this done before the end of the
[15] day today," and they did that. They came back and
[16] somebody from Williams Communication came in,
[17] changed the phone over so that I now had this
[18] digital analog phone on my desk.
[19]  Q: Okay. And what is it that makes you
[20] think that it was more likely to be the 6th than
[21] the 5th of December?
[22]  A: Because we were — we had already
[23] gotten through the — the beginning of all of
[24] these job descriptions. I remember there was now

Page 43

[1] a lot of work that the union was going to have to
[2] do to sit and look at employee records and try to
[3] come up with the same thing that we saw, and we
[4] had piles and piles of paper on this long
[5] conference room table that we had accumulated over
[6] the course of these two days that they had
[7] supplied and that we had supplied and it was all
[8] there, and there was a — there was a lot of work
[9] that had been done.
[10]   And Maureen and I — I remember
[11] sitting down next to Maureen when I went back up
[12] to the room, and she even asked me, "Gee, I
[13] thought you had" — but kidding with me — "I
[14] thought you had gone to lunch." And I said, "No,
[15] I just got a very strange phone call," and I left
[16] it at that, but she knew that something was wrong,
[17] so I didn't mention anything to her because Nick
[18] had asked me not to talk to anybody about it, so I
[19] didn't mention it to anybody.
[20]  Q: Okay. Was the next call January 2nd,
[21] 2001?
[22]  A: Yes.
[23]  Q: Okay. Oh, by the way, did you document
[24] the — I'm sorry, let's back up. Did you document

Page 44

[1] that December 5th or 6th call to the degree you
[2] did with others?
[3]  A: No, they were — they were phone calls.
[4] It was — I had just picked up the phone and
[5] called the help desk and got through to voice
[6] operations.
[7]  Q: You mean your reaction was to make
[8] phone calls?
[9]  A: Right, and I jumped right back into the
[10] meeting, and when I came back and the phone was
[11] installed, you know, I went about my business. I
[12] don't — I don't recall having documented that
[13] one.
[14]  Q: Okay. Now, let's move to the January
[15] 2nd, call. What happened this time?
[16]  A: January 2nd it was — it was quiet; it
[17] was the first day back after the long holiday
[18] weekend. Joe and I were the only labor people,
[19] employer relations people in the office that day.
[20] We were doing paperwork. I take a late lunch
[21] every day. I had just gotten back from lunch. I
[22] sat down at my desk and the phone rang, it was
[23] about 2:00, 2:05 in the afternoon, and I answered
[24] the phone, "Good afternoon. Kim Whitney." And it

Rogers 0012

Case 1:04-cv-11190-RCL   Document 27-5   Filed 01/10/2006   Page 3 of 10

Grievance: Termination of J. Rogers  pp. 1-223  Arbitration between NSTAR and
Vol. 1, February 14, 2002            Local 369, Utility Workers Union of America

Page 45

[1] was — again, there was no verbal response to my
[2] greeting. There was that very recognizable heavy
[3] breathing, rapid heavy breathing going on in the
[4] back. I immediately knew who it was. I knew — I
[5] recognized the breathing. I didn't know who it
[6] was, but I certainly recognized the caller by what
[7] I was hearing.
[8]   MR. KELLY: I guess — I guess I'd
[9] move to strike that portion of the answer. I mean
[10] what — I think it's helpful to hear what she
[11] heard, but the conclusions she drew from what she
[12] heard I don't think are evidence.
[13]   MR. McCOWN: I think — you can call
[14] it conclusions, but I think she is allowed to say
[15] that in her opinion it resembled the earlier
[16] calls.
[17]   MR SCHMERTZ: It's her opinion —
[18]   MR. McCOWN: It's opinion evidence,
[19] but —
[20]   MR. SCHMERTZ: — and she did
[21] testify earlier about what she considered to be
[22] similarities amongst the five calls, and so she is
[23] particularizing what she considered to be
[24] similarities. Whether they were or whether

Page 46

[1] they're not may be a matter of argument, but I'm
[2] going to allow her to testify to it.
[3]   You say you recognized the same —
[4]   A: I immediately recognized the — the
[5] caller on the other end as far as the breathing
[6] and this guttural noise that was being made. I
[7] tried to listen to see if there was anything in
[8] the background that would help me figure out who
[9] this was, where it was coming from. I listened
[10] and tried to listen beyond what I was hearing to
[11] find out if there was traffic noise, if there was
[12] anything.
[13]   MR. SCHMERTZ: Now, you earlier
[14] testified that on all of them there was no
[15] background noise.
[16]   A: Right, but this was the first one that
[17] I finally said to myself I had to get brave and
[18] start listening.
[19]   MR. SCHMERTZ: You would try.
[20]   A: Right. So I listened — I listened for
[21] as long as I could, until this breathing that was
[22] heavier than usual, more rapid, more escalated
[23] turned into a gasping sound, and I slammed the
[24] phone down and immediately picked up the phone,

Page 47

[1] called Nick Gianturco, explained to him that I had
[2] just had another call.
[3]   Nick asked me, "This the second
[4] call, right?" And I said, "No, this was the
[5] third," and he said — that's how I realized that
[6] I didn't tell him about the second one. And I
[7] said, "This is the third one. The second one took
[8] place while I was doing the joint clerical
[9] meetings back in December and I didn't call you
[10] about it because the phone had never been
[11] installed. I had immediately picked up the phone
[12] and called voice operations and had them come and
[13] install the phone. I realized we weren't going to
[14] have any more information than we did on the first
[15] call until that phone was put in."
[16]   So Nick asked me, "Okay, the phone
[17] was put in. Now, what happened with the call;
[18] what did it show on the display?" And I told him
[19] it just showed that five-digit random truncated
[20] number that gave you no information at all as to
[21] where it came from.
[22]   Q: Except that it was an outside call?
[23]   A: Except that it was outside the
[24] building, right, which meant that it could have

Page 48

[1] been anybody in another building, anywhere
[2] outside, a pay phone it could have been.
[3]   So he said, "All right." He went
[4] through this whole thing with the series of
[5] truncated five-digit numbers. He worked with
[6] telecommunications. I had actually written down
[7] the five-digit number that I saw. We did a bunch
[8] of tests from outside the building to see if there
[9] was any similarity. If somebody called from New
[10] Bedford, would it come up 703-10; if they called
[11] from Plymouth, would it come up 705-20, whatever;
[12] and there was no way of determining.
[13]   So at that point I told Nick that I
[14] had had enough; that it was upsetting; I couldn't
[15] deal with it anymore; and that it was affecting my
[16] life, my family life, my — at work I wasn't
[17] staying to work longer hours because I wanted to
[18] be out of the building before it got dark.
[19]   MR. McCOWN: Do you need a break?
[20]   MR. SCHMERTZ: Take a moment. Maybe
[21] you want a glass of water.
[22]   MR. McCOWN: Do you want to take a
[23] break or do you want to go on?
[24]   THE WITNESS: No, I'm all right. I

Rogers 0013

**Page 49**

[1] just want a glass of water.
[2]     (Pause.)
[3]     A: I asked Nick if we couldn't put a
[4] direct outside line in, because I knew that Joe
[5] Sullivan, who did the employee assistance program,
[6] had an office that had a direct outside line for
[7] confidentiality. And I said, "And obviously we
[8] can't trace a call that comes in here because it's
[9] truncated and there's just no way of following it
[10] to my phone," and he agreed.
[11]     He said, "We'll" — "we'll get
[12] telecommunications" — he took care of it. He had
[13] voice operations contact Verizon. They came in
[14] January 11th or 12th, it was within the next two
[15] weeks, and installed a direct outside line, gave
[16] me this new phone that had a digital — a Caller
[17] ID display on it, it had volume controls. It
[18] was — it was — it was a fancy phone, and I left
[19] my — my old phone, the extension 3581 phone, on
[20] my desk, and on the message for the voice mail, if
[21] anybody called through on that 3581 extension,
[22] they would hear me in a recording say, "This is
[23] Kim Whitney from human resources. If you'd like
[24] to contact me, you can reach me at my new number

**Page 50**

[1] (508) 273-0145."
[2]     The thought was that if this person
[3] is — if this is going to be ongoing and the
[4] person's going to insist on going through this,
[5] that he would probably hear that on my recording
[6] and call that number. I said, "Okay. Can we get
[7] the Call Trace installed now, too?" And he said,
[8] "No, let's wait and see first if he calls." So —
[9]     Q: He, you're talking about Mr. Gianturco
[10] the head of security at this point?
[11]     A: Mr. Gianturco said, "Let's wait and see
[12] if he swallows the hook," as he put it, "and
[13] calls, goes that one step further and calls this
[14] number too." So I said, "All right."
[15]     Q: All right. The next call was
[16] February 1st of 2000?
[17]     A: The next call was February 1st.
[18]     Q: What happened on this occasion?
[19]     A: It was later in the day. It was around
[20] 4:00, 4:15 — 4:16 in the afternoon actually,
[21] because now that I had the call display, it gave
[22] me the time and the date. I was getting ready to
[23] leave. It was — as I said before, I didn't stay
[24] too much longer than 4:00 or 4:30 at that time.

**Page 51**

[1] The call came in, and I immediately looked at the
[2] call display, which I now had gotten into the
[3] habit of doing, and the display read "private
[4] caller."
[5]     Q: Had you ever seen that before?
[6]     A: No, which I hadn't ever seen before on
[7] any of the calls. I answered the phone and
[8] immediately there was no response, but I
[9] immediately recognized the sound of the breathing.
[10] I don't recall that he said anything to me in that
[11] call. It was just the breathing.
[12]     Nick had also asked me that if this
[13] guy calls through again try to pick up background
[14] noise. You have a volume control now. Maybe by
[15] hitting the volume control you'll be able to get
[16] more detail from the background.
[17]     So I remembered that and I basically
[18] just said hello again to get him to think that I
[19] couldn't hear him or that — I just wanted him to
[20] be able to stay on the phone a little bit longer.
[21] I pushed up the ear piece volume. I didn't hear
[22] traffic, TV, radio, nothing in the background, but
[23] I did hear the sound of masturbating, and I hung
[24] up the phone immediately when I heard that.

**Page 52**

[1]     I called Nick. Nick had a message
[2] on his voice mail saying that he was on vacation
[3] and to contact JoAnn Murphy at her extension if
[4] there were any security issues that needed to be
[5] discussed with anybody from security. I picked up
[6] the phone. I called JoAnn and left her a message
[7] as I had just before this call with Nick. I still
[8] left him a call because he told me that he checked
[9] his messages from Florida.
[10]     Q: And JoAnn Murphy is also in security?
[11]     A: JoAnn Murphy works for Nick, correct.
[12]     Q: Um-hm.
[13]     A: I then sat and quickly fired off an
[14] e-mail to both Nick and JoAnn while I had all the
[15] details of that call fresh in my mind, and then
[16] left the building and went right to the Wareham
[17] Police Department because I was — I wanted
[18] something done. I didn't want to deal with this
[19] anymore. And I saw the officer on duty. He took
[20] down some details that he was going to pass along
[21] to the detective the next morning and told me that
[22] he would be in touch with me, the detective.
[23]     That next day I came in early. I
[24] fired off an e-mail again to Nick and to JoAnn and

Case 1:04-cv-11190-RCL    Document 27-5    Filed 01/10/2006    Page 5 of 10

Grievance: Termination of J. Rogers  pp. 1-223  Arbitration between NSTAR and
Vol. 1, February 14, 2002  Local 369, Utility Workers Union of America

Page 53

[1] let them know that I had made the decision leaving
[2] the parking lot to go to the Wareham Police
[3] Department and what had happened and that a
[4] detective was going to be in touch with me during
[5] the course of the day.
[6]     So JoAnn happened to be in the
[7] Wareham — her remote office in Wareham, read the
[8] e-mails and came down. I told her what had
[9] happened. I went down, met the detective down the
[10] street at the Wareham Police Department after he
[11] called, and sat, gave him as much detail as I
[12] could and told him that I wanted to have a Call
[13] Trace put on my phone, and I wanted to have it
[14] activated because I wanted to find out who this
[15] was.
[16]     And I discussed with him how many
[17] calls would I have to have come through and do a
[18] Call Trace before anything could be done. I said,
[19] "Because Nick Gianturco in security had told me
[20] that it was probably going to be three calls in
[21] order to qualify for the police department to do
[22] anything about it."
[23]     The detective, Detective Cabral,
[24] indicated to me that that wasn't the case. That

Page 54

[1] annoyance calls, annoyance hang-up-type calls
[2] would require three call traces. He said that
[3] sexually explicit-type phone calls, obscene phone
[4] calls, are a different level, and that one call
[5] trace would be sufficient, which I was very happy
[6] to hear because I didn't want to go through three
[7] more of these.
[8]     Q: Let me hand you this document at this
[9] point.
[10]     (Document exhibited to witness.)
[11]     Q: Let me ask, can you identify this,
[12] please?
[13]     A: This is the — I had copies of e-mails
[14] with me when I went to see Detective Cabral that
[15] day, and I jotted notes down on the back of one of
[16] the e-mails that was folded in half, and this
[17] basically explains what he told me.
[18]     Q: So these are your notes of a discussion
[19] with the detective?
[20]     A: Yes.
[21]     Q: Okay.
[22]     A: And the additional thing that's
[23] documented here was that Detective Cabral was also
[24] asking me to stay on the phone as long as I could.

Page 55

[1] That if another call came in, stay on the call,
[2] keep the caller on the phone as long as I could
[3] and that I should hit star 57 and that would
[4] activate it, and he gave me a case number when I
[5] left, and I spoke with JoAnn Murphy. She had or
[6] was in the process of going to see Detective
[7] Cabral.
[8]     MR. McCOWN: Okay. Hang on. I'd
[9] like to mark this as Company Exhibit 2.
[10]     MR. KELLY: Well, I — I guess I
[11] don't object to it. It's already in through the
[12] testimony.
[13]     MR. SCHMERTZ: Well, except — are
[14] you going to ask her about the last two lines of
[15] it, counsel?
[16]     Q: Could you explain the last two lines?
[17]     A: That basically — I asked Detective
[18] Cabral if we catch this guy what happens —
[19]     MR. SCHMERTZ: Um-hm.
[20]     A: — and he said, "Well, Wareham District
[21] Court", he said, "basically if the guy's got no
[22] prior record, it will end up just being a slap on
[23] the hand. If he's got any prior convictions or
[24] anything on his record, that it would be more

Page 56

[1] severe."
[2]     MR. SCHMERTZ: Um-hm. Okay.
[3] Company 2. Thank you.
[4]     Q: Okay. And I'd like to hand you another
[5] document at this point and ask you to identify
[6] this.
[7]     (Document exhibited to witness.)
[8]     A: This is — JoAnn Murphy came back to
[9] me. It was — I believe it was the next day. She
[10] had been in touch with someone in voice operations
[11] or she wasn't — I wasn't clear as to where she
[12] had gotten this, but she basically handed me this,
[13] and it was off of a Verizon Web site, said, "This
[14] is the procedure" —
[15]     MR. KELLY: Can I interrupt just for
[16] a second? I'm sorry. You said it was the next
[17] day. I'm not sure what day you're making
[18] reference to.
[19]     THE WITNESS: This was the — the
[20] fourth call was February 1st, and this was the
[21] next day, this was the day after that call.
[22]     MR. KELLY: February 2nd.
[23]     THE WITNESS: Right.
[24]     MR. KELLY: I was — you had just

Rogers 0015

Arbitration between NSTAR and
Local 369, Utility Workers Union of America

pp. 1-223

Grievance: Termination of J. Rogers
Vol. 1, February 14, 2002

Page 57

[1] been talking about a discussion you had with
[2] Detective Cabral, and when you said the next day,
[3] I thought you were referring to —
[4]     THE WITNESS: Right. It was the
[5] same day as that. It was the same day as the
[6] discussion with Detective Cabral.
[7]     MR. SCHMERTZ: Well, Company 2 shows
[8] February 8. Spoke to Cabral on 2/8.
[9]     Q: Did you have more than one meeting with
[10] Detective Cabral?
[11]     A: Yes, I did.
[12]     Q: And roughly what time period are we
[13] talking about? Start with February 1st and over
[14] the next course of how many days did you meet with
[15] Detective Cabral more than once?
[16]     A: Well, February 1st, the day of the
[17] call, that took place at night and there was
[18] nobody on, so it was the next day. The police
[19] officer that was on duty that night had passed the
[20] information to Detective Cabral, and that — the
[21] first time I met with Detective Cabral it was
[22] February 2nd. I probably — because it was right
[23] literally a quarter of a mile down the street, I
[24] actually stopped there probably a total of three

Page 58

[1] times to give him information, to discuss things
[2] with him as to what was going to happen down the
[3] road, and that was — that was basically what this
[4] was going to be.
[5]     Q: Okay. So that's — your notes of
[6] February 8th were one of those occasions?
[7]     A: Yes.
[8]     Q: Okay. And this Call Trace document,
[9] JoAnn Murphy gave this to you on —
[10]     A: She gave me —
[11]     Q: — February —
[12]     A: — that the day after the call.
[13]     Q: So February 2nd?
[14]     A: Right.
[15]     Q: Okay.
[16]     A: Because we were going to have Call
[17] Trace activated immediately, and the company was
[18] very good about making sure that it was going to
[19] happen as soon as possible, which it did.
[20]     Q: All right. And what did you —
[21]     MR. SCHMERTZ: Are you offering
[22] this?
[23]     MR. McCOWN: Yes, I'd like to offer
[24] this as Company Exhibit 3, but I was going to ask

Page 59

[1] a couple more questions.
[2]     MR. SCHMERTZ: Go ahead.
[3]     Q: What did you do with this Call Trace
[4] document?
[5]     A: I folded it in half and kept it under
[6] that new phone so that, you know, when and if a
[7] call came through, I would have it right there for
[8] easy — to easily grab, but I had already been —
[9] you know, I had become familiar with what I needed
[10] to do. I was told by both JoAnn and Detective
[11] Cabral that when the call came through that I was
[12] — as soon as I hung up the phone from the call,
[13] without letting any time elapse, I needed to pick
[14] the phone up right away before another call came
[15] in, and I couldn't make another call out, I had to
[16] pick up the phone immediately after I hung up with
[17] the caller and hit star 57.
[18]     Q: And is this a photocopy of the actual
[19] document which you kept under your phone?
[20]     A: Yes.
[21]     MR. McCOWN: Okay. Now I'd like to
[22] introduce this as Company Exhibit 3.
[23]     MR. SCHMERTZ: Company 3 received.
[24]     Q: All right. So after the February 1st

Page 60

[1] call and this period of activity where you met
[2] with the detectives and got the Call Trace set up,
[3] et cetera, what happened then?
[4]     (Pause.)
[5]     Q: Well, when was the next call?
[6]     A: March 30th, but I had also — I believe
[7] also what I did after this, which is what I did
[8] with all of them, was I fired off an e-mail to
[9] Nick and to JoAnn with details about the call.
[10] And the next call came through on March 30th. It
[11] was a Friday. It was late in the day again. It
[12] was, you know, 4:00. I was the only one in the
[13] office. I was getting ready to leave to go have
[14] dinner with a friend, and the phone rang and I
[15] looked over and I saw "private caller" again.
[16]     Q: So that was like the fourth call,
[17] private caller — I'm sorry — that resembled —
[18]     A: This was the second call that came
[19] through on that new phone —
[20]     MR. KELLY: The February 1st call
[21] you were referring to.
[22]     A: — that said "private caller," right.
[23]     Q: And other than those two calls that
[24] said "private caller," had you ever seen that

Rogers 0016

Case 1:04-cv-11190-RCL    Document 27-5    Filed 01/10/2006    Page 7 of 10

Grievance: Termination of J. Rogers  pp. 1-223  Arbitration between NSTAR and
Vol. 1, February 14, 2002                Local 369, Utility Workers Union of America

Page 61

[1] before or since when you had that phone?
[2] A: No.
[3] Q: Okay.
[4] A: No. So to that point on March 30th
[5] when the phone rang and I looked over and saw
[6] "private caller," for a split second I froze
[7] because I had a feeling that obviously this was
[8] going to be that caller again.
[9]     I answered the phone, "Good
[10] afternoon. Kim Whitney." And it was the same
[11] exact breathing. I pretended that I couldn't hear
[12] him because I wanted to make sure that the call
[13] was solid and that I was giving the system enough
[14] time to — you know, for it to be solid, a solid
[15] call. I basically said, "I can't hear you. Is
[16] there anybody there?" And there was just this
[17] rapid, escalating breathing going on.
[18]     I again just said, "Hello. Is there
[19] anybody there," fully hearing all of this going on
[20] in the background, and I did as much as I could
[21] handle and I hung the phone up. I picked the
[22] phone up right away, hit star 57, and there was a
[23] recorded message that came on from Verizon that
[24] said that the call had been successfully traced

Page 62

[1] and that a member of local law enforcement would
[2] be contacted, and that was it.
[3] Q: How much time passed between you
[4] hanging up and hitting star 57, hanging up from
[5] the caller?
[6] A: Not even — I mean, two seconds, maybe.
[7] I mean just enough time for me to pick that up
[8] from underneath the phone, but I already knew that
[9] I was going to be hitting star 57, and I did that.
[10] Q: Any other calls come in —
[11] A: No.
[12] Q: — between the time you hung up and the
[13] time you hit star 57?
[14] A: No, I did it immediately after. Then
[15] as soon as I hung up from the Verizon recorded
[16] message that I heard, I remembered that JoAnn had
[17] been in her office down the hall that afternoon,
[18] and I literally ran down the hallway and went
[19] around the corner to find JoAnn there, and I said,
[20] "I just got another call." And she said, "Did you
[21] hit Call Trace?" And I said yes.
[22]     She immediately picked up the phone,
[23] tried to call the detective, and then said, "We're
[24] just going to have to wait, wait until they get

Page 63

[1] back to us." And on Monday, which was April 2nd I
[2] want to say because Friday was the 30th, Monday,
[3] April 2nd, in the morning Detective Cabral called
[4] me, said, "Hi, Kim. I just want to let you know
[5] that Verizon is going to be getting back to me;
[6] that it was a successful trace; and that somebody,
[7] either myself or JoAnn Murphy, will get back to
[8] you with the information." Because I had asked
[9] him if I was going to be able to find out who it
[10] was, and he said yes.
[11]     So shortly after that JoAnn Murphy
[12] called me and said, "Detective Cabral just called
[13] me." She said, "The trace was identified to an
[14] employee's phone number." And I said okay. And I
[15] said, "What's the name?" And she said, "His name
[16] is James Rogers," and she hesitated. She said,
[17] "Do you know him?" And I said no. I said, "The
[18] name is familiar, but I don't know anybody by the
[19] name of James Rogers. Let me" — I had the HRIS
[20] database up in front of me. I punched his name in
[21] and it came up with all of his employee
[22] information. And I said, "Do you want me to tell
[23] you what I have for a street address?" And she
[24] said, "Yeah, we'll just go confirm what you have."

Page 64

[1]     So I punched — I gave her the
[2] street address of 234 Sandwich Street, and I gave
[3] her the phone number that was listed, and I then
[4] even recalled, having done roster sheets for
[5] years, I remembered that I had seen his name on
[6] the roster sheet under lineman, first class. I
[7] even opened one of the old roster books and his
[8] name was there. Other than that, I have no idea
[9] who he is.
[10] Q: Okay. Did you make any effort to
[11] determine that the traced phone number was in fact
[12] Mr. Rogers' phone number, at least the one he
[13] listed with the company?
[14] A: Right. We had — in HR we had these
[15] white cards, white index cards, that listed every
[16] employee's name and address and their job history.
[17] I went to that. It confirmed the address also. I
[18] then called Richard Barboza, who was the senior
[19] line supervisor over in Plymouth, and asked him if
[20] he would provide me with their list of employees
[21] for storm restoration. Every year they have to
[22] update employee records and phone numbers and
[23] addresses in case there's an outage, that they
[24] have current information to call them, and —

Rogers 0017

Case 1:04-cv-11190-RCL   Document 27-5   Filed 01/10/2006   Page 8 of 10

Arbitration between NSTAR and	pp. 1-223	Grievance: Termination of J. Rogers
Local 369, Utility Workers Union of America		Vol. 1, February 14, 2002

**Page 65**

[1] Q: So if there's some sort of weather
[2] emergency is what you're saying?
[3] A: Right.
[4] Q: Okay. Can you identify this document,
[5] please?
[6] A: He faxed —
[7] Q: Here, you take that one.
[8]   (Document exhibited to witness.)
[9] A: He faxed this document over with
[10] everyone's — you know, the line — line
[11] department, T and D department employees' names
[12] and addresses on it.
[13] Q: So these are the phone numbers and
[14] addresses that the employees themselves report to
[15] be contacted in case there's a weather emergency?
[16] A: Right.
[17] Q: All right.
[18] MR. McCOWN: I'd like to mark this
[19] as Company Exhibit 4, if I've got the number
[20] right.
[21] MS. AMBER: Um-hm.
[22] MR. SCHMERTZ: Um-hm. Company 4, no
[23] objection.
[24] Q: Did you make any effort to determine

**Page 66**

[1] whether you had even met or been in the presence
[2] of Mr. Rogers?
[3] A: At first I couldn't imagine how he knew
[4] me. I very rarely attended, you know, discipline
[5] hearings in Plymouth or grievances in Plymouth due
[6] to the fact that Joe usually handled those.
[7] Thinking back, though, I remembered during that
[8] summer of 2000 Joe was going to take on taking
[9] care of the New Bedford gas and electric area and
[10] that he wanted me to continue with covering the
[11] Cape and wanted me to also take on Plymouth.
[12]   He had mentioned to me on one
[13] occasion towards the end of July, I had just
[14] gotten back from vacation and I remember him
[15] telling me that there were some phone calls that
[16] had come in about potential workplace violence,
[17] that there was some intimidation going on over in
[18] the locker room in the line department in
[19] Plymouth, and it was nothing that we weren't
[20] familiar with, but Joe said, "Let's" — "let's cut
[21] to the chase and go over there and do our thing,"
[22] which was basically to go over and talk with the
[23] whole department and put them on notice that,
[24] again, we have a no tolerance policy with respect

**Page 67**

[1] to workplace violence or intimidation; and that if
[2] there were any further episodes and we were able
[3] to determine who it was, that there was going to
[4] be severe discipline. I remember being there that
[5] morning.
[6] Q: So this is at the Plymouth Service —
[7] A: We went to Plymouth.
[8] Q: — Center?
[9] A: Right. We went to the Plymouth Service
[10] Center on Summer Street, and it was Joe and
[11] myself, Sue McSherry, I don't recall how many
[12] other supervisor or management people were in the
[13] room, but it was basically all of the first shift
[14] linemen, troublemen, anybody that would have been
[15] on duty in the line department was in that room
[16] that day. I looked around and probably recognized
[17] four or five faces in the room, Chris Horn, Bob
[18] Fernandes. There were — there were a couple of
[19] faces I recognized, but for the most part I knew
[20] nobody else.
[21] Q: Okay. Let me show you this document
[22] and ask if you can identify it, please.
[23]   (Document exhibited to witness.)
[24] A: This is the daily work summary. It was

**Page 68**

[1] basically, you know, a report that indicated what
[2] — you know, you'd put a function number down that
[3] would be associated with what you were doing that
[4] day. It was — basically it was entered into the
[5] work management system and work orders were tied
[6] into them, so —
[7] Q: So this is essentially a kind of a time
[8] sheet?
[9] A: It's a daily time sheet.
[10] Q: And who's it for?
[11] A: Well, Gordon — GFM is Gordon
[12] Maccaferri, JAR is James Rogers.
[13] Q: Okay. And what day is it for?
[14] A: This is for July 31st, which was the
[15] day that Joe and I went to the Plymouth district
[16] office in the morning to talk with the crew.
[17] Q: And what does this indicate about how
[18] Mr. Rogers spent his morning?
[19] A: The first line in the middle of the
[20] document indicates start time of 7:30, stop time
[21] of 10:00. The number 1020 indicates training, and
[22] that was the number that was put in for all of the
[23] linemen that morning when we were over there.
[24] MR. McCOWN: I'd like to mark this

Rogers 0018

Case 1:04-cv-11190-RCL    Document 27-5    Filed 01/10/2006    Page 9 of 10

Grievance: Termination of J. Rogers                pp. 1-223            Arbitration between NSTAR and
Vol. 1, February 14, 2002                                               Local 369, Utility Workers Union of America

### Page 69

[1] as Company Exhibit 5.
[2]   MR. KELLY: No objection.
[3]   MR. SCHMERTZ: Company 5 received.
[4]   Q: All right. At some point did you write
[5] down a chronology, a written chronology, of the
[6] calls that you have described and the evidence
[7] that you put in?
[8]   MR. SCHMERTZ: Before you ask that,
[9] can you tell us a little bit about that meeting?
[10] Did you identify yourself to the employees? How
[11] did that meeting commence and end?
[12]   THE WITNESS: Basically Joe pretty
[13] much always took the reins in these types of
[14] meetings.
[15]   Q: That would be Joe Roda, your boss?
[16]   A: Joe Roda, who is the labor relations
[17] manager. He identified himself. He said, "For
[18] any of you who don't know me, I'm Joe Roda from
[19] Labor Relations, and this is Kim Whitney who works
[20] for me in Labor Relations." He identified me.
[21]   Q: Did you participate in the training?
[22]   A: I didn't really have any involvement
[23] with it. It was basically just — I had done
[24] enough of these on my own. Joe's point with

### Page 70

[1] having me there was to introduce me and have them
[2] get familiar with who I was so that he could start
[3] passing off any of the Plymouth issues to me.
[4]   MR. SCHMERTZ: Okay. Thank you.
[5]   Q: At some point did you write down a
[6] chronology of the five telephone calls?
[7]   A: Yes.
[8]   Q: When was that?
[9]   A: It was approximately within the next
[10] — it was two or three weeks after the March 30th
[11] phone call.
[12]   Q: And what did you — apart from your
[13] memory, what did you use to compile that
[14] chronology?
[15]   A: All of the — I put together all of the
[16] e-mails that I had sent back and forth between
[17] myself and Nick and JoAnn and anybody else, and
[18] they were detailed, the ones — the e-mails that I
[19] had were the detailed e-mails that Nick had
[20] requested of me, and I put together the
[21] chronology. Jim McGuire and Dave Dorant were
[22] handling the suspension and the upcoming hearing
[23] and wanted something a little easier to work with,
[24] so I put that together for them.

### Page 71

[1]   MR. McCOWN: I'd like to make that
[2] chronology an exhibit.
[3]   MR. KELLY: I guess I'll object to
[4] that. This is not a — these — I don't know of
[5] any exception into which this particular package
[6] fits. This is — this, as I understand it, is
[7] done sometime in the middle of April. It's a —
[8] it's the witness' summary of events that were by
[9] now six months old, some of them. I don't — I
[10] mean, if the contemporaneous notes came in that
[11] were —
[12]   MR. McCOWN: That's next.
[13]   MR. KELLY: — that were taken —
[14] huh?
[15]   MR. McCOWN: I was going to do that
[16] next.
[17]   MR. KELLY: Well, I'm objecting to
[18] this, what you're doing first.
[19]   MR. SCHMERTZ: Why don't we —
[20]   MR. McCOWN: Let me explain. The
[21] chronology refers to various e-mails, et cetera.
[22] So I was going to enter the chronology as a
[23] summary of the witness' recollection written in
[24] mid April for what it's worth, she's already

### Page 72

[1] testified to these events, and then introduce the
[2] backup documents that she made to write the
[3] summary.
[4]   MR. SCHMERTZ: I'll take the backup
[5] documents. Hold the summary because she's
[6] testified, and I'm not sure it's not cumulative in
[7] that respect, but the documents, the
[8] contemporaneous documents, that she made at the
[9] time of the calls or shortly thereafter are
[10] certainly admissible.
[11]   MR. McCOWN: That's fine. All
[12] right, and just so there's no confusion, I'm going
[13] to hand the witness now a series of e-mails that
[14] run from August 30th —
[15]   MR. SCHMERTZ: Fine.
[16]   MR. McCOWN: — through September
[17] 12th, and they obviously pertain to the first
[18] call, the August 30th, 2000 call. I'm going to do
[19] them call by call —
[20]   MR SCHMERTZ: Fine.
[21]   MR. McCOWN: — rather than the
[22] whole package.
[23]   MR. SCHMERTZ: Fine.
[24]   MR. McCOWN: This one happens to be

Rogers 0019

Case 1:04-cv-11190-RCL    Document 27-5    Filed 01/10/2006    Page 10 of 10

Arbitration between NSTAR and  pp. 1-223  Grievance: Termination of J. Rogers
Local 369, Utility Workers Union of America  Vol. 1, February 14, 2002

**Page 73**

[1] a bigger package than the others.
[2]   MR. SCHMERTZ: That will be Company
[3] 6, and there are — let me see how many pages.
[4]   (Pause.)
[5]   MR SCHMERTZ: Nine pages. Company
[6] 6, nine pages.
[7]   Q: Now, except for the, you know, the odd
[8] effect of e-mails that sometimes repeat each
[9] other —
[10]   MR. SCHMERTZ: We're all familiar
[11] with that, unfortunately.
[12]   Q: — could you explain what these nine
[13] pages are, Ms. Whitney?
[14]   A: These — these capture all of the
[15] detail from the phone call that day that Nick had
[16] requested that I put together and send him. It
[17] also contains the e-mails that came back and forth
[18] between voice operations regarding having the
[19] other phone from Joelle's office installed on my
[20] line, and it — the e-mails also show the fact
[21] that there was no technology in place at that time
[22] through that phone system that would allow us to
[23] trace that call or any other calls in the future.
[24]   MR. McCOWN: I would move to

**Page 74**

[1] introduce these as a package as Company Exhibit 6.
[2]   MR. SCHMERTZ: Received.
[3]   Q: Can you identify this document, please?
[4]   (Document exhibited to witness.)
[5]   A: This is an e-mail that I sent to Nick
[6] Gianturco after the third phone call on
[7] January 2nd.
[8]   MR. SCHMERTZ: I think it speaks for
[9] itself.
[10]   MR. McCOWN: I'd like to introduce
[11] this as Company Exhibit 7.
[12]   MR. SCHMERTZ: Received.
[13]   Q: And I think you've previously testified
[14] you don't have any such paper trail for that
[15] second call, correct?
[16]   A: No, I don't.
[17]   Q: So that was for the third call, this
[18] most recent exhibit?
[19]   A: Um-hm. Yes.
[20]   (Document exhibited to witness.)
[21]   A: This e-mail starts on the day of my
[22] fourth phone call, basically speaks to the — the
[23] new phone that I had installed showing "private
[24] caller" when that call came in that day, and it

**Page 75**

[1] was just a documentation about the phone call that
[2] took place that day.
[3]   MR. McCOWN: I'd like to introduce
[4] these two pages as Company Exhibit 8.
[5]   MR. SCHMERTZ: Received as
[6] Company 8.
[7]   Q: And for the traced phone call, do you
[8] have a similar set of e-mails or not?
[9]   A: No, I don't recall having any e-mails—
[10] doing any e-mail on that because it was the last
[11] one, everybody was already involved in it, and the
[12] trace was successful.
[13]   Q: How did these phone calls affect you,
[14] Ms. Whitney?
[15]   A: I — I can't say that I've ever been
[16] through anything like this. It's — I don't — I
[17] don't, I didn't and I still to this day don't
[18] understand why I was targeted. The impact that
[19] they had on me basically was that I was fearful.
[20] My kids were worried about me. My boyfriend,
[21] Scott, was concerned. I was looking in the
[22] rearview mirror all the time. I seeked the help
[23] of the employee assistance director in setting me
[24] up with some therapy to get through it and was

**Page 76**

[1] also referred to a doctor to get some medication
[2] so that I could start sleeping at night because I
[3] wasn't sleeping. It almost — the calls
[4] themselves almost made me somewhat feel as though
[5] I had been raped at times and —
[6]   Q: Since the call that was traced to
[7] Mr. Rogers' house, have you had any more of these
[8] calls?
[9]   A: No.
[10]   MR. McCOWN: That's all I have.
[11]   MR. SCHMERTZ: Cross-examine?
[12]   THE WITNESS: Could I have a minute?
[13]   MR. SCHMERTZ: Do you want a moment?
[14]   THE WITNESS: Could I, please?
[15]   MR. SCHMERTZ: Yes. Let's take five
[16] minutes.
[17]   (Off record.)
[18]   MR. SCHMERTZ: All right,
[19] cross-examine?
[20]           CROSS-EXAMINATION
[21]           BY MR. KELLY:
[22]   Q: Good morning, Ms. Whitney. My name is
[23] Paul Kelly and I have the opportunity to ask you a
[24] couple of questions about what you just testified

Rogers 0020