Case 1:04-cv-11190-RCL    Document 27-6    Filed 01/10/2006    Page 1 of 10

Grievance: Termination of J. Rogers  pp. 1-223  Arbitration between NSTAR and
Vol. 1, February 14, 2002                      Local 369, Utility Workers Union of America

Page 77

[1] to, and the — I guess the first question I'd have
[2] is: If there is a difference between what you
[3] said this morning about each of these calls, and
[4] there were five of them I guess, and in what you
[5] documented when you sent the e-mails, which —
[6] which version would be more accurate?
[7]    A: I'm sorry, do you — are you — do you
[8] mean is my chronology more accurate than my
[9] e-mails or —
[10]    Q: No. What I'm saying is, your testimony
[11] here this morning about the August 30th call and
[12] the events surrounding that, which would be more
[13] accurate, what you've said earlier today or your
[14] e-mail that you wrote about it if there were to —
[15] if there were any differences between them?
[16]    A: I would say —
[17]    MR. McCOWN: Excuse me, isn't that a
[18] speculative question, if there were any
[19] differences which one is more accurate?
[20]    MR. SCHMERTZ: Well, it may be, but
[21] it's cross-examination, so we'll see if she can
[22] answer.
[23]    A: The only — the only thing I can say to
[24] that would be that if there were specific details

Page 78

[1] that I didn't capture or minor details in my mind
[2] that were a little inaccurate, you know, I would
[3] probably be more inclined to go with the e-mails,
[4] as they took place in the time frame shortly
[5] following each one of the calls.
[6]    My — my memory of what happened and
[7] what took place inside of each one of those phone
[8] calls is imbedded in my mind, and it would have to
[9] be that would be the more accurate one.
[10]    MR. KELLY: Have you got those
[11] exhibits, Chris?
[12]    MR. HORN: Which one do you want?
[13]    MR. KELLY: Just give me the
[14] exhibits.
[15]    Q: Well, for example, Ms. Whitney, you
[16] testified earlier that after you received the
[17] first phone call you immediately went to Mr. Roda,
[18] right?
[19]    A: Right.
[20]    Q: And then you called the operator, and
[21] it was something like ten minutes ago —
[22]    A: Um-hm. That's correct.
[23]    Q: — and she said that a call came in and
[24] somebody asked for your extension —

Page 79

[1]    A: Right.
[2]    Q: — do you remember that?
[3]    Now, I'd like you to take a look at
[4] Company Exhibit 6.
[5]    MR. McCOWN: It's this one.
[6]    (Document exhibited to witness.)
[7]    Q: It's the nine-page set of e-mails.
[8]    A: Um-hm. Yes.
[9]    Q: And I'd like you to look at the top of
[10] the second page, and this is your second e-mail to
[11] Nick Gianturco, right?
[12]    A: Yes.
[13]    Q: And it says, "From: Whitney, Kimberly.
[14] Sent: August 30th at 12:20 p.m." And that's when
[15] you sent it, right?
[16]    A: Yes.
[17]    Q: Okay. And the e-mail itself says, "Hi,
[18] Nick. One more thing. I just called the
[19] switchboard and asked the operator if a call came
[20] in this morning from someone asking for my
[21] extension." Do you see that?
[22]    A: Yes.
[23]    Q: Now, does that refresh your
[24] recollection that you actually called the operator

Page 80

[1] about three hours after the call was made?
[2]    A: It's — that's possible. I — you
[3] know, the whole discussion that took place with
[4] Joe in his office after that call went back and
[5] forth. I went from his office, you know, back
[6] into my office. He would come into my office.
[7] There was a period of time it went on, so I may
[8] have been inaccurate about the precise time that I
[9] called the switchboard on that, but I did call the
[10] switchboard, and the operator's name was Nancy
[11] Andrews.
[12]    Q: Okay. But it may not have been ten
[13] minutes after the call, right?
[14]    A: No, it may not have.
[15]    Q: And the first page of Company Exhibit
[16] 6, that is the e-mail you wrote to Nick Gianturco
[17] which first documented the — the August 30th
[18] phone call, right?
[19]    A: Yes.
[20]    Q: And, for example, the — when you —
[21] when you thought it was somebody trying to be
[22] funny, at least in your e-mail you said, "I'm
[23] fine. Why are we whispering?" I don't believe
[24] you said that earlier today.

Rogers 0021

Arbitration between NSTAR and
Local 369, Utility Workers Union of America

pp. 1-223

Grievance: Termination of J. Rogers
Vol. 1, February 14, 2002

Page 81

[1] A: I believe I did.
[2] Q: Oh, you did?
[3] A: Yes.
[4] Q: Okay. But your memory today is that
[5] that's what you said?
[6] A: Yes.
[7] Q: Did you — I know when you spoke to
[8] Mr. Roda you were trying to figure out if you had
[9] ever disciplined anybody or been involved in
[10] discipline with somebody who might do this, and
[11] you couldn't come up with anybody; is that right?
[12] A: Right. And ultimately we both agreed
[13] that if it were somebody that I had been involved
[14] in in disciplining or an investigation, that this
[15] is probably not the kind of behavior that would
[16] have resulted, but that was speculation, so...
[17] Q: Had you been involved in discipline
[18] cases?
[19] A: Yes.
[20] Q: And what was — what was your — what
[21] involvement had you prior to August 30th?
[22] A: The only discipline that I recalled at
[23] that time that I was directly involved in was more
[24] on the employer relations side of my job between

Page 82

[1] an employee in the stockroom and his supervisor,
[2] and ultimately the supervisor was put on notice
[3] not to — just to discontinue the behavior that
[4] was going on between the two of them.
[5] Q: This was harassment-type behavior?
[6] A: No, actually it was just they just
[7] didn't get along, they never saw eye to eye, and
[8] they basically would give — assign work to
[9] somebody else, and this person, who was the
[10] president of the local at the time, was unhappy
[11] about it because he understood what the rules
[12] were, and that he was angry that the supervisor
[13] wasn't following the rules.
[14] Q: And when was that relative to August of
[15] 2000?
[16] A: I'm not sure. It — right now I
[17] couldn't tell you exactly when it took place, but
[18] that was the only one in my mind that I could
[19] think of at that time that I was directly involved
[20] in.
[21] Q: Well, can you give me any idea? I mean
[22] was it years before? Are we talking —
[23] A: Oh, no. Oh, no. It was —
[24] Q: Within 2000?

Page 83

[1] A: In 2000, yes.
[2] Q: Okay. Okay, and your role in that was
[3] to do what?
[4] A: To do an investigation, to talk to each
[5] one of the two individuals separately and write up
[6] an investigation and follow up with results and
[7] give them to my boss if it involved labor.
[8] Q: Now, did you and Mr. Roda talk about
[9] that incident as a possibility?
[10] A: I don't recall. I don't recall if Joe
[11] and I ever discussed that specific one. That may
[12] have been later on I was thinking back to — I
[13] don't recall.
[14] Q: Did you — did you — and I guess this
[15] is what I'm driving at. Did you wonder at the
[16] time whether it was somebody completely unrelated
[17] to work —
[18] A: Yes. Yeah. I had absolutely no idea.
[19] Q: — somebody from your personal life?
[20] A: I thought maybe — I mean, I thought
[21] about stories about men standing over a woman's
[22] shoulder while she's writing a check, and mine
[23] happens to have my address and my phone number on
[24] it, and I thought it could have been a complete

Page 84

[1] stranger. We had absolutely no clue as to who it
[2] could have been that day or anytime throughout the
[3] whole ordeal.
[4] Q: Now, if I understand the — the
[5] telephone problem where you worked, it was that
[6] because calls come in to a central number, either
[7] the Wareham number, which I assume is a 508
[8] number —
[9] A: Yes.
[10] Q: — right, or the 800 number, wherever
[11] they go in, they then get disbursed to whatever
[12] extension the person is looking for —
[13] A: Yes, if they —
[14] Q: — right?
[15] A: Right, exactly.
[16] Q: And so if they get through to your
[17] extension, you can't go back out and figure out
[18] where it came in from because it just routes it
[19] back to the central number; is that the problem?
[20] A: Yeah, it would just end there.
[21] Q: Did you ever try and get a — a list of
[22] telephone calls that came into that 508 number,
[23] for example? I mean, is that — did you do that?
[24] A: I believe that the gentleman by the

Case 1:04-cv-11190-RCL    Document 27-6    Filed 01/10/2006    Page 3 of 10

Grievance: Termination of J. Rogers  
Vol. 1, February 14, 2002  
pp. 1-223  
Arbitration between NSTAR and  
Local 369, Utility Workers Union of America

Page 85

[1] name of Peter Dolan that worked in voice
[2] operations attempted to do that in conjunction
[3] with Mary Lou Segreve who was familiar with the
[4] toll-free numbers and that whole truncated system.
[5]     Q: Were they able to do it?
[6]     A: Not at that time. They said that they
[7] had been able to do that in the past, but at this
[8] point they couldn't. They either — not — that
[9] piece of the phone system was no longer being used
[10] or I'm not sure.
[11]     Q: So for none of the calls — I mean, I'm
[12] talking about the four calls that were not
[13] identified from August through February — for
[14] none of those calls was there even a general
[15] record made of calls that had come into the
[16] company and where they had come from?
[17]     A: Correct, there were no call traces
[18] either possible on the first four, and on the
[19] fourth one Call Trace wasn't even enabled on the
[20] phone to be able to do that.
[21]     MR. McCOWN: I think the witness
[22] just misspoke but — you said for the first four
[23] Call Trace was not possible.
[24]     A: Oh, for the first three. The phone was

Page 86

[1] installed after the third one, so it would have
[2] been, yeah, for the last two.
[3]     Q: And isn't it true that one of the
[4] problems you had during this time was that you
[5] didn't get the kind of support from the company
[6] that you would have hoped to have gotten?
[7]     A: Was I frustrated? Absolutely. I felt
[8] that — I felt that it should have been handled a
[9] little bit more aggressively, but I relied on Nick
[10] to, you know, guide me through it. He was the
[11] specialist in it, and the whole time that these
[12] were going on Nick said was just becoming more
[13] history.
[14]     Q: Now, you have had the opportunity to
[15] testify to all this before today, haven't you?
[16]     A: Yes.
[17]     Q: You — you — and you testified
[18] because in following through on this police
[19] business, you went to the police and you asked
[20] them to prosecute a complaint for you against
[21] Mr. Rogers after you identified his home phone;
[22] isn't that right?
[23]     A: I'm not sure that it was actually up to
[24] me to make that decision. Once I — as I

Page 87

[1] understood it, once I agreed to have Call Trace
[2] put on the phone, that it then became an issue for
[3] the Commonwealth of Massachusetts and that they
[4] pursue that.
[5]     Q: Okay. Okay. Fair enough. Fair
[6] enough. But the Commonwealth pursued a claim
[7] against Mr. Rogers?
[8]     A: Correct.
[9]     Q: And there was a show cause hearing, was
[10] there, at which you testified?
[11]     A: Yes.
[12]     Q: In front of a magistrate?
[13]     A: He was a temporary — he was filling in
[14] for the clerk magistrate that day, yes.
[15]     Q: Well, there was a decision-maker there,
[16] right?
[17]     A: Yes.
[18]     Q: And your understanding was that —
[19]     MR. McCOWN: Right there is where I
[20] object. If the question is going to ask —
[21]     MR. KELLY: I'm sorry.
[22]     MR. McCOWN: — as to the result of
[23] a criminal proceeding, especially through this
[24] witness, I object that that's irrelevant to your

Page 88

[1] consideration. There's different standards in a
[2] criminal matter. There is, as we all know, a wide
[3] variety of results and reasons —
[4]     MR. SCHMERTZ: He hasn't asked the
[5] question.
[6]     MR. McCOWN: Well, I think he's
[7] headed there and I just want to make sure —
[8]     MR SCHMERTZ: I don't know if he's
[9] headed there or not. Let's wait and —
[10]     MR. McCOWN: All right. I object to
[11] that question.
[12]     MR. SCHMERTZ: I thought he was
[13] relating to her testimony or her, whatever it was,
[14] her participation in that proceeding —
[15]     MR. KELLY: Right.
[16]     MR. SCHMERTZ: — and he may use
[17] that as it relates to her testimony here today.
[18] The conclusion we'll deal with when and if he asks
[19] about it.
[20]     MR. McCOWN: Okay. I was
[21] anticipating the question, I agree.
[22]     MR. SCHMERTZ: I understand. Maybe
[23] I cut him off at the pass.
[24]     MR. McCOWN: Okay.

Rogers 0023

Case 1:04-cv-11190-RCL   Document 27-6   Filed 01/10/2006   Page 4 of 10

Arbitration between NSTAR and
Local 369, Utility Workers Union of America   pp. 1-223   Grievance: Termination of J. Rogers
Vol. 1, February 14, 2002

Page 89

[1] MR. KELLY: That's right. If I
[2] don't go there, we'll never know.
[3] Q: All right. But I did — I did want to
[4] ask you about — about your testimony on that
[5] occasion. And that was on the 11th of May, was
[6] it?
[7] A: (Witness nodded.) Okay. I can't
[8] remember the exact date, but...
[9] Q: Ever seen a copy of the transcript of
[10] that hearing?
[11] A: Yes.
[12] Q: Now, you said in the — this call which
[13] was — which was not documented, the one in
[14] December, you said earlier that there was — there
[15] was breathing and muttering going on in that
[16] telephone call. Do you recall that?
[17] A: Yes.
[18] Q: Right. But do you recall on May 11th
[19] saying that there was no whispering on the other
[20] end and there was nothing at all?
[21] MR. McCOWN: As to which call?
[22] MR. KELLY: The one that's in
[23] December on either the 5th or the 6th.
[24] A: I — I may — I may have said that. I

Page 90

[1] was extremely nervous that day going through that,
[2] but I may have — I didn't go — I didn't have any
[3] of my notes or anything in front of me to refer
[4] to, but the only thing that I realized that was
[5] actually said after I looked back and remembered
[6] it with the e-mails that I later put together was
[7] that he did say my name again, and in the hectic
[8] spot that I was in that day between that meeting
[9] and having to get this information all together
[10] and then answering that call, I — you know, I
[11] can't be exact about a lot, but it — it was
[12] definitely the same caller with the same
[13] breathing. That was absolutely sure at that
[14] moment.
[15] MR. McCOWN: Can we stipulate also
[16] that this hearing was May 11th of this year. It
[17] was not —
[18] MR. KELLY: Of 2001.
[19] MR. McCOWN: 2001, right. So it
[20] was —
[21] MR. KELLY: A month and a half after
[22] March 30th.
[23] MR. McCOWN: Yeah.
[24] MR. KELLY: We can stipulate to

Page 91

[1] that.
[2] MR. McCOWN: Thank you. I didn't
[3] hear a year.
[4] Q: And you earlier said — you earlier
[5] said today that you heard — this is in the
[6] December phone call, that you heard your name
[7] repeated to the beat of the breathing I think is
[8] what you said, words to that effect, do you recall
[9] that?
[10] A: Today, yes.
[11] Q: Now, you would agree with me, would you
[12] not, that that is inconsistent with there was no
[13] whispering, there was nothing at all?
[14] A: True. True. But the fact still
[15] remained I identified the person by that
[16] breathing, the escalated breathing pattern. To
[17] confuse in a very nervous point one call from the
[18] other as far as when he was — when I heard him
[19] masturbating or when I heard the gasp or in the
[20] other call when I heard my name being whispered —
[21] Q: Well, you'll excuse me, but I
[22] understand that you want this all to be the same
[23] person, but you've got to understand that it may
[24] not be, okay, and that it is important to be able

Page 92

[1] to determine what actually happened in each of
[2] those calls, all right? That's — that's the
[3] reason I'm going here. Not because — and not for
[4] any other reason. But I guess I would ask you
[5] which version, the version that you testified here
[6] today or the one you testified on May 11th, which
[7] is more accurate?
[8] A: The one that I testified to today would
[9] be the most accurate.
[10] Q: And you had no notes of that
[11] December 5th or 6th call?
[12] A: (Witness nodded.)
[13] Q: But your memory today is clearer than
[14] your memory was on May 11th?
[15] A: After I stopped and started thinking
[16] back to that, because of the fact that I didn't
[17] have any documentation along the lines of e-mails,
[18] I went back in my mind to each one of those calls.
[19] They're imbedded in my brain. The time —
[20] May 11th in the Wareham District Court I missed
[21] that detail; but, nonetheless, every one of these
[22] calls was made by the very same person.
[23] Q: All right. Now, you also testified
[24] earlier that — that you got a call on December —

Rogers 0024

Case 1:04-cv-11190-RCL   Document 27-6   Filed 01/10/2006   Page 5 of 10

Grievance: Termination of J. Rogers  pp. 1-223  Arbitration between NSTAR and
Vol. 1, February 14, 2002                     Local 369, Utility Workers Union of America

Page 93

[1] I mean, I'm sorry, on February 1st and you
[2] immediately called Nick, I believe you said, and
[3] JoAnn —
[4]   A: Yes.
[5]   Q: — right?
[6]   And they weren't there, neither one
[7] of them?
[8]   A: Right. Correct.
[9]   Q: You left messages and you went to the
[10] Wareham Police Department?
[11]   A: I left messages, and before I left,
[12] because everything was fresh in my mind, I knew
[13] that I needed to send an e-mail to both of them to
[14] follow-up with the message that I left. So I did
[15] that and then went to the Wareham Police
[16] Department.
[17]   Q: All right. And you testified earlier
[18] that you didn't — it was late at night; you
[19] didn't talk to the detective; you talked to the
[20] detective the next day and a couple more times —
[21]   A: Right.
[22]   Q: — before February 7th?
[23]   A: Yes.
[24]   Q: Look at Company Exhibit 8. Do you have

Page 94

[1] that?
[2]   MR. McCOWN: The e-mails.
[3]   A: Oh, right here. (Indicating.)
[4]   Q: Now, the first page up top there's a
[5] short e-mail from Nick to you, "Re: phone call."
[6] Do you see that?
[7]   A: Um-hm.
[8]   Q: And then beneath that there is your
[9] message to Nick which is dated February 7th —
[10]   A: Yes.
[11]   Q: — right?
[12]   And the second paragraph says, "I
[13] was supposed to hear from Gil Cabral from Wareham
[14] P.D. this week and have heard nothing yet." Was
[15] that true when you wrote it?
[16]   A: I was probably waiting for a call back
[17] from — for a second call. That wouldn't have
[18] been the initial call.
[19]   Q: You had heard — you had already heard
[20] from Gil Cabral?
[21]   A: Yes.
[22]   Q: And what was it that you were waiting
[23] to hear from him about?
[24]   A: Because — oh, just to go back to that,

Page 95

[1] though, I had no idea who the detective was until
[2] he called and identified himself and — you know,
[3] after the — that call. So at this point, by
[4] looking at this, it was obviously one of those
[5] conversations that we were having back and forth
[6] but — I'm sorry, your next question?
[7]   Q: When did you first hear from Gil
[8] Cabral? He was the detective I take it.
[9]   A: He was a detective. That February 1st
[10] call came in on a Thursday. I — I heard from him
[11] — I'm pretty sure it was the next day, and if
[12] not, it would have been Monday, but I'm pretty
[13] sure it was the next day after. Everything ran
[14] together, but it may have even been Monday.
[15]   Q: And when you say you first heard from
[16] him, was it by telephone? Did you meet with him
[17] in person that first day or did you talk to him on
[18] the phone?
[19]   A: I talked to him on the phone and then
[20] asked if I could come down and talk with him in
[21] person, and I did.
[22]   Q: And you went down and talked to him in
[23] person before you sent this e-mail or after it?
[24]   A: I went down and talked to him in person

Page 96

[1] the first time, and then I sent this e-mail the
[2] following week about something else that I was
[3] waiting to hear back from him on.
[4]   Q: Let's just get our — let's get our
[5] dates straight here. You said the phone call came
[6] on Thursday the 1st?
[7]   A: Right.
[8]   Q: Right. So the following Thursday would
[9] have been Thursday the 8th, right?
[10]   A: Right.
[11]   Q: So this e-mail in which you said you
[12] haven't heard nothing yet —
[13]   MR. McCOWN: This —
[14]   Q: — was on Wednesday the 7th, right?
[15]   A: Right. I e-mailed Nick on Wednesday
[16] the 7th.
[17]   Q: And you had had a face-to-face meeting
[18] with Gil Cabral prior to sending him this e-mail?
[19]   A: I had a face-to-face with him. I
[20] talked to him on the phone first and then had a
[21] face-to-face with him, right, and it was either
[22] Friday or Monday, and I remember —
[23]   Q: That you had your face-to-face?
[24]   A: Mmm. And he apologized to me for not

Rogers 0025

Case 1:04-cv-11190-RCL   Document 27-6   Filed 01/10/2006   Page 6 of 10

**Arbitration between NSTAR and**  pp. 1-223   Grievance: Termination of J. Rogers
**Local 369, Utility Workers Union of America**   Vol. 1, February 14, 2002

Page 97

[1] getting back to me sooner, but that there was some
[2] confusion over who he was supposed to call, JoAnn
[3] Murphy or myself.
[4]   Q: And when you had your face-to-face
[5] meeting with him, what was it that you discussed?
[6]   A: We discussed — you know, I described
[7] the calls to him. Basically, you know, he would
[8] ask me questions like did I have any idea who this
[9] person was; you know, could it be anybody from the
[10] company; could it be anybody from outside the
[11] company; basically went through all of the
[12] possibilities.
[13]   Q: Did you talk to him about the three
[14] call minimum problem?
[15]   A: I had — on the first — the first time
[16] I met him I'm not sure if I got into that
[17] discussion. It was when I realized that I was now
[18] — that that call on February 1st was the
[19] qualifier that was going to enable me to get Call
[20] Trace. Then I believe I had other questions for
[21] him, and other questions would have been the three
[22] call minimum.
[23]   Q: I don't understand. Why was the
[24] February 1st call a qualifier?

Page 98

[1]   A: Because that was the first call that I
[2] had received after that new outside — direct
[3] outside line phone had been installed with Caller
[4] ID on it, and remember Nick said, "No, we're not
[5] going to activate Call Trace now. We're going to
[6] wait to see if he" —
[7]   Q: Okay.
[8]   A: — "swallows this and makes this call."
[9]   Q: All right. But on your first meeting
[10] with Gil Cabral you told him the details of each
[11] of your calls?
[12]   A: Yes.
[13]   Q: All Right.
[14]   A: He asked me questions, right, and I
[15] answered them.
[16]   Q: And did he explain to you the
[17] difference between annoyance calls and sexually
[18] offensive calls on your first —
[19]   A: I don't — no, I don't think — I don't
[20] think we had discussion about that, but —
[21]   Q: Well —
[22]   A: — it was either that meeting, because
[23] I was definitely in that police department twice
[24] inside of a week discussing with him some of

Page 99

[1] these — these issues, and I mean, I would be
[2] sitting there thinking about things at work that I
[3] wanted to ask him and I'd jot down notes, and if
[4] he was in the office, rather than talking to him
[5] over the phone, I said to him, "Is it all right if
[6] I just come down?" And so I would discuss — but
[7] the specifics about the three call minimum, I
[8] don't remember if that was the very first meeting
[9] with him or the second one within that following
[10] week.
[11]   Q: All right. So you're saying the first
[12] meeting occurred either on, what, Friday or Monday
[13] but shortly after the Thursday call?
[14]   A: Right.
[15]   Q: And then you met with him again on the
[16] Thursday, the 8th?
[17]   A: Right.
[18]   Q: And as of February 7th when you sent
[19] this e-mail to Nick, what was it that you were
[20] supposed to hear from Gil Cabral about; what was
[21] he supposed to get back to you about?
[22]       (Witness perusing document.)
[23]   A: Reading this, I obviously came up — I
[24] had had some discussion back and forth constantly

Page 100

[1] with Nick. I hounded him with questions, and, you
[2] know, he was telling me during the course of this
[3] — this whole period that, you know, I was to
[4] believe that I had to have three calls. Nick knew
[5] that I wasn't happy about it. I didn't want to
[6] have to go through that three more times, and
[7] these notes that I would jot down in my car while
[8] I was driving or sitting in my office and I was
[9] thinking about it, I had a list of questions that
[10] I came up with for Cabral. I called him, left a
[11] message on his machine to call me back. He didn't
[12] always get back to me that day; sometimes it would
[13] be a day or two later because he had court cases
[14] that he had to deal with and it took him out of
[15] the office all day. My comment back to Nick on
[16] this one, though, is, basically I want to find out
[17] if I really and truly have to go through this
[18] three more times. I want to hear what he has to
[19] say. That was the point I was making in this
[20] message to Nick.
[21]   Q: Well, nowhere in this message do you
[22] tell Nick that you have already met with him, do
[23] you?
[24]   A: No, but we talked on the phone quite a

Case 1:04-cv-11190-RCL   Document 27-6   Filed 01/10/2006   Page 7 of 10

Grievance: Termination of J. Rogers    pp. 1-223    Arbitration between NSTAR and
Vol. 1, February 14, 2002                            Local 369, Utility Workers Union of America

Page 101

[1] bit, too, Nick and I.
[2]  Q: The last — the last paragraph of that
[3] e-mail says, "If I don't hear from him today" —
[4] and I guess you mean Cabral —
[5]  A: Yeah.
[6]  Q: — "I'll call him tomorrow and see if I
[7] can meet with him," right?
[8]  A: Yeah.
[9]  Q: No suggestion that you've already met
[10] with him?
[11]  A: To meet with him again to ask him, but
[12] I had already met with Detective Cabral and given
[13] him all the basic information. I had a case
[14] number already assigned that he gave me.
[15]  Q: Now, this — this February call, if I
[16] understand your testimony correctly, you
[17] physically turned up the volume on your telephone
[18] in order to hear what was going on over the
[19] background noise or whatever?
[20]  A: Yes.
[21]  Q: And do I understand correctly that you
[22] wouldn't have heard what you heard if you hadn't
[23] turned up the volume?
[24]  A: Probably not, probably not, because it

Page 102

[1] was — the volume on this new phone was extremely
[2] loud.
[3]  Q: Let me — let me ask you this. If on
[4] February 1st, if you know, if you had hit, what is
[5] it, star 57, is that the magic numbers?
[6]  A: Yes.
[7]  Q: If you had hit star 57 on February 1st,
[8] would you have gotten a readout —
[9]  A: I don't know that.
[10]  Q: — a trace?
[11]  A: I don't know.
[12]  Q: That wasn't something you were told to
[13] do?
[14]  A: No. Not then, no. Because I was under
[15] the impression that it was something that was like
[16] installed or it was something that had to
[17] physically be done in the system or in the police
[18] department to that line, so — but I can't say
[19] that anybody ever told me that, maybe it was
[20] something that I thought —
[21]  Q: Okay.
[22]  A: — but they said that they weren't
[23] going to, you know, initiate that star 57 until
[24] after that call, and maybe —

Page 103

[1]  Q: Who said that?
[2]  A: Nick Gianturco had said that they
[3] wouldn't initiate or start that, activate it,
[4] until after I had gotten that fourth call, which
[5] meant that this guy is going to obviously go that
[6] one step further and call this outside line that I
[7] now have.
[8]  Q: And you said earlier that Nick put this
[9] phone in your office on the 12th of January or
[10] thereabouts?
[11]  A: Right around there. It was within two
[12] weeks after the January call.
[13]  Q: Okay. And at that time you had a
[14] discussion with him about — about whether Call
[15] Trace was going to be enabled?
[16]  A: Sometime from when — that January 2nd
[17] call to the February 1st call we had discussions
[18] about, you know, Nick said, "We're going to have
[19] to" — you know, when the time — when and if the
[20] time comes that we have a trace put on this line,
[21] we'll discuss it; but, you know, we're going to
[22] have to have three calls come in to qualify to be
[23] traced or we had — we had discussion on a regular
[24] basis on the phone about these things.

Page 104

[1]  Q: All right. But none of your
[2] discussions included the possibility that the
[3] Caller ID display on that phone might show up
[4] "private caller"?
[5]  A: No, I think that Nick — if I remember,
[6] Nick also told me the reason that — you know,
[7] this will be a good phone for me to have; it not
[8] only will show, you know, where the call is coming
[9] from, but he told me if there — if somebody has a
[10] private line, it would come through as some — I
[11] think he told me that it would come through as
[12] "private caller," because he had that phone at
[13] home.
[14]  Q: Yeah, I mean, it's not that unusual.
[15] It may have been the first time, but I suggest to
[16] you it's not that unusual, and I was wondering if
[17] you were prepared for that.
[18]  A: Yes, I did know about it before the
[19] call came in, yes.
[20]  Q: And how were you instructed to handle
[21] it if a call came in that said "private caller" —
[22]  A: Without the Call Trace on there Nick
[23] basically said, "If this guy calls again, notice
[24] if it says "private caller," notice what the call

Rogers 0027

Case 1:04-cv-11190-RCL   Document 27-6   Filed 01/10/2006   Page 8 of 10

Arbitration between NSTAR and
Local 369, Utility Workers Union of America

pp. 1-223

Grievance: Termination of J. Rogers
Vol. 1, February 14, 2002

Page 105

[1] display says, this phone has that capability. As
[2] usual, write down the time and the date,
[3] whatever." He said, "What you really need to do
[4] with this phone, it also has the volume control,
[5] turn the volume up, see if you can hear anything
[6] else in the background that's going to help us" —
[7] "give us a clue as to who the guy is."
[8]   Q: Now, beyond what is in Company
[9] Exhibit 7, which is an e-mail from you to Nick on
[10] January 2nd, and I'm just looking to the
[11] description of the — of the call, "I just
[12] received another obscene phone call, same guy,
[13] same everything, apart from that, is there any
[14] contemporaneous description you made of that
[15] telephone call apart from this e-mail?
[16]   (Witness perusing document.)
[17]   MR. McCOWN: You mean in writing?
[18]   MR. KELLY: Yes, notes.
[19]   A: This basically was a — this was
[20] basically an e-mail that was just letting Nick
[21] know that I received another call; that I
[22] hadn't — and this one I hadn't — you know, he
[23] and I talked on the phone shortly after he got
[24] this about the fact that I hadn't reported the

Page 106

[1] second phone call, but this one basically had, you
[2] know, just indicated that it was —
[3]   Q: Well, listen to my question, though.
[4] The only question I'm asking is: Apart from this
[5] e-mail that you sent to Nick, did you write
[6] anything down describing the phone call of January
[7] 2nd?
[8]   A: I — I had notes that I wrote,
[9] handwritten notes, describing it. It was on a pad
[10] of paper in the corner of my desk, and I don't
[11] have the notes. I don't know where they are. It
[12] was part of other labor relations stuff that I had
[13] written down, and I may have — I may have thrown
[14] them out, because I sent the e-mail to Nick —
[15]   Q: All right.
[16]   A: — and then later went over the
[17] description of the — in-depth description of the
[18] call with him after that.
[19]   Q: Well, you have a fairly — in Company
[20] Exhibit 6 there's a fairly thorough description of
[21] the August 30th call —
[22]   A: Yes.
[23]   Q: — right?
[24]   A: Yes.

Page 107

[1]   Q: It takes up most of that page actually.
[2] There is no description of the December call, and
[3] apart from "same guy, same everything," there's no
[4] written description of the January 2nd call?
[5]   A: Not in the form of an e-mail that I
[6] know of.
[7]   Q: Or any other form that's accessible to
[8] us?
[9]   A: Right, not that I have. I — at this
[10] point, Mr. Kelly, I was so upset that I had
[11] received now three phone calls. I was going
[12] through an emotional period with this, and in
[13] general I was — I was angry. I was angry and I
[14] wanted it over. I didn't sit and take the time to
[15] calmly come up with a detailed description of the
[16] call, you know, piece by piece like I had on that
[17] very first one, but I had — I had notes at some
[18] point, and like I said, where they are today,
[19] handwritten notes, I don't know on that call.
[20]   Q: Now, let's talk for a minute about this
[21] telephone call on March 30th. That telephone call
[22] lasted the sum total of 10 or 15 seconds; isn't
[23] that true?
[24]   A: Yeah, I would say 10 or 15 seconds. As

Page 108

[1] nervous as I was, it was — it was in that time
[2] frame, sure.
[3]   Q: And there was not a word uttered from
[4] the other side of the phone, was there?
[5]   A: No, not in that call, not that I
[6] recall. I do not recall anything being said or
[7] uttered or...
[8]   MR. KELLY: Can I take a brief
[9] recess at this point?
[10]   MR. SCHMERTZ: Sure.
[11]   (Off record.)
[12]   MR. SCHMERTZ: All right.
[13]   MR. KELLY: I do have a couple more
[14] questions for this witness.
[15]   Q: And the first one I think is true, but
[16] I just want to — I just want to confirm it. In
[17] none of these telephone calls did the caller
[18] threaten you; isn't that true?
[19]   A: Made no verbal threat, no.
[20]   Q: The only conversation — the only
[21] telephone call in which there was actual
[22] conversation was the August 30th call; isn't that
[23] true?
[24]   A: Yes.

Rogers 0028

Case 1:04-cv-11190-RCL   Document 27-6   Filed 01/10/2006   Page 9 of 10

Grievance: Termination of J. Rogers   pp. 1-223   Arbitration between NSTAR and
Vol. 1, February 14, 2002   Local 369, Utility Workers Union of America

Page 109

[1] Q: And I guess the last question, and I
[2] may have asked it, but is it your understanding
[3] that had you pressed star 57 in February it would
[4] not have worked; is that your understanding?
[5] A: Today, yeah, I guess. I wouldn't have
[6] — I wouldn't have considered doing it. So to say
[7] today — I would never have even thought of doing
[8] it back in February.
[9] Q: You weren't aware of it?
[10] A: No, I was aware — I was aware that
[11] Call Trace would be put on and initiated after
[12] that call, but nothing — I really thought that
[13] somebody would have to put it on the phone for me
[14] to use it, so I didn't consider even trying it.
[15] Q: You were aware of it, but you didn't
[16] think your phone was equipped to handle it at that
[17] time?
[18] A: I wasn't aware of star 57
[19] specifically —
[20] Q: You weren't?
[21] A: — but I — no, I wasn't — I was not
[22] aware at all about the specifics of how Call
[23] Trace — what the procedure was until after, you
[24] know, that February — the February 1st call; then

Page 110

[1] I was given all that detail.
[2] Q: I see. I see. So if the telephone was
[3] in fact able to trace on February 1st, you didn't
[4] — you didn't then know about it and don't now
[5] know about it?
[6] A: (Witness nodded.)
[7] THE STENOGRAPHER: I'm sorry?
[8] MR. KELLY: That's all I have. I'm
[9] sorry?
[10] THE WITNESS: That was no.
[11] THE STENOGRAPHER: Thank you.
[12] MR. KELLY: Redirect?
[13] MR. McCOWN: No.
[14] MR. SCHMERTZ: Thank you. You're
[15] excused.
[16] (Witness excused.)
[17] MR. McCOWN: We have several other
[18] witnesses, so I think we should probably —
[19] MR. SCHMERTZ: Take a luncheon
[20] break?
[21] MR. McCOWN: — take a lunch break,
[22] yeah.
[23] MR. SCHMERTZ: Luncheon break it is.
[24] It's quarter of one. I guess we'll have lunch

Page 111

[1] here. So within an hour you want to be back or
[2] earlier?
[3] MS. AMBER: Whenever the dining room
[4] will allow us to get back.
[5] (Lunch recess taken.)
[6] (JOANN MURPHY, Sworn.)
[7] MR. SCHMERTZ: Sit down. Give your
[8] full name to the reporter, please.
[9] THE WITNESS: JoAnn Murphy.
[10]
[11]        DIRECT EXAMINATION
[12]        BY MR. McCOWN:
[13] Q: Spell your first name, please.
[14] A: Capital J O, capital A, double N.
[15] Q: Who's your employer, Ms. Murphy?
[16] A: NSTAR Electric & Gas, and prior to the
[17] merger it was Boston Edison Company.
[18] Q: And what's your job title?
[19] A: Investigator with the security
[20] department.
[21] Q: And what are your duties generally?
[22] A: General duties include overseeing
[23] security matters for the company and conducting
[24] investigations as requested or needed.

Page 112

[1] Q: And you've indicated you're a former —
[2] that your job history runs up through Boston
[3] Edison, correct?
[4] A: Correct.
[5] Q: What is that job history, just
[6] generally, for the arbitrator?
[7] A: I've been an investigator since 1986
[8] through present with the exception of 1996 through
[9] the end of '99 where I was assigned to investigate
[10] strictly theft of covering jobs, stealing
[11] electricity.
[12] Q: So basically one way or the other since
[13] 1986 you've been involved in security
[14] investigations?
[15] A: Correct.
[16] Q: Was the NSTAR security department
[17] involved last year in the matter of the harassing
[18] telephone calls to Ms. Whitney?
[19] A: Yes.
[20] Q: And were you personally involved in the
[21] situation?
[22] A: I became personally involved in
[23] February of 2001.
[24] Q: Okay. And what's the security

Rogers 0029

Arbitration between NSTAR and                    pp. 1-223              Grievance: Termination of J. Rogers
Local 369, Utility Workers Union of America                              Vol. 1, February 14, 2002

Page 113

[1] department's role overall in a situation like
[2] that, or in this situation, be more specific?
[3]    A: The security department coordinated the
[4] installation of a private line that would be
[5] capable of having tracing for that line, and we
[6] also were an interface with Ms. Whitney and the
[7] Wareham Police Department.
[8]    Q: Okay. And only some of that was you,
[9] correct, some of it was also your boss?
[10]   A: Correct.
[11]   Q: All right. Beginning last February,
[12] could you describe the involvement that you had in
[13] this matter?
[14]   A: February 2nd I had an office at our
[15] Wareham facility. When I came to the office in
[16] the morning, I was checking voice messages from my
[17] office in Westwood. One of my messages was from
[18] Kim Whitney, and it was from February 1st, and the
[19] message was to the effect that she had received an
[20] obscene phone call.
[21]   Also on that morning I was — as I
[22] started my computer, I was checking voice —
[23] e-mail messages, and there was also an e-mail
[24] message from Kim Whitney stating that she had

Page 114

[1] received an obscene phone call on February 1st.
[2]   After I got settled, I went down —
[3] Kim Whitney had an office down the hall from where
[4] I was situated in Wareham, and I went down to see
[5] if she was in. She was. At this point in time
[6] Kim Whitney gave me background information on the
[7] call. She advised that the call on February 1st
[8] was the fourth call that she received. It was at
[9] this point that I had learned about the previous
[10] three calls, the fact that a private line had been
[11] installed, and that Call Trace was in place but
[12] was not activated.
[13]   Q: That's what you learned from
[14] Ms. Whitney?
[15]   A: Yes.
[16]   Q: Okay. What did you do after you got
[17] this information from Kim?
[18]   A: I then contacted voice operations,
[19] specifically spoke with Asalean Haynes from voice
[20] operations to get information on how to go about
[21] activating the Call Trace system. Later that same
[22] day I received an e-mail from Asalean; she had
[23] forwarded me the directions on how to activate the
[24] Call Trace.

Page 115

[1]    Q: Now, those directions are what we
[2] already put in as an exhibit?
[3]    A: I didn't see the exhibit, so I'm not
[4] certain.
[5]    Q: All right. The Verizon Web site
[6] printout.
[7]    (Document exhibited to witness.)
[8]    A: Yes.
[9]    Q: Okay.
[10]   MR. McCOWN: Company Exhibit 3 is
[11] what we were referring to.
[12]   Q: So Ms. Haynes furnished those to you?
[13]   A: Correct.
[14]   Q: Okay.
[15]   A: I forwarded that to Kim via e-mail, and
[16] I also printed out a copy and brought it down to
[17] her office.
[18]   Q: Okay. Now, were the Wareham Police
[19] involved at this point?
[20]   A: Kim had advised me that after receiving
[21] the call on February 1st she was upset and had
[22] stopped by the Wareham Police Department and they
[23] filed an incident report. So at that point, yes,
[24] they were.

Page 116

[1]    Q: Did you contact the Wareham Police?
[2]    A: I contacted the Wareham Police later.
[3] Kim explained that when she had gone to the police
[4] department and filed the incident report she was
[5] told that it would be assigned to a detective.
[6]    MR. KELLY: I'm going to object,
[7] just to keep the questions and the answers. The
[8] question was: Did you go to the Wareham Police?
[9] I think —
[10]   Q: Did you contact the Wareham Police?
[11]   MR. KELLY: Right.
[12]   MR. McCOWN: I think she was
[13] explaining.
[14]   MR. KELLY: But, I mean, in sort of
[15] the extreme of consciousness, I talked to this
[16] person; this is what this person told me.
[17]   MR. SCHMERTZ: All right. Just
[18] respond to the question.
[19]   A: Could I have the question again,
[20] please?
[21]   Q: Well, the question was: Did you
[22] contact the Wareham Police?
[23]   MR SCHMERTZ: And your answer is
[24] yes.

Rogers 0030