Case 1:04-cv-11190-RCL    Document 27-7    Filed 01/10/2006    Page 1 of 10

Grievance: Termination of J. Rogers  
Vol. 1, February 14, 2002  
pp. 1-223  
Arbitration between NSTAR and  
Local 369, Utility Workers Union of America

**Page 117**

[1] A: Yes, I did.
[2] Q: How did you know who to contact?
[3] A: I went to the Wareham Police Department
[4] and asked who the case was assigned to and I was
[5] advised that it was a Detective Gil Cabral.
[6] Q: And did you meet with Detective Cabral?
[7] A: At a later point. I did not on that
[8] day. He was not available that day I had gone to
[9] the station. I met with him — it was either the
[10] 8th or 9th of February that I went and met with
[11] Detective Cabral, and he provided me with a copy
[12] of the incident report.
[13] Q: So the police report?
[14] A: Yes.
[15] Q: Okay. All right. What happened after
[16] that with respect to your involvement in any calls
[17] to Ms. Whitney?
[18] A: The next involvement I had was
[19] March 30th. Again, I was at the Wareham office.
[20] It was in the afternoon, after 4:00. I was just
[21] sitting in the office doing some paperwork and Kim
[22] Whitney came into my office, and she appeared
[23] visibly shaken, and she made the comment to the
[24] effect, "I've just gotten another one of those

**Page 118**

[1] calls." I asked her if she had activated the call
[2] tracing mechanism and she stated that she had. I
[3] then called Detective Cabral to report that
[4] another call had been received.
[5] Q: Okay. And did you — when did you
[6] learn anything back from Detective Cabral?
[7] A: The following Monday, which I believe
[8] is April 2nd, but it was the Monday right after
[9] the 30th. I received a call from Detective
[10] Cabral, and he requested that I contact Verizon to
[11] get a case number. I did call Verizon. I was
[12] provided a case number, and I was informed by
[13] Verizon that the trace was successful but no
[14] information would be provided to me; it would be
[15] provided to the law enforcement agency.
[16] Q: Okay. What did you do with that
[17] information?
[18] A: I contacted Detective Cabral and I gave
[19] him the case number and told him what Verizon had
[20] told me, that the information would only be
[21] provided to him.
[22] Q: Okay. So it's Monday, April 2nd now?
[23] A: That's correct.
[24] Q: What happened next after you made this

**Page 119**

[1] connection between Cabral and Verizon?
[2] A: A while later I got another call from
[3] Detective Cabral, who told me also that the trace
[4] had been successful, and he provided me with the
[5] name of James Rogers, an address of 236 Sandwich
[6] Street, Plymouth, and a telephone number of which
[7] I do not recollect off my memory that number. He
[8] asked —
[9] Q: What did — go ahead.
[10] A: He asked me if I knew James Rogers, and
[11] I told him I wasn't familiar with the name. I
[12] told Detective Cabral that I would check company
[13] records to see if, in fact, we did have a James
[14] Rogers employed.
[15] Q: Did you do that?
[16] A: I checked company records and I found
[17] him — that we did have a James Rogers with an
[18] address of 234 Sandwich Street, Plymouth, and the
[19] telephone number that we had listed in our
[20] directory matched that that he had provided.
[21] Q: Okay. Did you contact Kim about this?
[22] A: I did. After I checked the employee
[23] listing, I called Kim Whitney and asked her if she
[24] knew a James Rogers. She told me that she didn't

**Page 120**

[1] but the name sounded a little familiar but she
[2] couldn't really place a face to it. Kim had a
[3] system, I'm not familiar with the system that she
[4] used, to check employees.
[5] Q: The computer system?
[6] A: Correct.
[7] Q: Yeah.
[8] A: So she advised, while she was on the
[9] phone with me, that she was checking that and came
[10] up with, yes, we did have a James Rogers at that
[11] address with that telephone number. She was also
[12] going to check some type of a roster list, and she
[13] advised me that he was a lineman that worked out
[14] of the Plymouth Service Center.
[15] Q: Okay. Did you contact Detective Cabral
[16] again?
[17] A: Yes, I — after verifying that we did
[18] have a James Rogers that matched that address and
[19] telephone number, I contacted Detective Cabral and
[20] provided him that information. At that point in
[21] time Detective Cabral advised me that the matter
[22] would be pursued by Wareham Police.
[23] Q: All right. Did you obtain the trace
[24] results that Verizon provided to the Wareham

Rogers 0031

Arbitration between NSTAR and                    pp. 1-223                Grievance: Termination of J. Rogers
Local 369, Utility Workers Union of America                              Vol. 1, February 14, 2002

Page 121

[1] Police?
[2] A: The results were provided to Wareham
[3] Police, and I asked Detective Cabral for a copy,
[4] of which he did give me.
[5] Q: Okay.
[6]    (Documents exhibited to witness.)
[7] Q: Are these the documents that the police
[8] furnished you —
[9] A: Yes, it is.
[10] Q: — or at least a copy of the documents?
[11] A: Yes.
[12] MR. McCOWN: I would move to
[13] introduce this as — I think we're on 10,
[14] Employer's 10.
[15] MS. AMBER: 9.
[16] MR. SCHMERTZ: 9.
[17]    (Mr. Kelly perusing document.)
[18] MR. KELLY: Could I just ask a
[19] question?
[20] MR SCHMERTZ: Voir dire, sure.
[21]         VOIR DIRE EXAMINATION
[22]              BY MR. KELLY:
[23] Q: This is a Verizon document; is that
[24] what you understand?

Page 122

[1] A: Yes.
[2] Q: That you obtained from —
[3] A: Detective —
[4] Q: — the police department?
[5]    Detective Cabral?
[6] A: Detective Cabral.
[7] MR. KELLY: Well, I guess my problem
[8] is this. I — I — I don't have any objection
[9] with the fact that Ms. Murphy got this document
[10] from Detective Cabral, but I do object to it being
[11] introduced to prove that the call was made from
[12] Mr. Rogers' residence, which is, I think, why it's
[13] being offered, and I don't think either this
[14] witness or this document is evidence of that.
[15] MR. McCOWN: Well, there's an
[16] affidavit from Eric Newman, and a photocopy is as
[17] good as the original even in the Federal Rules,
[18] and the affidavit says this is a regularly kept
[19] business record of Verizon, that they're made in
[20] good faith, and these records were made in the
[21] regular course of business, that they keep these
[22] as regular records, and the records were made
[23] before the beginning of any proceeding, civil or
[24] criminal. And I mean short of putting in a

Page 123

[1] regularly kept business record of Verizon of their
[2] regularly conducted business activity, the only
[3] other thing we can do is bring in Mr. Newman to
[4] testify, or somebody like him who's a caretaker of
[5] the records, and if we have to do that, we will,
[6] but I would submit that the reason they do these
[7] affidavits is exactly so that they don't have to
[8] come testify in proceedings like this.
[9] MR. KELLY: I'm not suggesting that
[10] — I'm not suggesting that that be done, and I'm
[11] not sure that Mr. Newman, the person who certifies
[12] — and I don't think that this isn't a regularly
[13] kept business record. I'm sure it is a record
[14] from Verizon, Verizon gave it to the police, the
[15] police gave it to Ms. Murphy, and —
[16] MR. SCHMERTZ: Well, that's all it
[17] purports to be.
[18] MR. McCOWN: And it shows, according
[19] to regularly kept business records, that at 4:05
[20] p.m. on March 30th, 2001 a call went from
[21] Mr. Rogers, as the listed owner of the phone
[22] anyway —
[23] MR. KELLY: Well, see, that's where
[24] I'd like to be able to cross-examine somebody, as

Page 124

[1] to — you say that, Keith, and I can't cross-
[2] examine you because you're not a witness and you
[3] don't know what this record means, but that's what
[4] you say.
[5] MR. McCOWN: And it went to
[6] Ms. Whitney's phone number, which is on the front
[7] page, that private line.
[8] MR. SCHMERTZ: Well, the next to the
[9] last paragraph on the first page states — and it
[10] doesn't necessarily identify the person making the
[11] call, but rather only the identity of the
[12] subscriber to the telephone service.
[13] MR. McCOWN: Absent a confession
[14] from the person who made the call, this is the
[15] best thing we can do.
[16] MR. SCHMERTZ: No, no, I'm just —
[17] I'm just — and this may come — relate to
[18] admissibility. No, it's admissible as a business
[19] document, Company 9, and it remains for me to
[20] decide and for the board to decide whether a
[21] connection has been made.
[22]    All right, Company 9 received.
[23]           BY MR. McCOWN:
[24] Q: Did you write a report of your own

Rogers 0032

Case 1:04-cv-11190-RCL   Document 27-7   Filed 01/10/2006   Page 3 of 10

Grievance: Termination of J. Rogers           pp. 1-223           Arbitration between NSTAR and
Vol. 1, February 14, 2002                                          Local 369, Utility Workers Union of America

Page 125

[1] activities involved in this investigation or this
[2] matter?
[3]   A: Yes, I did.
[4]   Q: When did you write your report?
[5]   A: The report was ongoing as events
[6] occurred.
[7]   MR. McCOWN: Before I hand this out,
[8] if you have the same objection, let's hash it out
[9] now. This is her report.
[10]  MR. KELLY: But the answer to the
[11] prior question wasn't as clear as the answer that
[12] Ms. Whitney gave earlier.
[13]  Q: Yes. Do you want to explain that?
[14]  A: I'm not sure I under —
[15]  MR. KELLY: The question was when
[16] did you prepare the report, and your answer was at
[17] various times, in essence, but...
[18]  A: The report was started on February 2nd
[19] when I became involved, and as — if I had a
[20] meeting or anything that pertained to this
[21] investigation, I added the notes to the report at
[22] that — on that day.
[23]  MR. KELLY: I guess my question
[24] would be, with respect to this document which I

Page 126

[1] haven't seen: Does this document represent notes
[2] that you took contemporaneously with the events
[3] that were taking place?
[4]   THE WITNESS: Yes.
[5]   MR. SCHMERTZ: Well, let counsel see
[6] it.
[7]   MR. McCOWN: It was produced.
[8]   MR. KELLY: There may be another
[9] reason to object to it, Keith, so I should have an
[10] opportunity to see it.
[11]  MR. McCOWN: I think this was
[12] presented to the union. I don't think we're
[13] springing it as a surprise, so...
[14]  MR. SCHMERTZ: You're offering it?
[15]  MR. McCOWN: Yes.
[16]  MR. SCHMERTZ: Okay, counsel,
[17] Mr. Kelly, take a look at it, and...
[18]   (Pause.)
[19]  MR. SCHMERTZ: These are notes that
[20] you made in the course of your investigation from
[21] the time the investigation began to its
[22] completion?
[23]  THE WITNESS: That's correct.
[24]  MR. KELLY: No objection.

Page 127

[1]   MR. SCHMERTZ: All right, Company 10
[2] received.
[3]   Q: Ms. Murphy, are you familiar with the
[4] Plymouth area?
[5]   A: Somewhat.
[6]   Q: In preparing for your testimony, did
[7] you investigate the drive time between the NSTAR
[8] Service Center where Mr. Rogers reports to work
[9] and the home at 234 Sandwich Street?
[10]  A: Yes, I did.
[11]  Q: What did your investigation consist of?
[12]  A: It consisted of finding 234 Sandwich
[13] Street, Plymouth, and then I set my odometer to
[14] see distance between 234 Sandwich Street, Plymouth
[15] and the Plymouth Service Center as direct route as
[16] I thought.
[17]  Q: Um-hm.
[18]  A: That came out to 2.4 miles. My speed
[19] was between 30 and 35 miles per hour and time was
[20] no more than five minutes. I just went by a
[21] digital clock, so I don't have it down to seconds
[22] or anything.
[23]  Q: Did you hit any red lights during that?
[24]  A: Yes, I did. I hit two red lights.

Page 128

[1]   Q: When did you do this drive?
[2]   A: It was a Saturday, approximately 11:30,
[3] quarter of 12:00 in the morning. I think it was
[4] two weeks ago.
[5]   Q: Okay. And did you drive it back and
[6] forth or just once?
[7]   A: I drove it back and forth. I didn't
[8] time it, both drives, just once, but the — I did
[9] set the odometer both times and it registered 2.4
[10] both times.
[11]  Q: Can you identify this document, please?
[12]   (Document exhibited to witness.)
[13]  Q: Well, this is obviously a map of
[14] Plymouth.
[15]  A: Yeah, it's a copy of a map, a section
[16] of Plymouth.
[17]  Q: Okay. And can you identify what this
[18] circled area is right there beneath the word
[19] "harbor"?
[20]  MR. SCHMERTZ: That's the top
[21] circle.
[22]  MR. McCOWN: Yes.
[23]  MR. SCHMERTZ: The north circle,
[24] um-hm.

Rogers 0033

Case 1:04-cv-11190-RCL    Document 27-7    Filed 01/10/2006    Page 4 of 10

Arbitration between NSTAR and                pp. 1-223            Grievance: Termination of J. Rogers
Local 369, Utility Workers Union of America                        Vol. 1, February 14, 2002

Page 129

[1]  A: Okay, I would say that to be the area
[2]  of 234 Sandwich Street, Plymouth.
[3]  Q: Okay. And moving over here, what does
[4]  this circle represent around that small gray box?
[5]  (Indicating.)
[6]  MR. SCHMERTZ: The west — the west
[7]  circle.
[8]  A: I would say that that's the Plymouth
[9]  Service Center on Summer Street in Plymouth.
[10] Q: Okay. And what's this lower circle?
[11] (Indicating.)
[12] MR. SCHMERTZ: The south circle.
[13] A: That looks to be the intersection of
[14] Rocky Pond Road and Drew Road.
[15] MR. McCOWN: Okay. We would move to
[16] introduce this as Company Exhibit 10.
[17] MR. SCHMERTZ: It would be 11.
[18] MR. McCOWN: 11.
[19] MR SCHMERTZ: Company 11 received.
[20] Q: Now, obviously the drive that you just
[21] described was between the upper two circled areas,
[22] correct?
[23] A: That's correct.
[24] Q: And can you just indicate what route

Page 130

[1]  you drove?
[2]  A: When I found 234 Sandwich Street, I
[3]  came out onto Sandwich Street, which from this
[4]  map, I would have been taking a left onto Sandwich
[5]  Street, heading towards the Service Center, just
[6]  followed that, and there's a little intersecting
[7]  street, I'm not sure what the name of it is, but
[8]  there's a Friendly's there, and I just followed
[9]  that right directly to Summer Street to the
[10] Plymouth Service Center and pulled into the
[11] driveway of the Plymouth Service Center.
[12] Q: So essentially you drove back down
[13] Sandwich Street and turned left on Summer, right
[14] down to the Service Center, right?
[15] A: Correct.
[16] Q: As part of your investigation, did you
[17] also review the — the telephone numbers for the
[18] Wareham Credit Union?
[19] A: Yes, I did.
[20] Q: And Ms. Whitney's telephone numbers?
[21] A: Yes, I did.
[22] Q: You take one and hand the rest on.
[23] (Document exhibited to witness.)
[24] Q: Why did you investigate these phone

Page 131

[1]  numbers?
[2]  A: I had learned from Detective Cabral
[3]  that he had spoken with Mr. Rogers asking him
[4]  about making phone calls, and the information that
[5]  I received from Detective Cabral was that
[6]  Mr. Rogers had a girlfriend that also worked at
[7]  the Plymouth Service Center, and possibly a phone
[8]  call was made to the credit union that was located
[9]  at that facility. So what I wanted to do is see
[10] if the extensions were close, that if somebody —
[11] you know, if they were off a digit or something
[12] like that.
[13] Q: And this is the results of what your
[14] checking —
[15] A: Yes.
[16] Q: — determined?
[17] MR. McCOWN: All right. I would
[18] move to introduce this as Company Exhibit 12.
[19] MR. KELLY: No objection.
[20] MR. SCHMERTZ: Company 12 received.
[21] Q: Other than Ms. Whitney, has the NSTAR
[22] Security Department had any reports since
[23] August 30th of 2000 from any other employees
[24] complaining of harassing-type phone calls like the

Page 132

[1]  one she reported?
[2]  A: Not that have been reported to the
[3]  security department.
[4]  MR. McCOWN: That's all I have.
[5]  MR. SCHMERTZ: Cross-examine?
[6]  CROSS-EXAMINATION
[7]  BY MR. KELLY:
[8]  Q: With respect to this last exhibit with
[9]  the telephone numbers on it, isn't it — isn't it
[10] also true that if one wanted to call the Wareham
[11] Credit union or — or the un-private line of Kim
[12] Whitney, extension 3581, they could call an 800
[13] number?
[14] A: I don't know.
[15] Q: You didn't — your investigation didn't
[16] go there?
[17] A: No.
[18] Q: You don't know how many 800 numbers
[19] there are to get into the company?
[20] A: No, I don't.
[21] Q: Now, when — when you first — when you
[22] first got involved, which you said was in
[23] February —
[24] A: Yes.

Rogers 0034

Case 1:04-cv-11190-RCL    Document 27-7    Filed 01/10/2006    Page 5 of 10

Grievance: Termination of J. Rogers    pp. 1-223    Arbitration between NSTAR and
Vol. 1, February 14, 2002                                    Local 369, Utility Workers Union of America

Page 133

[1] Q: — did you make any effort to identify
[2] the source of the call that was complained of in
[3] February?
[4] A: When I got involved in February I was
[5] advised that Call Trace was in place but was not
[6] activated. Prior to that I had no knowledge of
[7] any of this.
[8] Q: All right. Who told you Call Trace was
[9] not activated?
[10] A: That was the information when I was
[11] briefed by Kim on the calls that she had received
[12] the call.
[13] Q: Oh, I understand. She said that
[14] earlier today. I'm just wondering if it was true.
[15] Did you ever try and figure out whether that was
[16] true?
[17] A: I had no knowledge of it, and I didn't
[18] know how to activate it, that's why I contacted
[19] voice operations.
[20] Q: And didn't voice operations tell you
[21] all you've got to do is hit star 57?
[22] A: No, voice operations e-mailed me the
[23] directions.
[24] Q: And those directions say you've got to

Page 134

[1] hit star 57?
[2] A: Correct.
[3] Q: But it didn't say you had to do
[4] anything else, did it?
[5] A: I'd have to read them again to see,
[6] but...
[7] Q: Okay. All right. But my question is
[8] different. Apart from — apart from Call Trace,
[9] which you — you knew from talking to Ms. Whitney
[10] that she had not done that, in any event, even if
[11] it had been activated, right?
[12] A: That's correct.
[13] Q: All right. So that avenue is closed.
[14] Did you do anything else to try and determine
[15] where the telephone call came from aside from talk
[16] to her about Call Trace and the other people?
[17] A: No, I had nothing to identify.
[18] Q: Did you ever try and figure out whether
[19] the calls coming in to — to either the Wareham —
[20] the main Wareham number or any of the other main
[21] numbers — I'll suggest to you there are 800
[22] numbers that can get you into the company — did
[23] you ever try and determine whether the people who
[24] called the company at the main number, whether

Page 135

[1] the — the numbers are identified?
[2] A: That information had been looked into
[3] by Peter Dolan, and it was learned that the
[4] numbers could not be — there was no tracing
[5] mechanism for calls that were coming in, so I —
[6] Q: So part of your investigation was to
[7] talk to Peter Dolan?
[8] A: Peter Dolan is actually my colleague;
[9] he's an investigator.
[10] Q: I see. And to the best of your
[11] knowledge, Mr. Dolan tried to find out if the
[12] calls were documented?
[13] A: That's correct.
[14] Q: And to the best of your knowledge,
[15] they're not?
[16] A: That's correct.
[17] Q: Do you know whether — do you know
[18] whether outgoing calls are documented?
[19] A: I'm not certain on that. I didn't look
[20] into — I wasn't involved in that part of the
[21] investigation, so I can't answer that question.
[22] Q: Who was in charge of the part of the
[23] investigation that involved getting information
[24] from the phone company, is it Verizon, is that the

Page 136

[1] phone company that — that NSTAR engages?
[2] A: The best information — the best answer
[3] I can give you to that is that Peter Dolan was the
[4] one that had looked into the phone calls, whether
[5] they were traceable or not. I don't have any
[6] further information on that.
[7]     (Pause.)
[8] Q: Is Mr. Dolan still employed?
[9] A: Yes, he is.
[10] Q: In the same capacity?
[11] A: Yes, he is.
[12]     MR. KELLY: I have no further
[13] questions.
[14]     MR. McCOWN: Nothing else.
[15]     MR. SCHMERTZ: Why did you drive the
[16] distance?
[17]     THE WITNESS: I'm sorry, sir?
[18]     MR. SCHMERTZ: Why did you drive the
[19] distance?
[20]     THE WITNESS: I was asked to.
[21]     MR. SCHMERTZ: Were you told why you
[22] were to do that?
[23]     THE WITNESS: I was asked by
[24] Mr. McCown if I would do that.

Rogers 0035

Case 1:04-cv-11190-RCL   Document 27-7   Filed 01/10/2006   Page 6 of 10

| Arbitration between NSTAR and | pp. 1-223 | Grievance: Termination of J. Rogers |
| Local 369, Utility Workers Union of America | | Vol. 1, February 14, 2002 |

Page 137

[1] MR. SCHMERTZ: Did he tell you why
[2] he wanted you to do that?
[3] THE WITNESS: He was curious to see
[4] what the distance was from —
[5] MR. SCHMERTZ: Did he tell you? Not
[6] what you think. Did he tell you why you should do
[7] that?
[8] THE WITNESS: He wanted to know what
[9] the distance was from 234 Sandwich Street to the
[10] Plymouth Service Center.
[11] MR. SCHMERTZ: Okay.
[12] MR. McCOWN: I mean, I can answer
[13] the question, if you'd like.
[14] MR. SCHMERTZ: Well, the exhibit is
[15] in and we don't have any record —
[16] MR. McCOWN: I referenced it in my
[17] opening. The last two calls were made after work,
[18] and —
[19] MR. SCHMERTZ: All right.
[20] MR. McCOWN: — this just goes to
[21] show the amount of time it would take.
[22] MR. SCHMERTZ: You did make mention
[23] of how long it would take to go from one location
[24] to the other. I see. That's the purpose. All

Page 138

[1] right. Thank you.
[2] (Witness dismissed.)
[3] MR. McCOWN: Can we take a short
[4] break?
[5] MR. SCHMERTZ: Sure.
[6] (Off record.)
[7] (WANDA GOLDEN, Sworn.)
[8] MR. SCHMERTZ: Please sit down and
[9] give your full name to the court reporter.
[10] THE WITNESS: Wanda Golden.
[11]                   DIRECT EXAMINATION
[12]                   BY MR. McCOWN:
[13] Q: Who's your employer, Ms. Golden?
[14] A: I've been employed by NSTAR.
[15] Q: And what's your current position?
[16] A: I'm the manager of electric ops,
[17] planning and scheduling, in the southern division.
[18] Q: And the southern division covers
[19] Plymouth, New Bedford, Cape Cod?
[20] A: Correct.
[21] Q: As part of your — how long have you
[22] worked for either NSTAR or COM/Energy before?
[23] A: 24 years.
[24] Q: As part of your job over the years were

Page 139

[1] you familiar with the COM Electric Work Management
[2] Information System?
[3] A: Yes, I was very familiar with the work
[4] management system.
[5] Q: Why was that?
[6] A: I was in charge of the designers in the
[7] New Bedford District, and then for a while I
[8] actually worked with the work management program
[9] in our Wareham facility and maintained it until we
[10] moved over to the new Passport system for NSTAR.
[11] Q: And when did you move to the new
[12] system?
[13] A: We moved over — we converted over to
[14] the new system May 2001.
[15] Q: Okay. What was — and from now on when
[16] I ask you about the work management system I'll be
[17] referring to the older one that was in place
[18] before May of last year. What was the work
[19] management system?
[20] A: The work management system was a
[21] computerized document which allowed the company to
[22] identify all of the construction that occurred,
[23] the cost of the construction, what crews were
[24] there, and allowed us to actually feed the payroll

Page 140

[1] system from the information provided into this
[2] work management system.
[3] Q: So it's a system for tracking the work
[4] of the crews out in the field?
[5] A: One of its many functions, yes.
[6] Q: And it also has payroll functions?
[7] A: Yes, it had payroll and productivity
[8] functionality.
[9] Q: And then you have billing functions in
[10] there as well because customers get billed for
[11] some of the work?
[12] A: Correct. We were able to generate cost
[13] estimates and identify which property was going to
[14] be capitalized in the company's books.
[15] Q: For an overhead line crew that's out in
[16] the field, explain how their work gets transformed
[17] into records that are stored in the work
[18] management system?
[19] A: The line crew would go out and perform
[20] their work, and then they would document their
[21] time on a time sheet. The time sheet, typically
[22] prepared by the crew leader for his crew on that
[23] day, would submit the time sheet to the — to his
[24] supervisor or line foreman at the end of the day.

Rogers 0036

Case 1:04-cv-11190-RCL    Document 27-7    Filed 01/10/2006    Page 7 of 10

Grievance: Termination of J. Rogers          pp. 1-223          Arbitration between NSTAR and
Vol. 1, February 14, 2002                                        Local 369, Utility Workers Union of America

Page 141

[1] The foreman would then approve the time sheet,
[2] give it to the local clerk dispatcher person, and
[3] they would enter it into the work management
[4] system.
[5]    Q: Okay. Does the company rely on the
[6] information that's stored in the work management
[7] system in the regular operation of its business?
[8]    A: Yes, the company relies very heavily on
[9] it.
[10]   Q: And is this indeed regularly kept
[11] business information for the company?
[12]   A: Yes.
[13]   Q: And, likewise, the time sheets that are
[14] filled out by the field crews, are those regularly
[15] kept business records of the company?
[16]   A: Yes, they are.
[17]   Q: Does the company rely on those for
[18] payroll and other functions?
[19]   A: Yes, they rely on those for payroll and
[20] for any time we have to report out on reliability
[21] suits or liability claims in case of auto damages
[22] and construction damages or just bills incurred to
[23] customers.
[24]   MR. McCOWN: All right. Maybe we

Page 142

[1] should go off the record for one minute.
[2]    MR. SCHMERTZ: All right.
[3]    (Off record.)
[4]    MR. KELLY: Do I respond to —
[5]    MR. SCHMERTZ: Well, I think counsel
[6] is saying he wants to make an offer of proof.
[7] Maybe if he makes an offer of proof, then you'll
[8] see whether you can agree to the offer of proof.
[9]    MR. McCOWN: Oh, no, I'm sorry. I
[10] meant that my off-the-record comments were in the
[11] nature of an offer of proof.
[12]   MR. SCHMERTZ: Now I'm suggesting
[13] that maybe the quickest way to do this, if you
[14] want to, is to make an offer of proof as to what
[15] these documents purport to show. Do you want
[16] counsel to do that?
[17]   MR. KELLY: If it would —
[18]   MR. SCHMERTZ: Let's stay off the
[19] record.
[20]   (Off record.)
[21]   MR. SCHMERTZ: Let's go on the
[22] record. Would you make the offer of proof,
[23] please, the documents, if you can remember?
[24]   MR. McCOWN: This witness — this

Page 143

[1] witness would testify that the records we propose
[2] to mark as an exhibit would show that on
[3] August 30th, 2000 at approximately 9:30 a.m.
[4] Mr. Rogers was on a paid rest period due to
[5] overtime worked the previous night.
[6]    MR. SCHMERTZ: Which meant he was
[7] off that day?
[8]    MR. McCOWN: Yes, that means he was
[9] off that day after working in the wee hours after
[10] midnight. That on December 5th, 2000 between
[11] approximately 11:30 a.m. and 12:30 p.m. Mr. Rogers
[12] and his crew reported being at a work site in
[13] Marshfield, and their actual activities are
[14] contained in this summary chart for December 5th,
[15] 2000.
[16]   MR. SCHMERTZ: Um-hm.
[17]   MR. McCOWN: It actually may have
[18] been two work sites, but they're both in
[19] Marshfield. On December 6, 2000 between 11:30
[20] a.m. and 12:30 p.m. these work records show that
[21] Mr. Rogers and his crew finished a job in Plymouth
[22] that was located at — near the intersection of
[23] Rocky Pond Road and Drew Road, and between 12:00
[24] and 1:00 they reported a half hour lunch break and

Page 144

[1] travel to the next job, which was in Marshfield.
[2]    These records also show that on
[3] January 2nd, 2001 at 2:05 p.m. Mr. Rogers was on a
[4] vacation day. On February 1st, 2001 at 4:16
[5] p.m. — well, these records show that Mr. Rogers'
[6] workday ended at 3:30 p.m. and there was no
[7] overtime. And on March 30th at 4:05 p.m., again
[8] these records show that Mr. Rogers' workday ended
[9] at 3:30 p.m. and there was no overtime.
[10]   MR. SCHMERTZ: All right. Counsel,
[11] that's an offer of proof and that's acceptable?
[12]   MR. KELLY: Yeah, we don't have any
[13] objection to that representation.
[14]   MR. SCHMERTZ: All right. Company
[15] 13 are the documents that have just been referred
[16] to.
[17]   All right, any further direct of
[18] this witness?
[19]   MR. McCOWN: I don't believe so,
[20] but — no.
[21]   MR. SCHMERTZ: Cross-examine?
[22]   MR. KELLY: As much as I would enjoy
[23] talking about the old Work Management Information
[24] System —

Rogers 0037

Case 1:04-cv-11190-RCL  Document 27-7  Filed 01/10/2006  Page 8 of 10

| Arbitration between NSTAR and Local 369, Utility Workers Union of America | pp. 1-223 | Grievance: Termination of J. Rogers Vol. 1, February 14, 2002 |

### Page 145

[1] MR. SCHMERTZ: That must be an
[2] inside joke. All right.
[3] MR. KELLY: — no questions.
[4] MR. SCHMERTZ: No questions. Thank
[5] you very much.
[6] (Witness dismissed.)
[7] MR. McCOWN: The company's last
[8] witness is Mr. McGuire.
[9] MR. SCHMERTZ: Mr. McGuire.
[10] (JAMES McGUIRE, Sworn.)
[11] MR. SCHMERTZ: Your full name, sir,
[12] to the reporter.
[13] THE WITNESS: James M. McGuire, Jr.
[14] DIRECT EXAMINATION
[15] BY MR. McCOWN:
[16] Q: Your employer, Mr. McGuire?
[17] A: Presently it's NSTAR Gas & Electric.
[18] Prior to the merger it was Boston Edison.
[19] Q: And what's your current job title?
[20] A: Senior labor relations consultant.
[21] Q: And your duties and responsibilities?
[22] A: Administrator of the collective
[23] bargaining agreement.
[24] Q: Do you have a particular region that

### Page 146

[1] you're responsible for?
[2] A: I was responsible for the south,
[3] recently, up till about a few weeks ago. Now
[4] we're sharing the duties across all of the service
[5] territories that we now have, both gas and
[6] electric.
[7] Q: And in administering the collective
[8] bargaining agreement, you have responsibilities
[9] with respect to discipline?
[10] A: That's correct.
[11] Q: And grievance handling?
[12] A: That's correct.
[13] MR. McCOWN: Off the record.
[14] (Off record.)
[15] MR. McCOWN: Can we go back on the
[16] record?
[17] Q: Mr. McGuire, what's your job history
[18] with Boston Edison and NSTAR?
[19] A: I started for Boston Edison in 1981. I
[20] was a substation operator for the Boston division
[21] until I believe it was April of 1998 I went into
[22] the labor relations department.
[23] Q: And did you ever have any role in the
[24] labor union, utility workers, Local 369?

### Page 147

[1] A: 1982 I started as a steward in the
[2] Boston division up until 1987 I become a chief
[3] steward of substations. 1993 I become chief
[4] steward for the operator mechanic group. November
[5] 1993 I become executive board member for electric
[6] corporation substations until November of 1997.
[7] Q: Were you involved in the decision to
[8] terminate Mr. Rogers' employment?
[9] A: Yes, I was.
[10] Q: Who else was involved?
[11] A: Dave Dorant.
[12] Q: And what's his title?
[13] A: He was the manager, labor relations, at
[14] the time.
[15] Q: What was the basis for the decision to
[16] terminate?
[17] A: The basis for the decision to terminate
[18] was based on all the evidence that we had
[19] available to us. We had the one phone call that
[20] was placed sometime in March, 30th I believe the
[21] date to be, and —
[22] Q: That was the traced call?
[23] A: Yes.
[24] Q: Yeah.

### Page 148

[1] A: — and then going over with Wanda the
[2] WMIS records showing that —
[3] Q: That's the work management system,
[4] WMIS?
[5] A: Yeah.
[6] — that the ability for him to make
[7] those phone calls was also there, and he provided
[8] no alibi for the call that was placed from his
[9] residence that was traced, and given the
[10] opportunity to provide that alibi, he never came
[11] up with any alibi that showed anything different.
[12] Q: Okay. Did you conduct a suspension
[13] hearing, which actually turned into a termination
[14] hearing, for Mr. Rogers on April 23rd, 2001?
[15] A: That's correct.
[16] Q: Can you describe what happened at that
[17] hearing and the discussions you had with
[18] Mr. Rogers?
[19] A: During the suspension hearing, we
[20] talked about the incident that had taken place.
[21] We asked Mr. Rogers at that time if he had ever
[22] had — if he remembered being present at a meeting
[23] that took place in Plymouth — I forget the actual
[24] dates — that Joe Roda and Kim Whitney both

Rogers 0038

Case 1:04-cv-11190-RCL   Document 27-7   Filed 01/10/2006   Page 9 of 10

Grievance: Termination of J. Rogers   pp. 1-223   Arbitration between NSTAR and
Vol. 1, February 14, 2002                          Local 369, Utility Workers Union of America

### Page 149

[1] participated in, and he stated yes, he did. We
[2] asked about if he was aware of the code of conduct
[3] book and had he received a code of conduct book.
[4] He also stated at that time, yes, he had. And
[5] sometime after those conversations took place we
[6] were — there was a request made to us to take a
[7] break because Mr. Rogers had an alibi that he was
[8] with an employee the night the trace phone call
[9] was made and that those employees had met right
[10] after work at the American Legion Post somewhere
[11] around 4:00 in the afternoon, I believe. They
[12] were meeting to go and look at — I believe it was
[13] his brother or brother-in-law had just purchased a
[14] chocolate Labrador retriever dog and they were
[15] going to look at it. I think they told us at that
[16] time that Mr. Sherwood didn't show up in the
[17] parking lot to meet with them because he had a
[18] doctor's appointment.
[19]   Q: Sherwood was a coworker?
[20]   A: Yes. I think they also mentioned a Bob
[21] Laine, I'm not a hundred percent sure of that, but
[22] I do know they talked about a Mr. Knight.
[23]   Q: Is Mr. Knight a coworker as well?
[24]   A: Yes, he's an overhead lineman. And

### Page 150

[1] then we took approximately a 25-minute break
[2] because Mr. Knight had worked all night and that
[3] he was coming in to provide Mr. Rogers with an
[4] alibi at that particular time. Somewhere ten
[5] minutes later Mr. Knight showed up. He had a
[6] meeting with representatives from the local, and
[7] then Chris and Phil asked to go back into the
[8] hearing, and at that time it was explained to us
[9] that Mr. Knight would not be testifying on
[10] Mr. Rogers' behalf. I believe he stated because
[11] he didn't want his wife — his wife didn't want
[12] him involved, I believe is what happened. And
[13] then they stated that there was a possibility
[14] someone could have used a clip-on phone from
[15] outside his house, and —
[16]   Q: Do you remember any discussion of Call
[17] Blocking?
[18]   A: I believe I asked Mr. Rogers if he had
[19] Call Blocking as one of the options on his phone.
[20] He stated no. Then I believe I asked Mr. Rogers
[21] if he had ever used Call Blocking. He first
[22] stated no, and then he said, "Well, yes, on some
[23] occasions," I believe was what took place.
[24]   Q: Did you ask him about his whereabouts

### Page 151

[1] on the days of these phone calls?
[2]   A: We asked him —
[3]   Q: That is in addition to March 30th.
[4]   A: I believe the question was asked if he
[5] had ever placed any phone calls to Kim's phone
[6] numbers on the dates that were listed, the dates
[7] in question, and he answered no to all those
[8] questions.
[9]   Q: Did you ask him about calling the
[10] Wareham facility generally?
[11]   A: I believe I asked him that question
[12] also, and I believe his response to that was he
[13] may have called someone — I believe he said he
[14] may have called someone on a question on 401 K.
[15]   Q: Okay. You may have covered this
[16] already. Did you discuss the code of conduct that
[17] day?
[18]   A: We asked him if he had received the
[19] code of conduct and he told us he had.
[20]   Q: Did you make notes of this hearing on
[21] April 23rd, 2001?
[22]   A: Yes.
[23]   Q: When did you make them?
[24]   A: The day of the hearing.

### Page 152

[1]   (Document exhibited to witness.)
[2]   Q: Identify this document, please.
[3]   A: These are the notes that I made the day
[4] of the hearing on April 23rd.
[5]   Q: Okay. And let's identify the attendees
[6] there up at the top.
[7]   A: For the company it was myself and Dave
[8] Dorant. For the local it was Phil Trombly, Chris
[9] Horn, and James Rogers.
[10]   Q: At one point a few minutes ago you
[11] referred to Phil and Chris. That's Mr. Trombly
[12] and Mr. Hon —
[13]   A: That's correct.
[14]   Q: — Horn? Sorry. It's an Ohio problem.
[15]   MR. McCOWN: I would move to
[16] introduce these as the next company exhibit.
[17]   MR. KELLY: No objection.
[18]   MR. SCHMERTZ: All right, Company 14
[19] received.
[20]   Q: All right. Why, Mr. McGuire, did the
[21] company decide on a penalty of discharge rather
[22] than something less than that?
[23]   A: The company over the past few years has
[24] — has a policy of zero tolerance in the workplace

Rogers 0039

### Page 153

[1] and —
[2]   Q: Zero tolerance for what?
[3]   A: For — for violence in the workplace,
[4] numerous things that are covered, sexual
[5] harassment.
[6]   Q: Okay. And has this policy of zero
[7] tolerance been communicated to the employees?
[8]   A: Yes, it has. I believe it come out
[9] sometime around 2000.
[10]   Q: What was the method of communication?
[11]   A: There was meetings, there was books
[12] that were given out.
[13]   Q: Okay. And is this the book you're
[14] referring to? (Indicating.)
[15]   A: That's correct.
[16]   MR. McCOWN: Paul, we have — maybe
[17] we should go off the record for a moment.
[18]   MR. SCHMERTZ: Off the record.
[19]   (Off record.)
[20]   MR. McCOWN: Should we go back on
[21] the record?
[22]   MR. SCHMERTZ: Back on the record.
[23]   Q: Mr. McGuire, this code of conduct
[24] doesn't actually mention the phrase "zero

### Page 154

[1] tolerance" anywhere, does it?
[2]   A: Not that I believe, no.
[3]   Q: Were you in attendance at meetings
[4] where this was distributed to employees?
[5]   A: I have been at meetings where it was
[6] distributed to employees.
[7]   Q: All right. And is there a message that
[8] the company generally communicates with the
[9] distribution of this code of conduct concerning
[10] that zero tolerance issue?
[11]   A: There have been at the meetings that I
[12] have attended.
[13]   Q: And what is that message?
[14]   A: Zero tolerance in the workplace, and
[15] they go over the book.
[16]   MR. McCOWN: Okay. I would ask to
[17] put this in as a company exhibit, No. —
[18]   MR. SCHMERTZ: No. 15. I have the
[19] revised issue.
[20]   MR. McCOWN: Yeah, there's only one.
[21]   MR. SCHMERTZ: And I notice on
[22] page 6 it makes reference to employment
[23] discrimination and sexual harassment.
[24]   MR. McCOWN: I think the relevant

### Page 155

[1] parts would be this box on page 2 —
[2]   MS. AMBER: 2 and 3.
[3]   MR. McCOWN: — the consequences of
[4] violations.
[5]   MR. SCHMERTZ: Mine is on page 3.
[6]   MR. McCOWN: Oh, I'm sorry, that's
[7] just my eyes. It's on page 3.
[8]   MR. SCHMERTZ: Well, you make your
[9] argument. Company 15, code of conduct.
[10]   MR. McCOWN: That's all I have on
[11] direct.
[12]   MR. SCHMERTZ: Cross-examine?
[13]               CROSS-EXAMINATION
[14]               BY MR. KELLY:
[15]   Q: There was testimony earlier about a —
[16] a meeting at the — I think at this Plymouth
[17] Service Center over the question of, I don't know,
[18] violence and intimidation in the workplace.
[19] Remember that?
[20]   A: (Witness nodded.)
[21]   Q: Is that one of the meetings that you
[22] were at?
[23]   A: No.
[24]   Q: So whether the zero tolerance policy

### Page 156

[1] was discussed or not at that meeting is not
[2] something that you can testify to?
[3]   A: That's correct. That's why I answered
[4] that the meetings that I attended that it was
[5] expressed.
[6]   Q: Okay. You indicated earlier that one
[7] of the — one of the reasons you made the decision
[8] to terminate Jim Rogers was because he had the
[9] ability to make the phone calls. Remember that?
[10]   A: That's correct.
[11]   Q: And what did you mean by that?
[12]   A: I meant that we had one concrete date
[13] that we know that that phone call was placed from
[14] his residence.
[15]   Q: Yeah, but that was the first one, and
[16] then the second one —
[17]   A: No, that was the fifth one.
[18]   Q: No, no, but when you said the basis for
[19] our decision was, one, we had one concrete phone
[20] call; two, he had the ability to make the other
[21] ones.
[22]   A: Correct.
[23]   Q: And I'm asking you about No. 2, that he
[24] had the ability to make the other ones. What did

Rogers 0040