Case 1:04-cv-11190-RCL    Document 27-8    Filed 01/10/2006    Page 1 of 10

Grievance: Termination of J. Rogers          pp. 1-223          Arbitration between NSTAR and
Vol. 1, February 14, 2002                                        Local 369, Utility Workers Union of America

Page 157

you mean by that?
A: That looking at the WMIS documentation that showed that he was either on a rest period, a vacation day, something other than it showed him gainfully working on the job. We looked at the times the phone calls were placed from the records that we had to see if he was available or had the opportunity to be home at that time to make those calls.
Q: And are you suggesting that somehow you narrowed it down to him by doing that?
A: No, I'm just suggesting that we know that there was one traced call that came from that individual's residence, and he had the ability to be available or be at his residence when the other calls were made.
Q: Including the ones when he was working?
A: There may have been one when I think they discussed that he — there was possibility that he was working, correct. So four out of five.
Q: Did that figure into your calculus?
A: Yes, we looked at that — I looked at that.

Page 158

Q: And you concluded that he had the ability to make four out of five or you concluded that he had the ability to make five out five?
A: I feel like we concluded that he had the ability to make the four out of five — the five out of five. I'm sorry. That he had the ability to make them all.
Q: All right. The fact that he was working didn't make any difference; he could have made those calls?
A: That was a possibility. I believe I talked to the supervisor at the time down there, and he explained to me the locations that they're at on that particular day; and, yes, he had the opportunity to make that phone call that day.
Q: Okay. Is there anybody who was working for you on December 5th or 6th who didn't have the opportunity to make that phone call?
A: I can't answer that question. I don't know that.
Q: Is there anybody who was working for you, aside from Jim Rogers, that had January 2nd off?
A: Yeah, could be. Yeah.

Page 159

Q: Did you try and determine whether anybody else had the ability to make those calls?
A: If I had documentation that showed that the call was made from someone else's house, I would have looked into that, yeah, correct, but all I had was the evidence that was presented to me. I felt we had concrete evidence on the phone being placed with Mr. Rogers' residence on that particular day. That's why Mr. Rogers was looked at and no other employee, correct.
Q: Okay. Did you make an effort to determine where the other calls came from?
A: Did we make an effort? We asked for phone records, if we could get phone records coming into the Wareham Service Center, correct.
Q: And what kind of phone records did you get?
A: We asked for the phone records for — I don't know what the extensions were — her old extension and her new extension.
Q: Yeah. And did you get calls coming in and calls going out?
A: That's a possibility. I don't remember, to be honest with you.

Page 160

Q: All right. I've got a two-page document here I'll have to make copies of, but I'd like you to take a look at that, if you would, Mr. McGuire.
   (Document exhibited to witness.)
   (Witness perusing document.)
A: I'm looking at them.
Q: Are you recognizing it as you're looking at it?
A: To be honest with you, I can't remember what phone number this was, 3581. I'm not sure of that.
Q: All right. Let me direct your attention to Company Exhibit 12, which is a list of telephone numbers.
   (Document exhibited to witness.)
   (Witness perusing document.)
Q: Wasn't extension 3581 Kim Whitney's extension in August of 2000?
A: That's correct.
Q: And isn't that a list of telephone calls in August of 2000?
A: It appears to be, yeah.
Q: And didn't you provide that list to the

Rogers 0041

Case 1:04-cv-11190-RCL   Document 27-8   Filed 01/10/2006   Page 2 of 10

Arbitration between NSTAR and
Local 369, Utility Workers Union of America

pp. 1-223

Grievance: Termination of J. Rogers
Vol. 1, February 14, 2002

Page 161

[1] union?
[2] A: I believe I did, yeah.
[3] Q: Did you make an effort to get a similar
[4] list for the days in which the — I'll represent
[5] that August 30th is not one of the August dates on
[6] that list, but did you make an effort to get a
[7] similar list for August 30th, December 5th,
[8] December 6th —
[9] A: That's correct. I requested — now
[10] that I have some recollection, I requested that
[11] number be — to see if we could get a list of the
[12] calls that were placed to that number or from that
[13] number and also on the other phone, and the system
[14] that they were using had been dismantled or
[15] something, and the only dates they could provide
[16] me for phone calls coming in were on these
[17] particular dates —
[18] Q: And who was it who —
[19] A: — and I believe I told that to the
[20] union the day I met with them to provide them with
[21] the information request.
[22] Q: Who was it that told you that that was
[23] all they could produce?
[24] A: I'm going to say Peter Randall, but I'm

Page 162

[1] not a hundred percent sure of that.
[2] Q: Did you talk to Peter Dolan?
[3] A: I had no conversation with Peter Dolan,
[4] no. No.
[5] Q: Did you have discussion with Mr. Rogers
[6] about what provision of the code of conduct he was
[7] alleged to have violated?
[8] A: No, I didn't.
[9] Q: Can you tell me?
[10] A: I asked if he had been in attendance on
[11] the violence in the workplace with Kim Whitney and
[12] them down in Plymouth, and was he aware that this
[13] code of conduct book existed and had he received a
[14] copy of the code of conduct book, and he said to
[15] me at that time, "Yes, I had."
[16] Q: Okay. Can you answer my question,
[17] though? Which provision of the code of conduct
[18] did you determine that Mr. Rogers violated and
[19] deserved to be fired for?
[20] A: I'll have to go through it.
[21] Q: Take your time.
[22] (Witness perusing document.)
[23] A: If you go to page 6, "Employee/
[24] Employment Discrimination and Sexual Harassment.

Page 163

[1] NSTAR will not tolerate illegal discrimination or
[2] harassment in any form." Do you want me to go
[3] through the whole thing?
[4] Q: Well, you just tell me. Is that the
[5] provision of the code of conduct that Mr. Rogers
[6] is alleged to have violated?
[7] A: That would be — can I read through
[8] this for a couple of minutes, if you don't mind?
[9] Q: Sure.
[10] (Witness perusing document.)
[11] A: If you look at page 2, we have a table
[12] that talks about "we should." See under "we
[13] should?
[14] Q: Yes.
[15] A: Those bullets there also —
[16] Q: Mr. Rogers violated the —
[17] A: — provides — huh?
[18] Q: He violated the bullets? All of them
[19] or —
[20] A: "Treats everybody with respect and
[21] dignity, safeguard property" —
[22] MR. SCHMERTZ: You had a meeting,
[23] Company 14, these are your notes, right?
[24] THE WITNESS: Yeah.

Page 164

[1] MR. SCHMERTZ: And at this meeting
[2] you said you read charges and amended charges to
[3] include creating a hostile work environment.
[4] THE WITNESS: Correct. I didn't see
[5] that.
[6] MR. SCHMERTZ: What did you talk to
[7] him about at this meeting?
[8] THE WITNESS: We talked about
[9] Mr. Rogers placing phone calls, threatening
[10] harassing phone calls to a fellow employee. We
[11] talked about creating a hostile work environment.
[12] We talked about did he place those particular
[13] phone calls on those dates. We talked about
[14] numerous things. We requested that Mr. Rogers
[15] provide us with an alibi for the 30th of why that
[16] phone call —
[17] MR. SCHMERTZ: Did you tell him
[18] specifically what section or sections of the code
[19] of conduct he violated?
[20] THE WITNESS: No.
[21] MR. SCHMERTZ: You asked him whether
[22] he received the code of conduct and he said he
[23] did.
[24] THE WITNESS: No, I did not.

Rogers 0042

Case 1:04-cv-11190-RCL    Document 27-8    Filed 01/10/2006    Page 3 of 10

Grievance: Termination of J. Rogers     pp. 1-223        Arbitration between NSTAR and
Vol. 1, February 14, 2002                                Local 369, Utility Workers Union of America

Page 165

[1] MR. SCHMERTZ: No, you did not what?
[2] THE WITNESS: I did not tell him
[3] what part of the code of conduct he violated.
[4] MR. SCHMERTZ: All right. Continue.
[5] A: I didn't.
[6] Q: All right. But as we sit here today,
[7] the portion of the code of conduct that you think
[8] it was, was the provision that says, "NSTAR will
[9] not tolerate illegal discrimination or harassment
[10] in any form"; is that right?
[11] A: Yeah.
[12] Q: At the meeting you held on — this is
[13] the 23rd you were testifying to, right —
[14] A: Yes.
[15] Q: — April 23rd?
[16] A: Yes.
[17] Q: — did you tell either the union or
[18] Mr. Rogers or any of them the identity of the
[19] person who was complaining about the phone calls?
[20] A: No, I did not. I referred to the
[21] victim.
[22] Q: Do you know one way or another whether
[23] anything that Mr. Rogers did has been found to be
[24] illegal by anybody?

Page 166

[1] MR. McCOWN: I object. I mean, this
[2] witness isn't a lawyer. That's — illegal is a
[3] very broad —
[4] MR. SCHMERTZ: The question was
[5] "found to be illegal." If he knows. Found to be
[6] illegal. Not whether it's illegal, whether it has
[7] been found to be illegal.
[8] MR. KELLY: Whether it was found to
[9] be illegal. There's been a determination that he
[10] did something unlawful.
[11] MR. SCHMERTZ: If the witness can
[12] answer that, I'll let him answer it.
[13] MR. McCOWN: I think this is just a
[14] roundabout way to attempt to get in the criminal
[15] case.
[16] MR. SCHMERTZ: Well, I'm going to
[17] let him answer it. What do you know about that,
[18] if anything?
[19] A: The criminal case, other than
[20] information that the union made comments on, as
[21] far as my understanding, it's in appeal.
[22] Q: Isn't it — isn't it true that — that
[23] the criminal proceeding never commenced; that the
[24] complaint was dismissed?

Page 167

[1] MR. McCOWN: I object. That's two
[2] questions, No. 1; and, No. 2, neither one is
[3] relevant.
[4] MR. KELLY: I will — well, I
[5] think — I do think —
[6] MR. McCOWN: I'll be glad — if
[7] we're going to get there, I would be glad to give
[8] a lawyer's view of where that complaint stands,
[9] which is not dismissed —
[10] MR. KELLY: Well, I'll —
[11] MR. McCOWN: — as far as I know and
[12] as far as my sources are.
[13] MR. KELLY: I'll offer — I'll offer
[14] the document, and if you've got another document,
[15] we can see them all, but —
[16] MR. SCHMERTZ: I mean, I will hear
[17] about the — the criminal proceeding. You both
[18] know quite clearly that the standard of proof is
[19] different in a criminal matter than in an
[20] arbitration. I don't know —
[21] MR. KELLY: Right, I do know that.
[22] MR. SCHMERTZ: I don't know the
[23] relevance of it at this point, but if you want to
[24] ask this witness any question about it, you may;

Page 168

[1] and if counsel wants to offer an explanation as to
[2] procedurally where it stands at this particular
[3] time, I'll hear it. Its relevance is something
[4] that can be determined later, if at all.
[5] Q: Let me ask you this —
[6] MR. SCHMERTZ: Obviously you both
[7] know that it's not res judicata as to what we do.
[8] MR. KELLY: Right.
[9] Q: Isn't it true that on — in May of last
[10] year at the show cause hearing the matter was
[11] dismissed?
[12] MR. McCOWN: Foundation.
[13] Q: Isn't that true?
[14] MR. McCOWN: I object. This witness
[15] wasn't present.
[16] MR. KELLY: Well, he knows, though.
[17] MR. SCHMERTZ: If he knows. Can you
[18] answer that question?
[19] A: Other than being told by Mr. Trombly
[20] that the case had been dismissed, I have no
[21] knowledge of that —
[22] MR. SCHMERTZ: Okay.
[23] A: — and I seeked no knowledge of that.
[24] MR. SCHMERTZ: Okay. All right.

Rogers 0043

Case 1:04-cv-11190-RCL   Document 27-8   Filed 01/10/2006   Page 4 of 10

Arbitration between NSTAR and
Local 369, Utility Workers Union of America                pp. 1-223                Grievance: Termination of J. Rogers
                                                                                    Vol. 1, February 14, 2002

Page 169

[1] That's his answer.
[2] Q: Let me show you a document,
[3] Mr. McGuire. See if you can identify that.
[4] (Document exhibited to witness.)
[5] A: It's looks like a document —
[6] MR. SCHMERTZ: Have you seen it
[7] before?
[8] A: I don't remember seeing it, to be
[9] honest with you.
[10] MR. SCHMERTZ: Only if he's seen it
[11] before.
[12] MR. McCOWN: Nor have I.
[13] Q: All right. Let me ask you this,
[14] Mr. McGuire. Have you been involved in other
[15] cases of harassment or alleged harassment?
[16] A: I may have been, yeah. I'm — I may
[17] have been, yeah, a couple.
[18] Q: Have you fired anybody else for it?
[19] A: No. No.
[20] Q: And with respect to those that you have
[21] been involved or with which you have been
[22] involved, what was the — what were the steps that
[23] you took under the circumstances?
[24] A: The both cases were a non-precedent

Page 170

[1] agreement.
[2] MR. SCHMERTZ: They were, what,
[3] settled are you saying?
[4] THE WITNESS: Yeah, different —
[5] MR. SCHMERTZ: Well, answer my
[6] question. They were settled by agreement between
[7] the company and the union without precedent; is
[8] that what you're saying?
[9] (Witness nodded.)
[10] Q: Had you taken some action and then
[11] later on the grievance was resolved through a
[12] settlement?
[13] A: (Witness nodded.)
[14] Q: No?
[15] A: No, not that I'm — no, not that I can
[16] recollect.
[17] (off-the-record discussion.)
[18] Q: So that — so that if I understand
[19] — if I understand correctly, the cases that you
[20] were involved in you made — you made a
[21] disciplinary decision about what ought to happen
[22] with somebody who was alleged to have been
[23] harassing somebody else?
[24] A: Yes, one, on a no-precedent basis,

Page 171

[1] correct.
[2] Q: Well, forget about the precedent for
[3] the time being. You had — somebody alleged that
[4] somebody else was harassing them, is that right,
[5] and that was brought to your attention?
[6] A: That would be correct.
[7] Q: Okay. And this happened on two
[8] different occasions or are we only talking about
[9] one?
[10] A: We're talking one.
[11] Q: One incident?
[12] A: Yeah.
[13] Q: All right. That was brought to your
[14] attention and you made some disciplinary decision
[15] with respect to that incident?
[16] A: We conducted an investigation of that
[17] incident, correct.
[18] Q: Okay. And at the conclusion of the
[19] investigation you — you imposed some discipline,
[20] did you?
[21] A: We did, yes.
[22] Q: And was the discipline that you imposed
[23] in consultation with the union or did you do it
[24] yourself without consulting with the union?

Page 172

[1] A: We — I consulted with the union on
[2] that particular case, yeah. Yeah.
[3] Q: Before you imposed the discipline?
[4] MR SCHMERTZ: Mr. McGuire —
[5] A: That's correct.
[6] MR SCHMERTZ: — was a grievance
[7] filed?
[8] A: That would be correct.
[9] MR SCHMERTZ: Did you take some
[10] action and you didn't grieve it? Was a grievance
[11] filed?
[12] THE WITNESS: No.
[13] MR SCHMERTZ: No?
[14] THE WITNESS: No.
[15] MR SCHMERTZ: Did you take some
[16] action before the union intervened or did you take
[17] action as a result of an agreement with the union?
[18] THE WITNESS: No, we took action as
[19] a result of an investigation we conducted.
[20] MR. SCHMERTZ: Answer my question.
[21] Did you take some action without the agreement of
[22] the union which subsequently was adjusted because
[23] of an agreement with the union? Think of the case
[24] we're talking about.

Rogers 0044

Case 1:04-cv-11190-RCL   Document 27-8   Filed 01/10/2006   Page 5 of 10

Grievance: Termination of J. Rogers   pp. 1-223   Arbitration between NSTAR and
Vol. 1, February 14, 2002               Local 369, Utility Workers Union of America

Page 173

[1] THE WITNESS: Yeah, I'm thinking of
[2] it.
[3] MR. SCHMERTZ: You conducted an
[4] investigation. Then what happened?
[5] THE WITNESS: Then we suspended that
[6] particular individual.
[7] MR. SCHMERTZ: You suspended. And
[8] then the union intervened on that particular
[9] person's behalf?
[10] THE WITNESS: The union represented
[11] that person's behalf, yes.
[12] MR. SCHMERTZ: And then it was
[13] adjusted?
[14] THE WITNESS: It wasn't adjusted.
[15] In that particular case the individual sought help
[16] through our EAP.
[17] MR. SCHMERTZ: I understand that. I
[18] understand that. But was the suspension
[19] maintained?
[20] THE WITNESS: Yes.
[21] MR. SCHMERTZ: And what did you mean
[22] when you say that there was a — an agreement or a
[23] settlement without precedent in that case?
[24] THE WITNESS: That particular

Page 174

[1] individual was suspended and he was put into our
[2] drug and alcohol policy —
[3] MR. SCHMERTZ: Right, right.
[4] THE WITNESS: — and it was done on
[5] a no-precedent agreement because we put him into a
[6] — at the employee's request he went into a 15-day
[7] program.
[8] MR. SCHMERTZ: And that was with the
[9] agreement of the union?
[10] THE WITNESS: That was an agreement
[11] with the employee and the union, correct.
[12] MR. SCHMERTZ: After, the employee
[13] was suspended.
[14] THE WITNESS: That's correct.
[15] MR. SCHMERTZ: Then you and the
[16] union met with the employee —
[17] (Witness nodded.)
[18] MR. SCHMERTZ: — and it was agreed
[19] that the suspension would be maintained, but that
[20] the employee would go into a counseling program.
[21] THE WITNESS: That's correct.
[22] Q: Is that the only harassment case that
[23] you've been involved with before this one?
[24] A: I believe there may have been one other

Page 175

[1] for an individual who used foul and abusive
[2] language.
[3] Q: Okay. But that person wasn't fired,
[4] were they?
[5] A: No, that person was suspended for five
[6] days.
[7] Q: All right. When did these cases take
[8] place?
[9] A: The first case that I talked about took
[10] place approximately four weeks ago.
[11] Q: And the second case that you talked
[12] about involving the foul and abusive language?
[13] A: That was a couple years back.
[14] MR. McCOWN: Mr. Arbitrator, I guess
[15] I'm troubled by the fact that we've now heard
[16] testimony about what was a no-precedent
[17] arrangement —
[18] MR SCHMERTZ: Well, that's the
[19] reason I —
[20] MR. McCOWN: — and I didn't object
[21] because you were asking the questions.
[22] MR. SCHMERTZ: That's right. Well,
[23] and the reason I asked the question was to make
[24] sure — to make sure that I understood that there

Page 176

[1] was a resolution on a non-precedential or non-
[2] prejudiced basis.
[3] MR. McCOWN: I mean, that's a line
[4] that neither party wants to breach.
[5] MR. SCHMERTZ: That's correct. And
[6] that does not constitute any kind of a precedent
[7] for this case or any other case if it was resolved
[8] on a non-precedential, non-prejudiced basis. If
[9] that was the case, that's a matter that an
[10] arbitrator cannot take cognizance of.
[11] MR. McCOWN: I just didn't want to
[12] object to your questions, until now.
[13] Q: You testified, Mr. McGuire, that at the
[14] hearing there was testimony about a clipping-on
[15] phone or there was discussion about it at the
[16] hearing that you conducted.
[17] A: That's correct.
[18] Q: Remember that?
[19] A: (Witness nodded.)
[20] Q: And is it your understanding that if a
[21] — if somebody clips on a telephone wire outside
[22] of a house the call is reported as having been
[23] made from the house?
[24] A: I can't honestly answer that.

Rogers 0045

Case 1:04-cv-11190-RCL   Document 27-8   Filed 01/10/2006   Page 6 of 10

| Arbitration between NSTAR and Local 369, Utility Workers Union of America | pp. 1-223 | Grievance: Termination of J. Rogers Vol. 1, February 14, 2002 |

**Page 177**

[1] Q: You can't?
[2] A: I don't know that.
[3] Q: Did you try and find the answer to that
[4] out?
[5] A: No. No.
[6] MR. SCHMERTZ: Well, if he doesn't
[7] know, he doesn't know.
[8] Q: Mr. Rogers told you that he — he
[9] called the company many times, didn't he, when you
[10] asked him?
[11] A: No.
[12] Q: He didn't?
[13] A: No, he didn't.
[14] Q: Did he tell you he called the 800
[15] number, he calls the credit union, has a
[16] girlfriend that works at the company. You don't
[17] remember any of that?
[18] A: No, he never stated that, to be honest
[19] with you. I asked him if he would have had any
[20] reason to call the Wareham Service Center, and his
[21] answer to me on that date was he may have made a
[22] call about his 401 K. He mentioned some
[23] individual's name. That's the only statement he
[24] made about calling there.

**Page 178**

[1] Q: Is that where the 401 K people were, at
[2] Wareham?
[3] A: I have no idea, to be perfectly honest
[4] with you.
[5] (Mr. Kelly and Mr. Rogers
[6] conferring off the record.)
[7] Q: Do you remember asking him whether he
[8] had conversation with the switchboard operator?
[9] A: I never asked that question, no.
[10] Q: Do you remember him telling you that he
[11] did?
[12] A: No. No.
[13] Q: Take a look at Exhibit 14, your notes
[14] of the meeting, the bottom of the first page.
[15] (Witness perusing document.)
[16] Q: Do you recall asking him if he had any
[17] reason to call Wareham?
[18] A: Yeah.
[19] Q: Do you remember he said yes?
[20] A: That's correct. And I said — on the
[21] next one I said, "For what reason?" And he said,
[22] "401 K information from" — it looks like I wrote
[23] Dawn Grammer or whatever the individual's name is.
[24] Q: You don't know who that is?

**Page 179**

[1] A: No.
[2] Q: That must have been a name that
[3] Mr. Rogers gave you and you wrote down; is that
[4] what happened?
[5] A: Yes.
[6] Q: Who conducted this — this interview,
[7] you or Mr. Dorant?
[8] A: I did.
[9] Q: Did Mr. Dorant participate?
[10] A: Yes, he did.
[11] Q: Do you remember Mr. Dorant asking
[12] Mr. Rogers if he called the switchboard looking
[13] for a phone number?
[14] A: No, I don't.
[15] Q: You don't. Do you remember Mr. Rogers
[16] saying he may have called looking for Dawn
[17] Graham's number?
[18] A: (Witness nodded.)
[19] Q: No?
[20] A: No.
[21] Q: Do you remember Mr. Dorant asking
[22] Mr. Rogers if he ever called any employee at NSTAR
[23] on the dates that you guys —
[24] A: To be honest, I don't remember that

**Page 180**

[1] question, no.
[2] Q: Do you remember how that meeting ended?
[3] A: How the meeting ended?
[4] Q: How the meeting ended.
[5] A: That I found the suspension justified
[6] and would remain in effect till the close of
[7] business on May 18, 2001, at which time Mr. Rogers
[8] would be terminated.
[9] Q: Do you remember Mr. Rogers telling you
[10] that he had no idea why this was happening; that
[11] he had 15 years of a clean record and he wouldn't
[12] do anything to jeopardize it? Do you remember him
[13] saying that?
[14] A: I remember Mr. Rogers telling me that
[15] he had 15 years of service and he can't believe
[16] this is happening, and his uncle or someone was a
[17] manager in human resources at one time I believe
[18] is what he said.
[19] Q: Isn't it true you decided to fire Jim
[20] Rogers because the woman who complained of
[21] harassment was in labor relations?
[22] A: That's positively not true.
[23] MR. KELLY: I've got nothing
[24] further.

Rogers 0046

Case 1:04-cv-11190-RCL   Document 27-8   Filed 01/10/2006   Page 7 of 10

Grievance: Termination of J. Rogers          pp. 1-223         Arbitration between NSTAR and
Vol. 1, February 14, 2002                                      Local 369, Utility Workers Union of America

Page 181

[1]  MR. SCHMERTZ: Redirect?
[2]  MR. McCOWN: No.
[3]  MR. SCHMERTZ: Thank you,
[4] Mr. McGuire.
[5]     (Witness excused.)
[6]  MR. SCHMERTZ: Company's direct
[7] case?
[8]  MR. McCOWN: Yes, the company would
[9] rest its direct case at this point.
[10] MR. KELLY: Let's take a brief —
[11] MR. SCHMERTZ: Sure.
[12] MR. KELLY: — brief recess.
[13] MR. SCHMERTZ: Sure.
[14]    (Off record.)
[15] MR. KELLY: All right, union calls
[16] Jim Rogers.
[17] MR. SCHMERTZ: Mr. Rogers, over
[18] here.
[19]    (JAMES ROGERS, Sworn.)
[20] MR SCHMERTZ: Give your full name
[21] officially to the reporter, please.
[22] THE WITNESS: James Arthur Rogers.
[23] MR. SCHMERTZ: Okay.
[24]

Page 182

            DIRECT EXAMINATION
                BY MR. KELLY:
[3]  Q: Up until May of last year, by whom were
[4] you employed?
[5]  A: NSTAR Electric, formerly Commonwealth
[6] Energy.
[7]  Q: And for how long were you employed by
[8] either NSTAR or Commonwealth Energy?
[9]  A: 15 years.
[10] Q: What was your job?
[11] A: I was a first class lineman.
[12] Q: And in that capacity what were your
[13] duties?
[14] A: Maintenance of overhead line and
[15] underground distribution lines — overhead and
[16] underground distribution lines and storm
[17] restoration.
[18] Q: Did you typically work alone or as part
[19] of a crew?
[20] A: I was generally on a crew during normal
[21] working hours and after hours, generally. I
[22] wasn't a troubleman; troublemen work alone.
[23] Q: Troublemen work alone and linemen work
[24] in crews?

Page 183

[1]  A: Linemen work in crews, yeah.
[2]  Q: You work in the same crew typically?
[3]  A: During the normal working hours, yes.
[4]  Q: Who was your crew leader a year ago?
[5]  A: George Butters.
[6]  Q: Let me ask you this, Mr. Rogers. What
[7] were your — what were your relations with your
[8] coworkers out of the Plymouth facility?
[9]  A: Excellent. I generally got along with
[10] all of them, enjoyed working.
[11] Q: Was there anybody with whom you did not
[12] get along.
[13] A: Not particularly, no.
[14] Q: Did you have any — did you have any
[15] problem with your supervisors?
[16] A: No.
[17] Q: Did you have any discipline on your
[18] record?
[19] A: No.
[20] Q: Had you ever been suspended before May
[21] of 2001?
[22] A: No.
[23] Q: Written warnings?
[24] A: No.

Page 184

[1]  Q: Now, there's been — there's been a
[2] document put in evidence as Company Exhibit 9 that
[3] suggests a telephone call was made from your
[4] address on March 30th, 2001, and you're aware that
[5] that's one of the reasons we're here —
[6]  A: Yes.
[7]  Q: — right?
[8]     And is it true that your residence
[9] is 234 Sandwich Street?
[10] A: Yes.
[11] Q: All right. Does anybody else live at
[12] that address?
[13] A: No.
[14] Q: All right. And can you tell us why the
[15] — there is a record of a telephone call from your
[16] address on Sandwich Street to what appears to have
[17] been Ms. Whitney's telephone number on March 30th?
[18] A: I don't have an explanation for that,
[19] because I didn't go home after work that day. I
[20] have no idea why it's like that, other than it was
[21] a mistake or — I don't know.
[22] Q: And where were you on March 30th?
[23] A: I went from work to a friend's house,
[24] to the American Legion, and then left the American

Rogers 0047

Case 1:04-cv-11190-RCL   Document 27-8   Filed 01/10/2006   Page 8 of 10

Arbitration between NSTAR and  
Local 369, Utility Workers Union of America
pp. 1-223
Grievance: Termination of J. Rogers  
Vol. 1, February 14, 2002

**Page 185**

[1] Legion and went to Kingston, Mass.
[2]   Q: There's a — a document in evidence
[3] that suggests your workday ended at 3:30 on the
[4] 30th —
[5]   A: That's correct.
[6]   Q: — is that accurate?
[7]   A: Yes.
[8]   Q: And — and where did you go after work?
[9]   A: I went to my buddy Jeff's house to see
[10] his brother's puppy, new dog.
[11]   Q: And where is Jeff's house in
[12] relationship to the service center?
[13]   MR. McCOWN: Does Jeff have a last
[14] name?
[15]   THE WITNESS: Jeff Knight.
[16]   MR. McCOWN: Thank you.
[17]   A: I would say approximately two miles,
[18] maybe, west of the service center on Route 44.
[19]   Q: If I understand the map, your house is
[20] two and a half miles east of the service center?
[21]   A: That's correct.
[22]   Q: And how long were you there?
[23]   A: 15 minutes, 20 minutes.
[24]   Q: And where is the — and from there you

**Page 186**

[1] went where?
[2]   A: To the American Legion.
[3]   Q: And where is that in relationship to
[4] the service center?
[5]   A: That would be north, I suppose — no,
[6] south of the service center, towards Carver,
[7] Wareham area on Federal Furnace Road, which is an
[8] extension of Summer Street; basically the same
[9] road the company is on.
[10]   Q: How long did it take you to get from
[11] Jeff's house to the American Legion?
[12]   A: That would have put me at the Legion
[13] probably at about ten passed four, roughly there.
[14]   Q: Were you with anybody else?
[15]   A: No. I was supposed to meet people
[16] there and I waited in the parking lot and they did
[17] not show up, so I left. I stated that to
[18] Mr. McGuire in previous testimony.
[19]   Q: Now, you were — you were — you were
[20] charged in a criminal proceeding, were you not?
[21]   A: Correct.
[22]   Q: Do you know what the disposition of
[23] that criminal proceeding was?
[24]   A: The first original time that it went to

**Page 187**

[1] court was for a clerk's hearing, and the clerk
[2] dismissed it and it was appealed to go before a
[3] judge, and to the best of my knowledge, the
[4] assistant DA or district attorney, whichever it
[5] was, did not feel sufficient evidence was there to
[6] put it forth before the judge, so it was
[7] dismissed.
[8]   Q: Let me show you a document and see if
[9] you can identify it.
[10]     (Document exhibited to witness.)
[11]   A: Yes.
[12]   Q: What is that document?
[13]   A: That's the dismissal from the clerk's
[14] hearing.
[15]   MR. KELLY: I'd offer that as the
[16] first union exhibit.
[17]   MR. McCOWN: Well, I think this
[18] subject's irrelevant, but I —
[19]   MR. SCHMERTZ: Well, we've had some
[20] testimony on it and I've already made my ruling on
[21] it.
[22]   MR. McCOWN: That's why I didn't
[23] object, Mr. Arbitrator, I expected —
[24]   MR. SCHMERTZ: Union 1. By the way,

**Page 188**

[1] before you — you had some documents with some
[2] telephone numbers on them, and I think they're now
[3] in your possession. Are those being offered, do
[4] you want them back, or don't you care?
[5]   MR. McCOWN: Oh, these.
[6]   (Indicating.)
[7]   MS. AMBER: They were already ones
[8] that were submitted.
[9]   MR. KELLY: No, these. (Indicating.)
[10]   MR SCHMERTZ: No, these.
[11]   (Indicating.)
[12]   MS. AMBER: Oh, those. Oh, sorry.
[13]   MR. SCHMERTZ: Yeah, these.
[14]   (Indicating.)
[15]   MR. KELLY: I don't know what good
[16] they're going to do us, other than they had —
[17]   MR. SCHMERTZ: Okay, let's go on.
[18] Union 1 received.
[19]   Q: Now, you understand — you understand,
[20] Mr. Rogers, that — that because of this
[21] March 30th piece of evidence, if you want, it has
[22] been suggested that you made calls on other days
[23] to Ms. Whitney?
[24]   A: Yes.

Rogers 0048

Case 1:04-cv-11190-RCL   Document 27-8   Filed 01/10/2006   Page 9 of 10

Grievance: Termination of J. Rogers    pp. 1-223    Arbitration between NSTAR and
Vol. 1, February 14, 2002                            Local 369, Utility Workers Union of America

Page 189

[1] Q: You understand that?
[2] A: Yes.
[3] Q: Okay. And did you make those phone
[4] calls?
[5] A: No, I did not.
[6] Q: None of them?
[7] A: No.
[8] Q: Now, you heard — you heard Ms. Whitney
[9] earlier testify?
[10] A: Yes.
[11] Q: Do you have any reason to doubt the
[12] effect that those phone calls had on her that she
[13] reported they had?
[14] A: No.
[15] Q: What effect has the — has the
[16] suggestion that you're the guy responsible for
[17] these calls had on you?
[18] A: It's been humiliating. I feel somewhat
[19] slandered because everybody at the company knows
[20] what I'm accused of, and it's been humiliating,
[21] even though in my mind it's not been proven at
[22] all, but I've been fired over it, and so people
[23] are aware of why I got fired. So it's
[24] humiliating, basically.

Page 190

[1]   MR. KELLY: I don't have any other
[2] questions.
[3]   MR. SCHMERTZ: Cross-examine?
[4]         CROSS-EXAMINATION
[5]         BY MR. McCOWN:
[6] Q: How old are you, Mr. Rogers?
[7] A: 42.
[8] Q: Never been married, right?
[9] A: No.
[10] Q: And you have no children?
[11] A: No.
[12] Q: I think somebody mentioned that you
[13] have a steady partner or a girlfriend?
[14] A: That's correct.
[15] Q: And that's Elizabeth Clark?
[16] A: Correct.
[17] Q: She lives in Plymouth, too, right?
[18] A: Yes.
[19] Q: She's also a company employee?
[20] A: Yes.
[21] Q: And she has no children either?
[22] A: She has two children.
[23] Q: Does she have custody of them all the
[24] time?

Page 191

[1] A: One of them is grown and out of the
[2] house. The other one is 21 and lives at home. I
[3] would say that's custody.
[4] Q: Does the 21-year-old work?
[5] A: Yes.
[6] Q: And you both have access to each
[7] other's places, correct?
[8] A: Correct.
[9] Q: It's about a five-minute drive between
[10] the two?
[11] A: The two houses?
[12] Q: Yeah.
[13] A: It might be a little longer, seven
[14] minutes or so.
[15] Q: Under ten, correct?
[16] A: Right. With no traffic.
[17] Q: Right. And she lives on Crabtree Road,
[18] correct?
[19] A: That's correct.
[20] Q: Now, if you look at Company 11, which
[21] is this map —
[22] A: Um-hm.
[23]   (Document exhibited to witness.)
[24] Q: Crabtree road is right down there,

Page 192

[1] correct? (Indicating.)
[2] A: That's correct.
[3]   MR. KELLY: Would you be more
[4] precise when you say "right down there"?
[5]   MR. McCOWN: Yes.
[6]   THE WITNESS: Chris, you know where
[7] it is, off of Long Pond Road.
[8]   MR. HORN: I got it.
[9] A: Probably about a half hour drive
[10] through the State Forest.
[11] Q: All right. If we drew —
[12]   (Discussion off the record.)
[13]   MR. McCOWN: If you look at these
[14] two gray boxes —
[15]   MR. SCHMERTZ: Right, right.
[16]   MR. McCOWN: — in the lower
[17] center —
[18]   MR. SCHMERTZ: Right.
[19]   MR. McCOWN: — part of the map,
[20] there's a series of streets in there. Crabtree
[21] Road is one of those.
[22]   MR. SCHMERTZ: In this area right
[23] here? (Indicating.)
[24]   MR. McCOWN: Yes.

Rogers 0049

Case 1:04-cv-11190-RCL    Document 27-8    Filed 01/10/2006    Page 10 of 10

Arbitration between NSTAR and                pp. 1-223                    Grievance: Termination of J. Rogers
Local 369, Utility Workers Union of America                                Vol. 1, February 14, 2002

**Page 193**

[1] MR SCHMERTZ: Yeah, I think I even
[2] see Crabtree.
[3] MS. AMBER: I think you do, too.
[4] MR. SCHMERTZ: Okay. Do you want it
[5] marked?
[6] MR. McCOWN: Well, if we could do
[7] the same thing and just circle that area, I guess,
[8] on the map —
[9] MR. SCHMERTZ: Okay. All right.
[10] That area is circled. Okay.
[11] MR. McCOWN: — on Company Exhibit
[12] 11.
[13] MR. SCHMERTZ: Right.
[14] Q: Are you taking any medication today
[15] that might affect your testimony, Mr. Rogers?
[16] A: No.
[17] Q: Have you ever taken — regularly take
[18] any prescription medicine?
[19] A: No.
[20] Q: You've had some brushes with the law
[21] before, haven't you, Mr. Rogers, before this most
[22] recent one?
[23] A: No.
[24] Q: None whatever?

**Page 194**

[1] A: No, not that I recollect.
[2] Q: No alcohol-related incidents?
[3] A: In New Hampshire I was accused, but
[4] acquitted, of driving under the influence.
[5] Q: When was that?
[6] A: If I had to guess — hold on one
[7] second.
[8] (Pause.)
[9] A: — seven years ago.
[10] Q: So 1994 maybe, '95?
[11] A: My girlfriend's daughter was a freshman
[12] in college. That's why I'm guessing. I think
[13] she's 26 now.
[14] Q: You are a drinker, right, Mr. Rogers?
[15] A: Social drinker.
[16] Q: Do you drink beer every day?
[17] A: No.
[18] Q: Do you drink something else every day,
[19] alcoholic?
[20] A: That's possible.
[21] Q: That would be, what, stronger than
[22] beer?
[23] A: No. Mike's Lemonade.
[24] Q: Okay. That's an alcoholic beverage?

**Page 195**

[1] A: It might be stronger than beer.
[2] Q: Okay. Now, I think you testified
[3] you're the only person that resides at
[4] 234 Sandwich Street, correct?
[5] A: That's right.
[6] Q: So there's no other adult male who has
[7] access to that house?
[8] A: No.
[9] Q: And it is a single-family residence?
[10] A: Yes.
[11] Q: And you heard Ms. Murphy testify that
[12] it's maybe a five-minute drive from there to your
[13] place of work. That's correct, isn't it?
[14] A: That's correct.
[15] Q: And you heard Mr. McGuire testify that
[16] you recalled — I'm sorry — that you were —
[17] that's — I did ask it correctly. Excuse me.
[18] Mr. McGuire said you said you remembered the
[19] July 31st meeting that Kim Whitney conducted at
[20] Plymouth?
[21] A: I stated that that's the only time I
[22] had ever seen her.
[23] Q: Okay. So as of March 30 you knew who
[24] Kim Whitney was, correct?

**Page 196**

[1] A: I knew she was employed by the company.
[2] Q: Okay. And you had seen her at that
[3] previous meeting in July?
[4] A: That's the only time I've seen her.
[5] Q: Okay. That was a meeting where
[6] Mr. Roda was — he convened the meeting to talk to
[7] the workers about the subject of violence in the
[8] workplace and harassment between and among
[9] workers, correct?
[10] A: Right.
[11] Q: Now, did you attend any meetings where
[12] the new code of conduct was introduced in the
[13] summer of 2000?
[14] A: Are you referring to the —
[15] Q: That. (Indicating.)
[16] A: This? (Indicating.)
[17] Q: Yeah.
[18] A: Yes. I thought that was the meeting
[19] you were just referring to when I — the only time
[20] I've seen Ms. Whitney.
[21] Q: Oh, so the meeting of July of 2000,
[22] July 31st, 2000, it was to roll that out; is that
[23] it?
[24] A: I'm not sure of the date, but I'm

Rogers 0050