COMMONWEALTH OF MASSACHUSETTS

PLYMOUTH, SS                          WAREHAM DISTRICT COURT

```
----------------------)
                      )
IN RE:  JAMES ROGERS  )           COPY
                      )
----------------------)
```

S H O W   C A U S E   H E A R I N G

Friday, May 11, 2001

Wareham District Court
Wareham, Massachusetts

**BEFORE**:

Assistant Clerk-Magistrate David M. Nobrega

**APPEARANCES**:

Detective Gilbert Cabral
(For the Town of Wareham)

Stuart P. Delano, Esquire
Sorrenti & Delano
23 North Pearl Street
Brockton, MA 02301
(508) 580-1600
(For James Rogers)

Robert Donahue, Esquire
86 Willow Street
Yarmouthport, MA  02675
(508) 362-4022
(For Kimberly Whitney)

LINDA M. CORCORAN
CERTIFIED COURT REPORTER
P.O. Box 4
Kingston, Massachusetts  02364
(781) 585-8172

1      P R O C E E D I N G S

2            (9:01 a.m.)

3      ASSISTANT CLERK-MAGISTRATE:  Good morning.  My

4  name is Mr. Nobrega.  I'm one of the clerks here.

5      We're going to be conducting a show cause

6  hearing today on a complaint brought by the Wareham

7  Police Department against a James Rogers alleging

8  annoying phone calls -- I think that's the proper

9  charge -- and criminal harassment.

10      First of all, I'd like to just for the record

11  identify the parties in the courtroom.  I know we

12  have Detective Cabral for the Town of Wareham; the

13  alleged victim, Kimberly Whitney.

14      Be you, Ma'am?

15      MS. WHITNEY:  (Nods.)

16      ASSISTANT CLERK-MAGISTRATE:  And in the back

17  there?

18      MR. DONAHUE:  Attorney Robert Donahue.  I filed

19  an appearance on behalf of Kimberly Whitney.

20      ASSISTANT CLERK-MAGISTRATE:  And your name,

21  Ma'am?

22      MS. MURPHY:  Joanne Murphy, NSTAR security.

23      ASSISTANT CLERK-MAGISTRATE:  And for the

24  defendant?

Page 3

1       MR. DELANO:  Stuart Delano, Mr. Clerk, for the

2  defendant, James Rogers.

3       ASSISTANT CLERK-MAGISTRATE:  And we have the

4  defendant James Rogers.

5       The purpose of this hearing is for me to as a

6  clerk hear the facts of the case and to determine

7  whether there's enough evidence to issue a criminal

8  complaint on one or both of these charges or not

9  issue complaints.

10      First of all, we're going to be hearing from

11 Detective Cabral.  I think he's -- I believe you were

12 the investigating officer.

13      DETECTIVE CABRAL:  Yes, yes.

14      ASSISTANT CLERK-MAGISTRATE:  Detective Cabral is

15 going to be testifying, and I will allow cross-

16 examination of anyone who testifies, okay.  That's my

17 policy.

18      MR. DELANO:  Thank you.

19      ASSISTANT CLERK-MAGISTRATE:  And I'll also

20 obviously let you put on a case, Mr. Delano, if you

21 so wish to do that.

22      MR. DELANO:  Thank you.

23      ASSISTANT CLERK-MAGISTRATE:  Now, testifying

24 today will be Detective Cabral.

1    Will Ms. Whitney be testifying, I take it?

2    MR. DONAHUE:  Yes.

3    ASSISTANT CLERK-MAGISTRATE:  Will there be any

4    other testimony?  Will you be testifying, Ma'am?

5    MS. MURPHY:  Yes.

6    ASSISTANT CLERK-MAGISTRATE:  Okay, without any

7    further ado, why don't we start it off, Detective

8    Cabral.

9    MR. DONAHUE:  Do you want to swear the

10    witnesses?

11    ASSISTANT CLERK-MAGISTRATE:  Yes, excuse me.  We

12    can do that.

13    Anyone who's going to testify, please raise your

14    right hand.

15    (Witnesses are sworn.)

16    DETECTIVE CABRAL:  This case was assigned to me

17    on February 1 of this year.  I was notified by NSTAR

18    security, Ms. Murphy, and also the victim, Ms.

19    Whitney.  Ms. Whitney reported that she'd been

20    getting very obscene phone calls, even to the point

21    of the male caller was masturbating on the phone.

22    These calls started somewhere near approximately

23    August 30 of the year 2000.  She reported this to Ms.

24    Murphy, who was in charge of security, and then she

Page 5

1   continued getting calls.  She got the second call on

2   or about December the 5th or the 6th of 2000 sometime

3   in the afternoon, 11:30-12:30.  Then she got a third

4   call January 2, and that was about 2 o'clock in the

5   afternoon.  And then the fourth call came in February

6   -- that's what she reported to us -- at approximately

7   4 p.m., 4:16 p.m.

8        And it was the same caller who called all the

9   time.  The caller whispered, used her name.  As a

10  matter of fact, the first call that came through

11  asked to speak to Ms. Kim Whitney, came through the

12  receptionist.  NSTAR was in the process of trying to

13  trace these calls, but they couldn't trace it through

14  the phone systems they had at that time.  Ms. Murphy

15  along with Verizon was able to get a direct line

16  hooked up to Ms. Whitney's phone in the process to

17  trace the call the next time it came in, which they

18  believe would have came in the way it was coming

19  through.

20       Then on March 30 of this year I received a call

21  from both Ms. Whitney and Ms. Murphy in regards to a

22  fifth call, the same male party, the same type of

23  voice, same words, same obscene gestures, and this

24  came in about approximately 4 or 5 p.m.  And this

1   call was traced by Verizon.  I was contacted by

2   Verizon.  I got the printout, and the call came back

3   to an employee of NSTAR, Mr. James Rogers.  Time and

4   date, phone number, it all came through.

5         I attempted to contact Mr. Rogers to interview

6   him, and on or about the 3rd of April, I received a

7   call from Mr. Rogers who stated that he was just

8   terminated from NSTAR and wanted to find out what was

9   going on.  I asked him did he make a call to NSTAR on

10   that time and date, and at that point he stated, "I

11   might have."  He's got a girlfriend that works there.

12   Also he calls the credit union.

13         I asked him can he verify what call he made so I

14   could check into it, and he said he would get back to

15   me, which he never did.  I asked him if he lived

16   alone.  He said no, he lived with his girlfriend,

17   just him and his girlfriend lived in the house.

18         MR. DELANO:  Objection.

19         DETECTIVE CABRAL:  That's what he told me.

20         ASSISTANT CLERK-MAGISTRATE:  What's the

21   objection?

22         MR. DELANO:  Well, he's concluding.

23         ASSISTANT CLERK-MAGISTRATE:  Go ahead.

24         DETECTIVE CABRAL:  And I never received a call

Page 7

1  from him anymore.  I got a call from his attorney.

2  And after speaking to Ms. Whitney, she testified this

3  is the same male party that called her four times

4  before.  She was very upset during all these months.

5  She had security walk her to the parking lot.  This

6  was affecting her home life.  She always looked over

7  her shoulder.  And that's why I charged him also with

8  criminal harassment.

9           ASSISTANT CLERK-MAGISTRATE:  Thank you.

10          (To Mr. Delano)  Do you want to ask any

11  questions?

12          MR. DELANO:  No questions.

13          ASSISTANT CLERK-MAGISTRATE:  Okay.  Who's the

14  next witness to testify?

15          DETECTIVE CABRAL:  Ms. Whitney can tell what the

16  call was.

17          ASSISTANT CLERK-MAGISTRATE:  Why don't you take

18  your time.

19          DETECTIVE CABRAL:  Start on August 30, the first

20  call.

21          ASSISTANT CLERK-MAGISTRATE:  And take it from

22  the beginning and just go slow.  I need to hear

23  everything that was said on the phone calls.

24  Whenever you're ready, go ahead.

Page 8

1    MS. WHITNEY:  Back on August 30 I was in my

2    office at my desk doing some work.  Around 9:30 in

3    the morning the phone rang, and I answered it.  I

4    said, "Good morning.  Kim Whitney," as I usually do,

5    and the response that I got back was a whisper that

6    said -- whispered back, "Hi, Kim.  How are you?"

7        And at the time, thinking that it was maybe a

8    coworker just goofing with me, I whispered back,

9    "Fine.  How are you?  Who's this?" and there was no

10   response.  And I said, "Why are we whispering?" and

11   there was still no response.  And it finally got to a

12   point where I realized that for a coworker or a

13   friend that wouldn't have gone as long as it had, so

14   in less of a whisper, I said, "If you don't tell me

15   who this is, I'm going to have to hang up," and there

16   was no response again.  I said, "Okay, I'm hanging

17   up," and he whispered back in a very breathy tone --

18   whisper, I should say, "No, Kim, don't hang up now,"

19   and I immediately hung up because I knew something

20   was wrong, that it wasn't anybody that was a friend.

21       So I went around the corner, talked to my boss

22   about it, and we started trying to imagine who it

23   was.  I went out on Joe's suggestion to go to the

24   switchboard and ask them if the call had come in

Page 9

1   through -- 'cause we're on an 800 number, and I have

2   an extension off of that line.  I went to the

3   switchboard and asked them if anyone had come through

4   the switchboard and asked for me, and she said,

5   "Yeah, about five minutes ago somebody called for

6   you, asked for your extension and asked if I would

7   put him through," so I said, "Okay."  So I knew at

8   that point that it was somebody that wasn't a random

9   call, it was somebody who knew me who was calling me

10  directly.

11      So I called security and told them, reported

12  what had happened to them.  They asked me to, you

13  know, write something up in detail and to give them

14  something in written form so that they would be able

15  to trace it if it ever happened again.  At that time

16  they also checked to see if there was any way they

17  could see where the phone call was coming from when

18  it came in, and because of the truncated system in

19  Wareham, there was no way that they could actually

20  determine where the call came from at that time.

21      MR. DELANO:  Mr. Clerk, I'd object to this

22  testimony at this point.  It's clearly not based on

23  her own personal knowledge.

24      ASSISTANT CLERK-MAGISTRATE:  Just try to tell me

Page 10

1    what you know directly.

2        MS. WHITNEY:  That's just there's part of that,

3    as you'll see in a little bit.

4        ASSISTANT CLERK-MAGISTRATE:  Yeah.

5        MS. WHITNEY:  So December -- that was August 30.

6    It was either December 5 or December 6 --

7        ASSISTANT CLERK-MAGISTRATE:  So you had one on

8    August 30?

9        MS. WHITNEY:  August 30 at 9:30, and I didn't

10   get another call again until December 5 or 6.  And I

11   can't tell you exactly which date it was because I

12   was in a meeting.  I had two meetings with the same

13   group both of those days.  And I came downstairs to

14   get paperwork and answered the phone when it rang.

15   And I was going back upstairs, but I answered the

16   phone.  And same thing, "Good morning.  Kim Whitney,"

17   and there was no whispering on the other end.  There

18   was nothing at all.  So I just said, "Kim Whitney,"

19   and then I could hear the breathing.  And I

20   immediately knew it was the August 30 phone call.  So

21   I hung up, and I realized that nothing had been done

22   as far as being able to trace, you know, the call or

23   as far as knowing where the call came in, if it came

24   in through the company.

1    I called security.  No, I didn't call security

2  on that one because I wanted to find out if there

3  was some way somebody could switch a phone over so I

4  could get a digital display.  I went through

5  telecommunications.  They installed a phone.  Same

6  thing, came through a truncated line still, but at

7  least I had a digital display to see if I could tell

8  where the call was coming from.

9    January 2 I was in the office after the New

10  Year's holiday, and I answered the phone.  It was

11  about 2 -- yeah, it was 2 o'clock, 2:05 in the

12  afternoon, and it was the same individual.  I had a

13  digital display, which didn't help me.  Because of

14  the truncated system, I couldn't tell where it was

15  coming from, but all I could hear was him breathing,

16  and he was muttering my name in between breaths.  And

17  I said, "Why are you calling me?" and he didn't

18  answer.  So I hung up the phone.  I called security,

19  and I said, "That's it.  I just got a third phone

20  call from this guy," and I said, "I can't deal with

21  this anymore.  I need something to be done.  I want

22  to get a phone in, something, even if it's a direct

23  line from the outside because I want to have

24  something done about this.  I can't deal with this

1   anymore." So at that time they had Verizon come in

2   and install -- on January 12 they came in and

3   installed a direct outside line to my office. I left

4   a message on my old phone that said, "I'm no longer

5   at this number. You can reach me at area code

6   508-273-0145." We thought we'd wait and see if

7   anything was going to happen with the next phone call

8   by not calling in on an extension.

9       The next call came in. It was February 1. I

10  answered the phone as usual, you know, "Kim Whitney,"

11  and there was no response. The phone had a digital

12  display, a call display on it, and it showed private

13  caller. I knew immediately who it was and looked at

14  the phone and saw private caller, so I knew whoever

15  it was had a block on the line.

16      ASSISTANT CLERK-MAGISTRATE: When you say you

17  knew who it was, you knew it was this some person

18  that was --

19      MS. WHITNEY: I could tell from the breathing.

20      ASSISTANT CLERK-MAGISTRATE: -- that it was this

21  person calling?

22      MS. WHITNEY: That it was this person that had

23  made the other phone calls.

24      ASSISTANT CLERK-MAGISTRATE: Right. You didn't

Page 13

1    know who it was?

2          MS. WHITNEY:  No.

3          ASSISTANT CLERK-MAGISTRATE:  You just knew it

4    was this --

5          MS. WHITNEY:  No, I didn't know who it was, but

6    I knew -- I recognized --

7          ASSISTANT CLERK-MAGISTRATE:  -- same person?

8          MS. WHITNEY:  The phone also gave me the ability

9    to turn up the volume on the earpiece and --

10          ASSISTANT CLERK-MAGISTRATE:  Let me ask you a

11    question.  What is your position at NSTAR?

12          MS. WHITNEY:  At the time?

13          ASSISTANT CLERK-MAGISTRATE:  Right.

14          MS. WHITNEY:  Employee and labor relations

15    consultant.

16          So I turned up the volume, and I said rather

17    than hanging up -- to myself, rather than hanging up

18    right away, I'm going to see if I can pick up

19    anything else, background noise that's going to help

20    me with this to tell me who it is.  So I stayed on as

21    long as I could, turned up the volume.  I kept

22    saying, "Why are you calling me?  Why are you doing

23    this?"  And I turned up the volume, and I could hear

24    him masturbating in the background.  So the minute I

1  heard that I hung up, and I called security.  I left

2  a message on their phone because it was late in the

3  afternoon.  It was 4:16 I think when that call came

4  in on February 1, so I couldn't get through to

5  anybody.  But I was so upset about it at that point I

6  just --

7       ASSISTANT CLERK-MAGISTRATE:  Let me back you up

8  a minute.  When you say you could hear him

9  masturbating, was he speaking at that time?  Were

10  there any words?

11       MS. WHITNEY:  No, it was just escalated

12  breathing, and when I turned the earpiece up, that's

13  what I heard in the background.

14       ASSISTANT CLERK-MAGISTRATE:  So there was no

15  spoken word at that time?

16       MS. WHITNEY:  No.

17       ASSISTANT CLERK-MAGISTRATE:  You just heard him

18  -- you just thought someone --

19       MS. WHITNEY:  Just his breathing as though the

20  phone was tucked under his chin.  The breathing was

21  right in the mouthpiece.

22       MR. DELANO:  Well, breathing.  I mean, the phone

23  is tucked under his chin.  I mean, this is a leap,

24  Mr. Clerk, so I'd object to that.

Page 15

1      ASSISTANT CLERK-MAGISTRATE:  You could argue

2 that.

3      MS. WHITNEY:  I'm describing how close.  I mean,

4 it wasn't like a normal phone call.  You can't

5 normally hear somebody breathing in a normal pattern.

6      ASSISTANT CLERK-MAGISTRATE:  You heard what you

7 heard and what you thought it was.

8      MS. WHITNEY:  Right.  Yeah, whether it was --

9 I'm just trying to give an idea as to how close the

10 breathing and how loud the breathing was really.

11      So I hung up, called security, left them a

12 message, and then took it upon myself to go down to

13 the police department.  And I went down.  It was

14 late.  The police officer on duty said he would have

15 one of the detectives call me back.  At that time,

16 right after that, security was in touch with me, you

17 know, the next day and said that they were going to

18 follow up on it.  Now that this individual was

19 calling the outside line and going as far as, you

20 know, not stopping after they couldn't get me on my

21 other extension that now they felt, you know, this is

22 we know if he's called once, he's probably going to

23 call on this line again.  So they went down and had

24 the call trace activated, started things there with

Page 16

1    the police department.

2        ASSISTANT CLERK-MAGISTRATE:  So it wasn't until

3    the February 1.  So you went August, December,

4    January, February, and it wasn't until after February

5    that the police became involved?

6        MS. WHITNEY:  Right.  February 1, yeah.

7        ASSISTANT CLERK-MAGISTRATE:  So up until the

8    February 1 incident, including that incident, the

9    police weren't involved?

10        MS. WHITNEY:  Right.

11        ASSISTANT CLERK-MAGISTRATE:  All right.

12        MS. WHITNEY:  Then March 30 I was in my office.

13    It was late in the afternoon, 4 o'clock, 4:05.  I was

14    just getting ready to leave for the day, and the

15    phone rang.  I looked over at it because now I was in

16    the habit of looking at the caller I.D. before I even

17    answered the phone.  So it came up private caller.  I

18    answered the phone.  It was the same individual.  I

19    did the same thing that I had done in the past.  I

20    answered, "Kim Whitney."  There was no response, just

21    the sound of the breathing and in the escalating

22    fashion, kept him on the line as long as I could by

23    saying, "Who are you?  Is there somebody there?  Why

24    aren't you answering?"  I hung up.  I hit *57 to do

1  the call trace when I picked the phone up again

2  because I was told that I immediately had to pick up

3  the phone to do it again and hit *57 before another

4  call came in, which I did, and it basically -- the

5  recording said that this line was successfully traced

6  and a member of the police department would be in

7  touch with me, and that was it.

8       ASSISTANT CLERK-MAGISTRATE:  On this March 30

9  date, was there anything -- was there anything said

10 to you again?

11      MS. WHITNEY:  Nothing.

12      ASSISTANT CLERK-MAGISTRATE:  What did you hear?

13      MS. WHITNEY:  Just the same breathing that was

14 there in all the other four phone calls that I

15 received.

16      ASSISTANT CLERK-MAGISTRATE:  So the only time

17 anything was said, I believe your testimony was maybe

18 when the initial call when someone said, "Don't hang

19 up, Kim," or words to that effect?

20      MS. WHITNEY:  Right.  He said, "Hi, Kim.  How

21 are you?" and then, "No, Kim, don't hang up now."

22      ASSISTANT CLERK-MAGISTRATE:  And at that time

23 did you recognize -- did you recognize a voice at

24 that call?  When that call was made?

1    MS. WHITNEY:  No.  It was definitely a male

2    voice or a male whisper, if you can imagine.  I mean,

3    I could tell it was not female.

4    ASSISTANT CLERK-MAGISTRATE:  Okay, so what

5    happens next?  We're at March 30.

6    MS. WHITNEY:  And then basically I got in touch

7    with Joanne.  As soon as I hit the call trace, I ran

8    down the hall because Joanne is in the Wareham office

9    on Fridays.  And I ran down, and I told her I had

10    just gotten the last phone call.  And I said, "I just

11    hit call trace.  The recording said that it went

12    through."  She immediately picked up the phone, put

13    in calls to Verizon, to the Wareham Police

14    Department, and because it was late in the day, you

15    know, we didn't hear anything back again until

16    Monday.

17    On Monday Joanne called me and Detective Cabral

18    called me.  Both said, "We're getting this

19    information from Verizon this morning.  We'll get

20    back to you" 'cause they knew that I wanted to know

21    who it was.  They assured me that I would and that

22    this is what was going to happen today.  So she

23    called me back a little while later, and she said,

24    "Okay."  She goes, "I have the information," and I

1    said, "Okay," and she said -- she goes, "It's an

2    individual I believe is an employee by the name of

3    James Rogers."

4        MR. DELANO:  I'm going to object, Mr. Clerk.

5        ASSISTANT CLERK-MAGISTRATE:  She's going to, I

6    mean --

7        MS. WHITNEY:  I'm just relaying the story.

8        ASSISTANT CLERK-MAGISTRATE:  That's okay.  You

9    can't say what she -- she's going to testify.

10       MR. DELANO:  Is she here?

11       MR. DONAHUE:  Yeah, she's right here.

12       ASSISTANT CLERK-MAGISTRATE:  I believe that's --

13   yeah.

14       MS. WHITNEY:  So I said -- I thought for a

15   minute.  I said, well, it was nobody I knew, but I

16   knew the name because being in labor relations we

17   deal with roster sheets all the time.  I've been in

18   labor -- I mean, employee relations for fourteen

19   years, so I knew the name.  I went into the employee

20   directory on the computer screen and pulled it up.

21   And I said, "Do you have a phone number and a street

22   address?" and she said, "Yes."  And I said, "Okay,

23   I'm going to give you what I have in the system here

24   to see if that's what she had received from Verizon,"

Page 20

1    and it was that address and the phone number.

2        MR. DELANO:  Again, for the record, I will

3    object, Mr. Clerk.

4        ASSISTANT CLERK-MAGISTRATE:  Okay.

5        MR. DELANO:  Thank you.

6        ASSISTANT CLERK-MAGISTRATE:  So after that, it

7    was basically out of your hands and was handled?

8        MS. WHITNEY:  (Nods.)

9        ASSISTANT CLERK-MAGISTRATE:  After that March 30

10   call, were there any further calls?

11       MS. WHITNEY:  No more calls.

12       ASSISTANT CLERK-MAGISTRATE:  Any questions?

13       MR. DELANO:  Just briefly, if I may.

14   You've never met Mr. Rogers before, Ms. Whitney?

15       MS. WHITNEY:  No, I haven't.

16       MR. DELANO:  And you've never had any

17   conversations with him either face to face or on the

18   telephone?

19       MS. WHITNEY:  No, I have not.

20       MR. DELANO:  And, in fact, you don't recognize

21   -- you could not recognize the voice on the caller on

22   four calls -- five calls, quite frankly, that were

23   made, correct?

24       MS. WHITNEY:  No.  Right, that's correct.

Page 21

1    MR. DELANO: And during those calls, nothing

2    actually was said to you, is that right, other than

3    the first call where he said, "Hi, how are you?" or

4    something to that effect, true?

5         MS. WHITNEY: That's true.

6         MR. DELANO: There were no threatening comments

7    made, true?

8         MS. WHITNEY: No.

9         MR. DELANO: There were no reference to body

10   parts and things of that nature, true?

11        MS. WHITNEY: Just what my ears picked up on the

12   third or fourth phone call.

13        MR. DELANO: Apart from what you think happened,

14   vocally there was nothing said to you along those

15   lines, correct?

16        MS. WHITNEY: No.

17        MR. DELANO: Now, you say you reported each one

18   of these calls to NSTAR security?

19        MS. WHITNEY: Each one with the -- the December

20   calls I did not report immediately because of the

21   fact that I remembered that they had advised me to

22   get telecommunications to change my phone out, so I

23   focused on getting the phone because I realized that

24   they hadn't followed up on it and changed the phone

1    out.

2       MR. DELANO:  But did you report each of these

3    calls to NSTAR security?

4       MS. WHITNEY:  Yes.

5       MR. DELANO:  Now, did you keep notes as to the

6    dates and times?  Do you have those with you today?

7       MS. WHITNEY:  Yes, I do.

8       MR. DELANO:  Could I see them?

9       MR. DONAHUE:  I object.

10      ASSISTANT CLERK-MAGISTRATE:  I don't think she

11   has to.  If she wants to show them to you -- I mean,

12   if she wants to show them to you, that's fine, but I

13   don't think she's obligated to do so.

14      MR. DELANO:  So on August 30 of last year when

15   you got the first call, you took a note of that call,

16   is that right?

17      MS. WHITNEY:  Yes, I did.

18      MR. DELANO:  And you had no telephone calls

19   prior to that time of any nature such as what you've

20   testified to?

21      MS. WHITNEY:  No, not like that, no.

22      MR. DELANO:  And during the first call, the

23   August 30 call, how long would you say you were on

24   the phone with whoever the person was?

1    MS. WHITNEY:  It probably lasted forty-five

2  seconds to a minute.

3    MR. DELANO:  Forty-five seconds to a minute?

4    MS. WHITNEY:  Yeah, close to a minute.

5    MR. DELANO:  And all that was said was, "Hi,

6  Kim.  How are you?"

7    MS. WHITNEY:  From him?

8    MR. DELANO:  Yes, from whoever the person was.

9    MS. WHITNEY:  Yes, initially up front, but at

10  the end of the call when I said, "I'm going to hang

11  up if you don't identify yourself," he said, "No,

12  Kim, don't hang up now," and I immediately hung up.

13    MR. DELANO:  So essentially then your testimony

14  is that you sat in silence for forty-five seconds on

15  the telephone, true?

16    MS. WHITNEY:  No, I didn't.

17    MR. DELANO:  You were speaking?

18    MS. WHITNEY:  I was speaking.  I answered the

19  phone.

20    MR. DELANO:  But there was no response from the

21  person on the other end?

22    MS. WHITNEY:  Right.

23    MR. DELANO:  And you had spoken?

24    MS. WHITNEY:  Until I said, "I'm going to hang

1    up," and then he responded.

2        MR. DELANO:  And you actually spoke back in a

3    whisper, correct?

4        MS. WHITNEY:  Within the first four, five, six

5    seconds, and then when I got past the comfort zone, I

6    went to my own voice.

7        MR. DELANO:  You clearly don't know who called

8    on that day, do you?  You don't know who the person

9    was on the other end of that phone?

10        MS. WHITNEY:  Did I know?  No.

11        MR. DELANO:  And in December now, some four

12    months go by, you receive no other calls, true?

13        MS. WHITNEY:  Uh-huh.

14        MR. DELANO:  And it was either December 5 or 6,

15    but you're not sure which, you get the second call?

16        MS. WHITNEY:  Uh-huh.

17        MR. DELANO:  And that call consisted of nothing

18    but breathing, is that right?

19        MS. WHITNEY:  That call consisted of nothing but

20    breathing and some muttering.

21        MR. DELANO:  Unintelligible muttering?

22        MS. WHITNEY:  Exactly.

23        MR. DELANO:  Nothing of a threatening nature,

24    correct?

1    MS. WHITNEY:  No.

2    MR. DELANO:  Nothing of a reference to body

3    parts again or anything along those lines, true?

4    MS. WHITNEY:  No.

5    MR. DELANO:  And how long would you say you were

6    on the phone with that caller?

7    MS. WHITNEY:  Twenty-five seconds.

8    MR. DELANO:  And again, you did most of the

9    speaking, is that right?

10    MS. WHITNEY:  Yes.

11    MR. DELANO:  And the third call which you said

12    came in January -- is that right?

13    MS. WHITNEY:  January 2.

14    MR. DELANO:  How long would you say that call

15    lasted?  Let me back you up for one second.  The

16    December call you at this point don't know who this

17    individual is either?  You don't recognize any voice

18    or anything else, do you?

19    MS. WHITNEY:  No.

20    MR. DELANO:  January call, how long would you

21    say that call lasted?

22    MS. WHITNEY:  Probably twenty -- probably twenty

23    seconds, fifteen to twenty seconds.

24    MR. DELANO:  And again, that involved simply

1    breathing, correct?

2        MS. WHITNEY:  That involved the escalated

3    breathing, right.

4        MR. DELANO:  And again, no threatening

5    statements made to you or reference to body parts or

6    things of that nature, correct?

7        MS. WHITNEY:  No.

8        MR. DELANO:  Simply breathing, is that your

9    testimony?  True?

10       MS. WHITNEY:  Yes.

11       MR. DELANO:  Not even a "Hello, Kim," right?

12       MS. WHITNEY:  No.

13       MR. DELANO:  Likewise with the December call,

14   not even a "Hello, Kim," right?

15       MS. WHITNEY:  Right.

16       MR. DELANO:  Not one word was spoken, true?

17       MS. WHITNEY:  No.

18       MR. DELANO:  And again in March and the last

19   call that you say you received, likewise your

20   testimony is that there was not even a word spoken,

21   correct, by the caller?

22       MS. WHITNEY:  That's right.  Same thing with the

23   February phone call.

24       MR. DELANO:  I'm sorry.  I missed one, February.

1  Okay.  And the February phone call?  Okay.

2       MS. WHITNEY:  The February phone call was where

3  I turned the volume up and heard the background noise

4  that I heard.

5       MR. DELANO:  Why don't you describe the

6  background noise that you heard.

7       MS. WHITNEY:  The sound of skin slapping.  You

8  know, repetitive motion.

9       MR. DELANO:  So you're assuming then that this

10  was masturbation?

11      MS. WHITNEY:  I'm not an expert on it, but it

12  pretty much went with the whole phone call.  It fit

13  when I turned the volume up and heard it.

14      MR. DELANO:  How long did you stay on the phone

15  to listen to that, Ma'am?

16      MS. WHITNEY:  That was probably a thirty-second

17  phone call.  Long enough.

18      MR. DELANO:  So in thirty seconds you determined

19  that what you heard was akin to masturbation, is that

20  true?

21      MS. WHITNEY:  Yes.  Yes, that's true.  It's very

22  true.

23      MR. DELANO:  Now, as a result of these phone

24  calls, what medical treatment have you sought, if

Page 28

1      any?

2          MR. DONAHUE:  Object, Your Honor.  Why should we

3      get into her medical?

4          ASSISTANT CLERK-MAGISTRATE:  Yeah, I don't know

5      what's the -- make an offer on that.

6          MR. DELANO:  I guess, Mr. Clerk, my point is

7      under the criminal harassment statute she's got to

8      show some substantial emotional, I think, or --

9          ASSISTANT CLERK-MAGISTRATE:  Have you got the

10     cite on that?  I know that's relatively new.

11         MR. DELANO:  Yeah, I do.  I could copy the

12     statute, if you want.

13         ASSISTANT CLERK-MAGISTRATE:  I was looking for

14     it, but we're not updated.  We don't have the pockets

15     on it.  I know I have it in my office somewhere.

16         MR. DELANO:  It's substantial emotional distress

17     on her part, I guess, for the government to make its

18     element.

19         (Mr. Delano hands to the Assistant Clerk-

20     Magistrate.)

21         MS. WHITNEY:  Do you need the doctor's name?

22     Both of them?

23         ASSISTANT CLERK-MAGISTRATE:  See, I don't think

24     -- but I don't think that's --

1    MR. DONAHUE:  At this point it's not relevant.

2    ASSISTANT CLERK-MAGISTRATE:  I don't think it's

3    germane.

4    Can I just look at this for a minute, Mr.

5    Delano?

6    MR. DELANO:  Yeah, sure, you can hold onto it.

7    ASSISTANT CLERK-MAGISTRATE:  Thank you.

8    MR. DELANO:  So as you sit here today, Ms.

9    Whitney, you do not know who made those telephone

10    calls to you, do you?

11    MS. WHITNEY:  No, I don't.

12    MR. DELANO:  Thank you.  Nothing further.

13    ASSISTANT CLERK-MAGISTRATE:  Okay, do we have

14    another witness?  Ms. Murphy?

15    MS. MURPHY:  Yes.

16    ASSISTANT CLERK-MAGISTRATE:  And could you just

17    for the record identify yourself and your position at

18    NSTAR?

19    MS. MURPHY:  Sure, Joanne Murphy.  I'm an

20    investigator with NSTAR security.

21    I became involved in the case.  I actually

22    became involved in the case on February 2.  I have

23    two offices within the company, one on the North and

24    one on the South, being Wareham.  On February 2 I was