BEFORE ARBITRATOR ERIC J. SCHMERTZ

| | |
|---|---|
| LOCAL 369, UTILITY WORKERS UNION OF AMERICA, AFL-CIO )<br><br>v.<br><br>NSTAR ELECTRIC AND GAS CO. ) | Termination of James Rogers<br>P&M Grievance #6296 |

UNION'S POST-HEARING BRIEF

I. INTRODUCTION

This case arises from the Company's discharge of James Rogers for allegedly making harassing phone calls to Kimberly Whitney, while she was a Company labor relations' employee, between August 30, 2000 and March 30, 2001. The Union grieved the termination and submitted the matter to arbitration. An arbitration hearing was held on February 14, 2002. At the hearing, the parties agreed that the following issue would be submitted to the arbitrator:

> Did the Company have just cause to discharge James Rogers on or about May 18, 2001? If not, what shall be the remedy?

II. RELEVANT CONTRACT PROVISION

NSTAR Electric and Gas ("the Company") and Local 369, UWUA ("the Union") are parties to a collective bargaining agreement, Joint Exhibit 1, dated October 1, 2001. The agreement contains the following management rights clause:

# ARTICLE V
# MANAGEMENT RIGHTS

The Union and the Local recognize the right and power of the Company to select and hire all employees; to promote employees; to determine the necessity for filling a vacancy; to transfer employees from one position to another; to suspend, discipline, demote, or discharge employees; to assign, supervise, or direct all working forces and to maintain discipline and efficiency among them; to lay off employees and to stagger employment when required because of lack of work or curtailment of work; and generally to control and supervise the Company's operations and to exercise the other customary functions of Management in carrying on its business without hindrance of interference by the Union, the Local, or by employees. If the Local claims that the Company has exercised the right to suspend, discipline, demote, or discharge employees in an unjust or unreasonable manner, such claim shall be subject to the Grievance Procedure in Article XXXII and Arbitration under Article XXXIII. If the Local claims that the Company has exercised any of the other foregoing rights in a capricious or arbitrary manner, such claims shall be subject to the Grievance Procedure in Article XXXII and Arbitration under Article XXXIII. The Company, the Union, and the Local recognize the responsibility of the employees to comply with reasonable rules, regulations, and practices prescribed by the Company.

Joint ("Jt.") Ex. 1, Article V, page 5.

III. **RELEVANT EMPLOYER POLICIES**

   **The NSTAR Code of Conduct:**

   **Employment Discrimination And Sexual Harassment**

   NSTAR will not tolerate illegal discrimination or harassment in any form.

   Federal, state and local laws, regulations and guidelines prohibit discrimination in employment because of race, color, religion, sex, national origin, ancestry, sexual orientation, age, disability, or marital status in matters pertaining to employment. NSTAR is committed to

2

providing all employees with a work environment that is free is unlawful discrimination, sexual harassment, or other forms of unlawful conduct.

Co. Ex. 15, page 6.

## IV. FACTS

James Rogers was employed with NSTAR, formerly Commonwealth Electric[1], for fifteen years before his termination on or about May 18, 2001. Mr. Rogers was a first class lineman at the time of his termination. In that position, he generally worked on a crew with other linemen, performing maintenance of overhead and underground distribution lines and storm restoration. Transcript ("Tr.") at 182-83. Mr. Rogers had an excellent relationship with his coworkers. His record with the Company was free of any discipline. Tr. at 183.

Mr. Rogers lives alone in his house in Plymouth, Massachusetts. He has a girlfriend who has two grown children, one of whom lives with her. His girlfriend has access to his house. Tr. at 190-91.

Mr. Rogers testified that on March 30, 2001, he finished work at the Company's Plymouth Service Center at 3:30 p.m. At that time he left the center, and went to his friend Jeff Knight's brother's house to see the brother's new puppy. The house is a couple of miles from the center. Tr. at 185, 205, 212. Mr. Rogers spent approximately 15 to 20 minutes at the house, and then went to the American Legion hall in Wareham to meet some other people.[2] Tr. at 185, 206-07, 213-14. Mr. Rogers arrived at the

---

[1] NSTAR merged with Commonwealth Electric in August of 1999. Tr. at 22.

[2] James McGuire, Jr., Senior Labor Relations Consultant with the Company, testified that he thought Mr. Rogers had told him at the April 23, 2001 grievance hearing that Mr. Rogers, Mr. Knight and possibly another employee had met at the American Legion Hall and planned to go look at Mr. Knight's brother's puppy, but that Mr. Rogers had never testified that he saw the puppy that day. Tr. at 218-19. There is no evidence, however, that Mr. Rogers was asked at the grievance meeting whether he had in fact seen the dog. That Mr. Rogers did not volunteer or otherwise provide that information at that time does not render

American Legion hall at approximately 4:10 p.m. on March 30, 2001. He waited in the parking lot of the hall for approximately 15 minutes, and left when he determined that the other people were not going to show up. Tr. at 186, 205, 214-15. He subsequently went to Kingston. Tr. at 185. Mr. Rogers did not make any phone calls to Kimberly Whitney between August 2000 and March 2001. Tr. at 189. He may have called the Company's Wareham office at some time with a question about his 401(k). Tr. at 177-78.

Kimberly Whitney is a field services supervisor for the Company for Cape Cod and Martha's Vineyard. Tr. at 21. From August 1999 through March 2001, Ms. Whitney was an employee and labor relations consultant for the Company, working out of the Company's office in Wareham. Tr. at 22.

Ms. Whitney testified that she received five harassing phone calls to her Wareham office phone between August 30, 2000 and March 30, 2001. The first call occurred on August 30, 2000, at approximately 9:30 a.m. Ms. Whitney answered her phone, stating her name, and a male voice responded in a very low whisper, "Hi Kim. How are you?" Tr. at 27-28, Co. Ex. 6. After Ms. Whitney whispered back a response, and asked several times who the caller was, she heard only faint whispering and breathing which sounded increasingly heavier. The caller whispered to her not to hang up the phone, but she did. The phone call lasted approximately 1.5 minutes. Id. The Company was unable to trace the phone call. Tr. at 35, 73, Co. Ex. 9. Approximately three hours after the phone call, Ms. Whitney checked with the switchboard operator to see if any calls had come through the switchboard for her. The operator told her that a call had come in

---

his testimony untrue or not credible. It is undisputed that Mr. Rogers went to the American Legion Hall after work on March 30, 2001.

4

through the switchboard, and the caller had asked for her extension. Tr. 78-80, Co. Ex. 6, p. 2.

The second phone call occurred on December 5th or 6th, 2000 between 11:30 a.m. and 12:30 p.m. Ms. Whitney answered her phone, stating her name, and heard in response breathing, muttering and possibly whispering of her name.[3] She hung up the phone almost immediately. Tr. at 40-41. She did not document the phone call in any way. Tr. at 43-44, 74. The Company was unable to trace the phone call. Tr. 41-42. Ms. Whitney's phone was subsequently replaced with a digital analog phone, which had a display screen that would show whether an incoming call came from an internal extension within the building or from outside the building. Tr. at 42.

The third phone call was on January 2, 2001 at approximately 2:00 p.m. Ms. Whitney answered the phone, stating her name, and received no verbal response. She heard only breathing. Tr. at 44-45. She listened for background noise but heard none. Tr. at 45. She hung up after the breathing became heavier. Tr. at 46. Ms. Whitney told the Company's security manager, Nick Gianturco, the phone display showed a five-digit truncated number. That number showed only that the call was from outside the building. Tr. at 47. Although Mr. Gianturco worked with the Company telecommunications department to try to determine the town from which the phone call came, they were unable to do so. Tr. at 48, Co. Ex. 7.

---

[3] At the May 11, 2001 show cause hearing for the criminal complaint against Mr. Rogers, Ms. Whitney testified that the caller had not stated any words during that December 2000 call. Ms. Whitney contended that the description of the December 2000 phone call that she gave at the arbitration was more accurate than her May 2001 testimony because she had had a chance to review her e-mails and memory of the calls. Ms. Whitney, however, had no e-mails or other documentation of the December 2000 call, Tr. at 43-44, and no other explanation why her memory was clearer at the arbitration in February 2002, than it was in May 2001, only months after she had received the call. Tr. at 91-92.

5

On January 11th or 12th 2001, at the Company's request, Verizon installed a direct outside line in Ms. Whitney's office, which had a caller ID display and volume control. Ms. Whitney's old phone extension had a message directing callers to her new phone number. Mr. Gianturco informed Ms. Whitney that Call Trace would be "installed" after she received another harassing phone call. Tr. at 49-50.

Ms. Whitney received the fourth phone call on February 1, 2001 at approximately 4:15 p.m. The phone display read "private caller." Ms. Whitney heard no response to her greeting, but only breathing. She turned up the volume and heard nothing in the background. She then thought she heard "the sound of masturbating", and hung up the phone. Tr. at 51. She immediately called Mr. Gianturco, who was on vacation, and his assistant JoAnn Murphy, concerning the call and left them messages. Tr. at 52. She met with Ms. Murphy before she left work, and told her about the call. Tr. at 53. Additionally, on her way home from work that day, Ms. Whitney stopped at the Wareham police department to report the call. Tr. at 53. The appropriate detective was not on duty at that time, and called her the next day. Tr. at 57.

On February 1 and 2, 2001, Ms. Whitney sent Mr. Gianturco and Ms. Murphy e-mail messages concerning the call. Tr. at 52, Co. Ex. 8. She also spoke to Detective Cabral at the Wareham Police Department about the calls. Tr. at 57. On the same day, Ms. Murphy provided Ms. Whitney with information from Verizon about how to activate Call Trace on her phone at work. Tr. at 56-57, Co. Ex. 3.

The fifth call to Ms. Whitney was on March 30, 2001 at approximately 4:00 p.m. She saw the words "private caller" again on her phone display screen. She answered the phone "Good afternoon, Kim Whitney," and heard rapid, escalating breathing in

6

response. She told the caller that she could not hear him, and asked if anyone was there, trying to keep the caller on the line as long as possible for the call to be traced. She received no response to her questions other than the breathing. She then hung up and pressed *57 to activate the Call Trace, as she had been instructed. Tr. at 61. The call lasted approximately ten to fifteen seconds. Tr. 107-08. Neither Ms. Whitney nor Mr. Gianturco had any idea who was making the calls: "we had absolutely no clue as to who it could have been that day or anytime throughout the whole ordeal." Tr. at 83.

Ms. Whitney told Ms. Murphy about the fifth call immediately after it occurred. Ms. Murphy contacted the police department, and told Ms. Whitney that they would have to wait for the department to get back to them about the results of the Call Trace. Tr. at 62. The following Monday, on or about April 2, 2001, the police department called Ms. Murphy and gave her the results of the Call Trace. The results identified the grievant as the subscriber of the telephone service from which the fifth call was made. The Company checked their records and matched the phone number from the Call Trace as that listed for the grievant on emergency contact information. Tr. at 64, Co. Ex. 9.

On April 6, 2001, the Company suspended Mr. Rogers for "placing threatening and harassing phone calls to a fellow employee." Jt. Exs. 3A, 3B. Criminal charges were also brought against Mr. Rogers based on the alleged harassing phone calls to Ms. Whitney. The charges, however, were dismissed on May 14, 2001. Tr. at 186-87, Union Ex. 1.

On April 23, 2001, the Company held a suspension hearing for Mr. Rogers concerning the alleged harassing phone calls to Ms. Whitney, and at the outset of the hearing amended the charges against him to include creating a hostile work environment.

7

Tr. at 148-49, Jt. Exs. 4A, 4B. Neither at the hearing nor in correspondence to Mr. Rogers did the Company inform Mr. Rogers of the specific provisions of the Code of Conduct that he had allegedly violated. Tr. at 163-64, Jt. Exs. 3A, 4A. As a result of the hearing, the Company decided to terminate Mr. Rogers effective May 18, 2001. The Company's decision to terminate Mr. Rogers was based on the fact that the March 30, 2001 phone call to Ms. Whitney had been traced to his phone line, he allegedly had the ability to make all five of the phone calls, and he could not explain how the March 30, 2001 call came from his phone line. Tr. at 147-49, Jt. Ex. 4B, Co. Ex. 14.

The only time that Mr. Rogers had ever seen Ms. Whitney before the arbitration was at a meeting in July 2000 of all the linemen at the Plymouth Service Center to discuss workplace violence and harassment. Tr. at 195. Both Mr. Rogers and Ms. Whitney attended the meeting. At the meeting, Joe Roda, the Company's Labor Relations Manager and Ms. Whitney's boss at the time, explained the Company's zero tolerance policy for workplace violence or intimidation. Tr. at 66-69. There was no evidence, however, that the Company has ever terminated an employee for allegedly harassing another person. Tr. at 169-175.

Company records showed that on August 30, 2000, at approximately 9:30 a.m., Mr. Rogers was on a paid rest period, having worked late the previous night. Tr. at 143. The records showed that on December 5, 2000, Mr. Rogers and his crew reported that they were at a work site in Marshfield between 11:30 a.m. and 12:30 p.m. They showed that on December 6, 2000, between 11:30 a.m. and 12:30 p.m., Mr. Rogers and his crew finished a job in Plymouth, and had a half-hour lunch break between noon and 1 p.m. The records showed that on January 2, 2001, Mr. Rogers was on a vacation day, and that

on February 1 and March 30, 2001, Mr. Rogers worked until 3:30 p.m. Tr. 143-44, Co. Ex. 13.

V. **ARGUMENT**

    A. **The Company's Discharge of James Rogers Was Unjust and Unreasonable, and Not For Just Cause**

The Company charged Mr. Rogers with violating its Code of Conduct by allegedly making a series of threatening and harassing phone calls to Ms. Whitney, and creating a hostile work environment. As noted above, in section III, the Code of Conduct provides that the Company will not tolerate *illegal* discrimination, including sexual harassment, in any form. There is no evidence that Mr. Rogers committed *illegal* discrimination or sexual harassment so as to violate this provision of the Code of Conduct. The Company's case rests on mere suspicion, rather than actual proof, that Mr. Rogers made the alleged phone calls. While employers may use circumstantial evidence to try to prove their case, that "does not eliminate in any sense the requirement that there must be clear and convincing evidence that the offense charged was committed." Reed Roller Bit Co., 29 LA 604, 606 (Hebert, 1957). Mere suspicion is not sufficient. Enterprise & Century Undergarment Co., 24 LA 63, 64 (Donnelly, 1955). The Company has failed in this case to establish clear and convincing evidence that Mr. Rogers made any of the alleged phone calls to Ms. Whitney, and thereby violated the Code of Conduct. Alternatively, even if the arbitrator finds that the Company did establish clear and convincing evidence that Mr. Rogers made any or all of the phone calls, the calls did not constitute unlawful discrimination or sexual harassment in violation of the Code of Conduct. Consequently, there was not just cause for Mr. Rogers' discharge.

9

1. <u>There is No Clear or Convincing Evidence that Mr. Rogers Made Any Harassing Phone Calls to Ms. Whitney.</u>

While the March 30, 2001 phone call to Ms. Whitney was traced to Mr. Rogers' home phone, the evidence does not establish that Mr. Rogers actually made the alleged phone call. The Call Trace results explicitly state that they "do not necessarily identify the person[s] making the calls, but rather provide the identity of the subscriber of the telephone service." Co. Ex. 9. Neither Ms. Whitney nor any other witness could identify Mr. Rogers as the caller on March 30th. As Ms. Whitney acknowledged, she had no idea who the caller was for any of the five allegedly harassing phone calls she received. Tr. at 83.

Additionally, the evidence showed that Mr. Rogers was not at home on March 30, 2001, at 4:00 p.m., the time of the call. He left work at approximately 3:30 p.m. that day and drove to his friend Jeff Knight's brother's house, where he stayed for 15 to 20 minutes, and then went directly to the American Legion Hall in Wareham. He arrived at the American Legion Hall at about 4:10 p.m., ten minutes after the alleged phone call was made. Mr. Rogers thus had no opportunity on March 30th to make the alleged phone call to Ms. Whitney, and there was no evidence to contradict his testimony. It is possible that another person could have made the call from his house, either by clipping onto his phone line, or by gaining access to his house. Mr. Rogers' girlfriend had access to his house, and had a grown child living with her. While Mr. Rogers did not assert that his girlfriend or her child made the call, they did have access to his house and *could* have made the call. The caller on March 30th did not state any words, but only breathed rapidly on the phone, and therefore was not clearly identifiable as a man or woman.

Furthermore, there is *no* evidence that Mr. Rogers made any of the other four allegedly harassing calls to Ms. Whitney between August 2000 and February 2001. None of those phone calls was traced, much less traced to Mr. Rogers' residence, and again, neither Ms. Whitney nor anyone else could identify the caller as Mr. Rogers. As Ms. Whitney acknowledged concerning the third call in January 2001, the call "could have been anybody in another building, anywhere outside, a pay phone it could have been (*sic*)." Tr. at 47-48. Company records showed that Mr. Rogers could not have made the December 2000 call because on the alleged call dates, December 5 or 6, 2000, he was working on a crew in Marshfield or Plymouth between 11:30 a.m. and 12:30 p.m., the time of the call. Just because Company records showed that Mr. Rogers was not at work at the times of the other alleged calls does not mean that he made those calls. Almost *anyone* could have made those phone calls.

The Company contends that there is sufficient evidence that Mr. Rogers made all five phone calls to Ms. Whitney because she believes that the caller was the same for all five calls, and testified that she thought the breathing sounded the same in all the calls. While Ms. Whitney may believe this to be true, the objective evidence does not clearly establish that the same caller made all the calls. The evidence shows that the calls were not all the same. In the initial call and the second call the caller allegedly stated words, including Ms. Whitney's name, while in the last three calls, the caller did not state any words; there was only breathing. Additionally, if the caller was the same for all the calls, Mr. Rogers could not have been the caller, as he was working with his crew at the time of the December 2000 phone call.

Finally, there is no logical reason why Mr. Rogers would have made the phone calls to Ms. Whitney, and thereby jeopardize his longstanding employment with the Company. He had seen her only once, and had never had any dealings with her that would establish a motive for harassing her. Ultimately, the evidence does not clearly establish that Mr. Rogers made the calls, or that the caller or the calls were the same.

2. <u>Mr. Rogers Did Not Engage in Unlawful Discrimination or Harassment In Violation of the Company's Code of Conduct</u>

In stating that the Company will not tolerate illegal discrimination or sexual harassment, the Company's Code of Conduct refers to state, federal and local laws prohibiting employment discrimination and sexual harassment.[4] Co. Ex. 15, p. 6. Even if Mr. Rogers was responsible for the March 30, 2001 phone call to Ms. Whitney, he did not engage in any unlawful conduct as described in this provision. Ms. Whitney stated that the March 30th phone call consisted of rapid, escalating breathing, and lasted ten to fifteen seconds. There is no basis for finding that this call constituted employment discrimination, sexual harassment or other conduct in violation of federal, state or local law. Massachusetts General Laws, chapter 151B, section 1(18) defines sexual harassment to mean "sexual advances, requests for sexual favors, and other verbal or

---

[4] While Company witness James McGuire, Jr. indicated that the Company had determined that Mr. Rogers violated the provision of the Code of Conduct that states, "We should …treat everybody with respect and dignity," Co. Ex. 15 at p. 2, by allegedly making the phone calls to Ms. Whitney, Mr. McGuire was only able to identify that as the case after taking some time to review the Code of Conduct during the arbitration. Mr. McGuire acknowledged that Mr. Rogers was not told at the grievance hearing that he was charged with violating this provision or the provision prohibiting harassment and discrimination. Tr. at 162-64. No Code of Conduct provisions were referenced in his suspension or termination letters. Jt. Exs. 3A, 4A. Because there is no evidence that Mr. Rogers was made aware before the arbitration that his discharge was based on a violation of the respect and dignity provision, the Company should not be able to rely on that provision to support its decision to discharge him. Arbitrators have refused to allow employers to enlarge the grounds or reasons for an employee's discharge at the arbitration stage of a grievance because it is unfair to the grievant, and hampers his ability to rebut the Company's charges. <u>Riverside Book Bindery</u>, 38 LA 586, 593 (McKelvey, 1962); <u>Sealtest Dairy Products</u>, 35 LA 205, 209 (Morvant, 1960); <u>General Electric Co.</u>, 74 LA 125, 128 (Clark, 1979); <u>Commonwealth of Pennsylvania</u>, 73 LA 556, 560 (Gerhart, 1979).

physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; (b) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment." The definition under Title VII is comparable. See Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998)(reaffirming that Title VII forbids only behavior that is severe and pervasive enough to create an objectively hostile or abusive environment).

While the Union does not doubt that the March 30th call upset Ms. Whitney, it was devoid of sexual content or innuendo. No words were even spoken during the brief call. Thus, the call could not have created an unlawfully hostile work environment. The same is true of the other phone calls. Even if Mr. Rogers had made the other phone calls, which he did not, the calls did not contain sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, which could have interfered with Ms. Whitney's work performance by creating an intimidating, hostile or humiliating work environment.[5] The phone calls thus did not rise to the level of unlawful sexual harassment or employment discrimination in violation of the Code of Conduct, and were not reasonable grounds for terminating Mr. Rogers. Moreover, the calls did not

---

[5] While Ms. Whitney testified that she heard the "sound of masturbating" during one phone call, on February 1, 2001, she had turned up the volume of the call to listen for background noise, and stated that she heard only breathing and no words after she answered the phone. Tr. at 51-52. If indeed the sound she heard was obscene, it still did not constitute unlawful sexual harassment.

constitute any other unlawful conduct, as the dismissal of the criminal charges against Mr. Rogers show. Union Ex. 1.

### B. The Penalty of Discharge Was Too Severe For Mr. Rogers' Alleged Conduct.

Even assuming that Mr. Rogers bears responsibility for the March 30, 2001 phone call to Ms. Whitney, the penalty of discharge was too severe a penalty and greatly exceeded the seriousness of the alleged offense. Under established arbitral principles of just cause and progressive discipline, it is "axiomatic that the degree of the penalty should be in keeping with the seriousness of the offense." Capital Airlines, 25 LA 13, 16 (Stowe, 1955).

As explained above, the March 30, 2001 phone call to Ms. Whitney did not contain any words, much less ones that could have been construed as threatening or harassing, and thus did not rise to the level of unlawful discrimination or sexual harassment. The phone call consisted of only breathing, which may have sounded more rapid or more escalated than normal breathing for a variety of non-obscene reasons, including because the caller had his mouth too close to the phone, had a cold, or had just exercised, or otherwise just exerted a lot of energy, before making the call. As explained above, none of the other alleged harassing phone calls rose to the level of unlawful harassment or discrimination either.

The Company's decision to terminate Mr. Rogers summarily for allegedly making harassing phone calls to Ms. Whitney, without clear and convincing evidence that he made *any or all* of the calls, was excessively severe and lacked just cause. While some discipline may have been warranted if there was clear and convincing evidence that Mr.

14

Rogers had made the alleged phone calls, termination was not the type of discipline warranted. See Capital Airlines, supra at 16 ("one of the primary purposes of discipline in the industrial relations field is to bring about improvement. It is therefore, axiomatic that the degree of the penalty should be ... designed primarily to bring about such improvement.") This is especially true where Mr. Rogers had no record of discipline during his 15 years with the Company and was a good employee who got along well with his co-workers. Further, there was no evidence that the Company has ever terminated any other employee for the same or similar conduct, despite its alleged "zero tolerance" policy against workplace violence and intimidation.

At least one arbitrator has found an employer's termination of an employee for making harassing phone calls to her supervisor was not for just cause, in part because of the employee's length of service, excellent record, and the Company's past practice of imposing progressive discipline. City of Virginia, Minnesota, v. City of Virginia Supervisors' Ass'n, 108 LA 59 (Daly, 1997). In City of Virginia, Minnesota, an employee was terminated after making at least five traced hang-up calls to her supervisor, the city's mayor, and admitting to having made more such calls. The arbitrator found that her termination was not for just cause, however, because she had an excellent work record, was under extreme stress and depressed, past practice showed that the City imposed progressive discipline on employees, and the City had failed to follow precisely the notice provisions under the parties' contract. In this case, where there is less damaging evidence against the grievant, i.e. no clear proof that Mr. Rogers made the March 30, 2001 or other calls, Mr. Rogers' fifteen-year discipline-free record and the lack of evidence that the Company has terminated other employees for similar conduct,

should warrant a finding that Mr. Rogers' discharge was not for just cause. In even more egregious cases involving harassing phone calls, suspension, and not discharge, was the only penalty warranted. See City of Virginia, Minnesota, supra; Jasper County Board of Supervisors v. Public Professional & Maintenance Employees Local 2003, IBPAT, 101 LA 564 (Alexander 1993). Consequently, the penalty of discharge imposed on Mr. Rogers was too severe and not for just cause.

VI. **CONCLUSION**

For all of the foregoing reasons, the Company did not have just cause to discharge James Rogers.

Respectfully submitted,

LOCAL 369, UTILITY WORKERS
UNION OF AMERICA, AFL-CIO,

By its attorneys,

_____
Paul F. Kelly, Esq.
Elizabeth A. Sloane, Esq.
SEGAL, ROITMAN & COLEMAN
11 Beacon Street
Boston, MA 02108
617-742-0208

Dated: March 29, 2002

pfk/9314/02047/arbbrief2.doc