*In the Matter of the Arbitration Between*

---

Nstar Electric & Gas Corporation,

          Employer,

    and                                    Arbitrator Eric Schmertz, Esq.
                                            (Discharge of James Rogers)

Utility Workers Union of America,
Local No. 369, AFL-CIO,

          Union.

---

### Brief for the Company

**I.**     **The Issue.**

    Did the Company have just cause to discharge James Rogers on or about May 15, 2001? If not, what shall be the remedy? (Jt. Ex. 2)

**II.**     **Preliminary Statement.**

    Nstar Electric & Gas Corporation ("Nstar" or the "Company") is a Massachusetts public utility engaged in the transmission and distribution of electricity and gas. Nstar was formed by the 1999 merger of BEC Energy (whose principal operating subsidiary was Boston Edison Company) and COM/Energy (whose principal operating subsidiaries were Cambridge Electric Company, COM Electric Company, and COM Gas Company). (T. 7)

    Utility Workers Union of America, Local No. 369, AFL-CIO (the "Union") represents a broad unit of production and maintenance, office clerical, technical and professional employees across most of Nstar, and the Union is itself the product of mergers among various formerly

separate bargaining units from Boston Edison and COM/Energy. (*See* Jt. Ex. 1, at 1 - 2)

From August of 2000 through March of 2001, Kim Whitney, then an Employee & Labor Relations Consultant for the Company, received a series of five similar, sexually harassing "heavy breathing" phone calls through her desk phone at work. The fifth call was traced to the home telephone of James Rogers, an Overhead Lineworker for the Company. Mr. Rogers and Ms. Whitney were not acquainted, but Mr. Rogers knew who Ms. Whitney was.

The Company investigated and found strong evidence to conclude that Mr. Rogers had been making the calls, even though he denied that he had been doing so. In addition to the traced telephone call itself, among a tight web of additional circumstantial evidence nothing was more important than the fact that Mr. Rogers claimed he was with co-workers away from his home when the fifth call was traced to his house – and none of the co-workers ever came forward to verify his alibi. Based upon this and numerous other facts, all discussed below, the Company terminated Mr. Rogers' employment for placing threatening and harassing telephone calls to a co-worker, and creating a hostile environment. (Jt. Ex. 4) The Company contends that this termination was for just cause; the Union disagrees.

The parties conducted an arbitration hearing on February 14, 2002, at the Dedham Hilton Hotel in Dedham, Massachusetts. Eric Schmertz, Esq., was selected as the Chair of the tripartite arbitration board; Lisa K. Amber served as the Company member of the board; and Phillip Trombley served as the Union member of the board. (*See* Jt. Ex. 1, at 45 - 46)

## III.    Relevant Contract Provisions.

The contractual grievance and arbitration procedure, and disciplinary procedures leading thereto, are all relevant to the instant proceeding, but there is no need to reproduce that language

here. (*See* Jt. Ex. 1, at 43 - 46) So far as the Company is aware, there are no procedural

irregularities involved in this case. The management rights clause provides a "just cause"

standard for discipline by the Company, as follows: "The Union and the Local recognize the right

and power of the Company to ... suspend, discipline, demote, or discharge employees ... If the

Local claims that the Company has exercised the right to suspend, discipline, demote, or

discharge employees in an unjust or unreasonable manner, such claim shall be subject to the

[grievance and arbitration procedures] ..." (Jt. Ex. 1, at 5)

## IV.    Facts.

### A.    The Primary Employees Involved In This Case.

Kim Whitney has worked for Nstar or its predecessors since 1979, with a gap in the mid-

1980's where she had children and stopped working for the Company. (T. 21) After being rehired

in 1988, in 1989 Ms. Whitney transferred into a human resources role, where she remained for

many years in various capacities until May of 2001. (T. 21 - 22) Ms. Whitney was serving as an

employee and labor relations consultant during the last half of 2000 and first months of 2001.

Her work location was a Wareham, Massachusetts office facility that served the Company's

employees and operations in the New Bedford area, the Plymouth area, and across Cape Cod.

(*Id.*)

Ms. Whitney did not know James Rogers, an electrical lineworker assigned to the

Company's Plymouth service center. Both Ms. Whitney and Mr. Rogers recalled that she

appeared in front of a group meeting of the Plymouth employees on July 31, 2000, with Mr.

Rogers in attendance. (T. 65 - 70, 195 - 197, *and see* Co. Ex. 5) Mr. Rogers testified that the

meeting on July 31, 2000 was the only occasion where he had seen Ms. Whitney. (T. 196) Both

he and Ms. Whitney remembered that this meeting was called to roll out the Company's "zero tolerance" policy toward workplace violence and harassment, and to introduce the Company's new Code of Conduct (Co. Ex. 15) (T. 65 - 70, 196 - 197)

James Rogers was a first class electrical lineworker, employed by the Company for 15 years until he was fired in May of 2001. (T. 182) In this capacity he generally worked in a crew, maintaining overhead and underground electrical distribution lines. (T. 182 - 183) Mr. Rogers had no disciplinary record before being terminated. (*Id.*) Mr. Rogers is 42 years old, has never been married, and lives alone at a single family residence at 234 Sandwich Street in Plymouth, Massachusetts. (T. 184, 195) Mr. Rogers' house is about a five minute drive (2.4 miles) from his reporting location at the Plymouth service center. (T. 195, *and see* Co. Ex. 11)

Mr. Rogers' girlfriend is also a Company employee, and she also lives in Plymouth, on Crabtree Road, which is a five-to-seven minute drive from Mr. Rogers' residence on Sandwich Street. (T. 190 - 192, *and see* Co. Ex. 11) Mr. Rogers' girlfriend has two adult children. One is living out of the house; the other is 21 years old and works during the day. (T. 190 - 191) Mr. Rogers has access to his girlfriend's house. (T. 191)

### B.    The Disciplinary Setting.

As mentioned, it is undisputed that in or about July of 2000 the Company announced a "zero tolerance" policy toward workplace violence and harassment. (T. 66 - 67, 152 - 154, 196 - 197) This announcement came with the introduction of the new Code of Conduct (Co. Ex. 15, T. 152 - 154) which says, in relevant part:

> The Nstar Code of Conduct ... sets the principles and framework for other company policies ... We should ... treat everyone with respect and dignity ... (Co. Ex. 15, at 2)

4

Every employee is responsible for maintaining the highest standards of ethics and integrity. Every employee should carefully read the Code of Conduct because everyone must comply with it. The responsibility to behave ethically and lawfully rests with each individual ... (Co. Ex. 15, at 3)

**Employment Discrimination and Sexual Harassment:** Nstar will not tolerate illegal discrimination or harassment in any form. Federal, state and local laws, regulations and guidelines prohibit discrimination in employment because of ... sex ... Nstar is committed to providing all its employees with a work environment that is free of unlawful discrimination, sexual harassment, or other forms of unlawful conduct ... (Co. Ex. 15, at 6)

**Consequences of Violations:** Violators of the Code will be disciplined. Action may include termination of employment and/or, under appropriate circumstances, referral to law enforcement authorities. (Co. Ex. 15, at 3)

Mr. Rogers readily admitted that he was aware of the contents of the Code of Conduct, and that he was present in a meeting when the Company announced the "zero tolerance" policy toward workplace harassment and violence. (T. 162, 197) As mentioned, Mr. Rogers was terminated for placing threatening and harassing telephone calls to a co-worker, and creating a hostile environment. (Jt. Ex. 4)

### C.    The Harassing Calls to Kim Whitney.

#### 1.    The General Resemblance of the Calls.

Beginning on August 30, 2000, and ending on March 30, 2001, Kim Whitney received a series of five similar harassing calls on her work telephone. Each call was placed to Ms. Whitney's desk phone at her Wareham office while she was at work. (*See* T. 25- 29, 40 - 41, 44 - 47, 50 - 52, 61 - 62, *and see* Co. Exs. 6, 7, and 8) For each call, the caller did not identify himself, and instead the caller engaged in rapid, heavy, rhythmic breathing that escalated as the call proceeded, plus guttural sounds, and eventually gasping sounds, depending on how long Ms. Whitney could stand listening. (*Id.*) During some calls the caller mentioned Ms. Whitney by

name; and on each occasion the caller was otherwise unintelligibly whispering, muttering, and mumbling. (T. 25 - 26) There was no discernible background noise such as traffic, radio, or television. (T. 26) Each call had a sexual context, with the caller engaged in whispering and gasping, and during the fourth call, when Ms. Whitney turned up the volume of her telephone receiver, she could hear the sound of a male masturbating. (*See* T. 25- 29, 40 - 41, 44 - 47, 50 - 52, 61 - 62 *and see* Co. Exs. 6, 7, and 8) Ms. Whitney was sure that the calls resembled each other very closely and that the same person was making the calls. (*Id.*)

### 2.    The First Call, on August 30, 2000.

The first in the series of five harassing calls occurred on August 30, 2000 at about 9:30 AM. (T. 26 - 30) On August 30, 2000 at about 9:30 AM, Mr. Rogers was not at work. Having worked overtime for several hours the previous night, Mr. Rogers was on an eight-hour paid rest period after 6:00 AM, and thus was released from his regular daily work hours. (T. 142 - 143, Co. Ex. 13)

When Ms. Whitney picked up the call, the caller whispered, "Hi, Kim, how are you?" At first Ms. Whitney thought the call was a joke, and for a few moments she whispered back at the caller, saying things like, "why are we whispering," "who's this," and "I can't hear you." (*Id.*, *and see* Co. Ex. 6) As the call proceeded, the caller's breathing became heavier and more pronounced, and the caller was muttering and whispering unintelligibly, sounding like the telephone was tucked under his chin. Soon Ms. Whitney became very uncomfortable and said, "if you don't tell me who you are right now, I'm going to hang up." The caller responded in a breathy, gasping voice, "no, Kim, don't hang up now," and Ms. Whitney slammed the phone down. (*Id.*)

After this first call, Ms. Whitney was shocked and took few moments to think about what had happened. She went to the next office and talked over the situation with her boss, Joe Roda. They sat for a time and tried to think of who might have placed the call. (T. 29 - 31) At some point Ms. Whitney called the receptionist, who said that there had been a call from a man who asked for Ms. Whitney's extension, and asked to be connected to her number, so the receptionist had put it through. (Thus, the caller had asked for Ms. Whitney by name, and must have known her name, at least). (*Id.*, *and see* Co. Ex. 6)

Upon Joe Roda's recommendation, Ms. Whitney contacted Nick Gianturco, the head of Nstar security. (T. 31 - 32, *and see* Co. Ex. 6) The Wareham office telephone system was not amenable to tracing calls. Calls arriving at a desk phone extension came through either an 800 number or a local number, and were then distributed internally to individual extensions, making it impossible to trace a call from a Wareham desk phone extension back to the original caller. (T. 32 - 35) Ms. Whitney learned that unfortunate fact over the next several days after August 30, 2000. (*Id.*, *and see* Co. Ex. 6) Nonetheless, Ms. Whitney contacted the Nstar telecommunications department to try to get a desk telephone that would at least specifically identify calls that came in from an internal Nstar extension. (*Id.*) Although she made that request, action was not immediately taken. (*Id.*)

### 3.    The Second Call, on December 5 or 6, 2000.

Thus, when the second in the series of five harassing calls came in on December 5 or 6, 2000, Ms. Whitney was not at all prepared. Indeed, she had largely put the first call out of her mind. (T. 36 - 44) On December 5 and 6, 2000, Ms. Whitney was heavily engaged in employee meetings to try to facilitate the ongoing merger process between Boston Edison and

COM/Energy. (*Id.*) At that point, in her role as a labor and employee relations consultant, Ms. Whitney was attending intense meetings to identify differences and similarities in job descriptions, and to create new, unified job descriptions. (*Id., and see* Co. Ex. 1)

Between 11:30 AM and 12:30 PM on December 5 or 6, 2000, Ms. Whitney left the meeting and went to her office to retrieve some pertinent materials. (*Id.*) A call coincidentally came to her desk phone, and when Ms. Whitney answered she immediately recognized the heavy breathing, rhythmic whispering of her name, and unintelligible utterances and muttering that marked the August 30 call. (*Id.*) Ms. Whitney did not listen for very long and simply hung up the phone.

Ms. Whitney's best recollection is that this call was made on December 6, 2000. She remembered that the meeting participants had already reviewed the job descriptions and that she was involved in planning for all the work that remained to be done with respect to the merger of the job classifications from Boston Edison and COM/Energy. (T. 42 - 43) Because Ms. Whitney was in the midst of the intense merger meetings, and the call caught her off guard, she did not document the call but simply called telecommunications immediately and reminded them that she had requested the telephone that would at least identify any internal caller's extension for incoming calls. (T. 41 - 44) After that, Ms. Whitney returned to the merger meetings and told a fellow labor and employee relations representative, "I just got a very strange phone call." (T. 43)

On December 5, 2000, Mr. Rogers was working with an electrical line crew in Marshfield all day, with a lunch break reported between 12:00 noon and 12:30 PM. (*See* Co. Ex. 13) On December 6, 2000, Mr. Rogers was working with an electrical line crew in Plymouth, not far from either his home or his girlfriend's home. The crew reported working at a job site on Rocky

Pond Road near the intersection of Drew Road between 11:00 AM and 12:00 noon, and then traveling for 30 minutes and taking a 30 minute lunch break between 12:00 noon and 1:00 PM before beginning their next job in Marshfield. (T. 143 - 144, Co. Ex. 13) Thus, for half an hour on December 5, 2000, and for an hour on December 6, 2000, at the approximate time Ms. Whitney recalls the second call coming in to her desk phone, Mr. Rogers was not reported as working. Instead, the crew reported either being at lunch or traveling to the next job.

Mr. Rogers has a cellular telephone. (T. 216) In addition, Mr. Rogers' home at 234 Sandwich Street is about three miles from the December 6 job site at Rocky Pond Road, or about a five minute drive. (*See* Co. Ex. 11 [note the scale on this map, which reveals the distance between the intersection of Rocky Pond and Drew, and Mr. Rogers' home, to be about three miles], *and see* T. 127 - 129, 195, where Company Witness Joanne Murphy and Mr. Rogers both agree that a 2.4 mile drive in Plymouth, from Mr. Rogers' house to his reporting location for work, consumes no more than five minutes) Mr. Rogers' girlfriend's home, to which he has access and which is vacant during the workday, is also about three miles from this job site, again, about a five minute drive. (*See* Co. Ex. 11, T. 190 - 193)

###     4.     The Third Call, on January 2, 2001.

On January 2, 2001, at about 2:05 PM, Ms. Whitney received the third in the series of five harassing calls. (T. 44 - 47) On January 2, 2001, Mr. Rogers was on a vacation day and was not at work. (Co. Ex. 13, T. 144)

Ms. Whitney recalled that it was a quiet day after the New Years holiday, and that she took a late lunch. At about 2:05 PM her desk phone rang, and when she answered she heard heavy, rapid breathing and guttural noises, which escalated as she listened. Ms. Whitney tried

9

this time to listen for background noise or anything that might identify the caller, but as she listened the caller's breathing escalated and turned into gasping, and she hung up. (T. 46) Ms. Whitney was sure that this was the same caller as the first two calls from the previous August 30 and December 5 or 6. (T. 45 - 46)

Ms. Whitney called Mr. Gianturco, head of security, and reported this latest call. She also, for the first time, told Mr. Gianturco about the second call that had come in so unexpectedly about a month earlier that she had not documented it at all. (T. 47 - 48) Ms. Whitney was now becoming extremely upset by these calls, and they were affecting her home life. She and Mr. Gianturco discussed installing a direct outside line for her, so that calls to her at work could be traced. (T. 48 - 50) That installation was completed within a few weeks in January of 2001. (*Id.*)

Even though by mid-January, 2001, Ms. Whitney had a new phone that was a direct outside line (and thus allowed for incoming calls to be traced), on the advice of the security personnel there was no tracing procedure implemented for her phone yet. (T. 49 - 50) Instead, on the advice of the security professionals, Ms. Whitney recorded a message on her old extension instructing callers to contact her at the new, direct dial number. (T. 50) The idea was to determine if the harassing caller was persistent enough to pursue Ms. Whitney at her new number, and if he was, then a tracing process could be activated to determine from where the calls were being placed. (*Id.*)

### 5.    The Fourth Call, on February 1, 2001.

On February 1, 2001, at about 4:15 PM, the fourth in the series of five harassing calls was placed to Ms. Whitney. On February 1, 2001, Mr. Rogers worked his usual hours until 3:30 PM, and there was no overtime. (T.144, Co. Ex. 13) As mentioned, Mr. Rogers' home is only 2.4

miles from his reporting location at the Plymouth Service Center, no more than a five minute

drive. (T. 127 - 129, 195)

Now equipped with a much more sophisticated telephone that included caller ID for

outside calls, when this call arrived on February 1 Ms. Whitney looked at her telephone display

and saw that it merely identified this call as "private caller." (T. 51, Co. Ex. 8) An incoming call

designated as "private caller" means that the caller activated "call block", a process to defeat

"caller ID". "Caller ID" is the telephone function which displays an incoming telephone caller's

number. "Call block" defeats this identification process, and simply displays "private caller," or a

similar generic term. (T. 197 - 203) Making a call from an unlisted number will display "private

caller" or something similar to that on the recipient's caller ID display. (*Id.*) However, if the

caller does not have an unlisted number, the caller can activate "call block" for any individual

call by dialing "*67" before placing the call. (T. 197 - 198)[1]

Ms. Whitney had never seen a call identified as "private caller" before the fourth

harassing call came in at about 4:15 PM on February 1, 2001. (T. 51) When she answered the

call, she immediately recognized the heavy breathing of the three earlier calls. (T. 51) This time,

on advice of the security personnel, Ms. Whitney used her new, more sophisticated telephone to

try to pick up background noise that might identify the caller in some way. Ms. Whitney turned

up the volume of the ear piece and said "hello" more than once, to try to keep the caller on the

line. (T. 51, Co. Ex. 8) Ms. Whitney heard no particular identifying background noise, such as

---

[1]As discussed further herein, Mr. Rogers was well versed in these telephone features, and
testified to this, plus volunteering additional information, such as how to activate "call block"
when using a rotary telephone (T. 197 - 203), that a caller has to dial "*67" *before* dialing a
number, not after (T. 211), and that a forwarded call will still register on caller ID as coming
from the original telephone from which it was forwarded. (T. 216 - 217)

traffic, television, or radio, and instead, with the amplified earpiece volume, she could hear the

sounds of a male masturbating while faintly whispering her name. (T. 51 - 52, Co. Ex. 8)

Hearing this, Ms. Whitney hung up the phone. (*Id.*)

Extremely upset by this fourth call and with the continuing pattern of calls, Ms. Whitney

called Mr. Gianturco, and learned from his voice mail that he was on vacation. (T. 51 - 52, *and*

*see* Co. Ex. 10) Following Mr. Gianturco's voice mail instructions, Ms. Whitney called JoAnn

Murphy, who was covering for Mr. Gianturco during his vacation, but Ms. Murphy was not

available to answer the call. (*Id.*) Ms. Whitney left voice mail messages and sent email messages

(T. 113 - 114, *and see* Co. Exs. 8 and 10), but she felt the need for more direct action and went to

the Wareham Police Department on the way home from work. (T. 52) She reported the series of

calls to the police, and from this point on began working with the police to deal with the

harassing calls she had been receiving since August 30 the prior year. (T. 52 - 54, 114 - 116)

Working with the Wareham Police and with Joanne Murphy of Nstar security over the

next several days, Ms. Whitney learned that a tracing process through Verizon had been activated

for her desk telephone, and that she could trace a call by dialing "*57" immediately after hanging

up from the call she wanted to trace. (T. 57 - 60, 114 - 115, *and see* Co. Exs. 3 and 10) At some

point within the next several days after February 1, 2001, Detective Cabral of the Wareham

police told Ms. Whitney that one traced call was sufficient for police purposes, since the calls

were sexually harassing in nature. (T. 53 - 54, *and see* Co. Ex. 2)

**6.     The Fifth Call, on March 30, 2001 – Traced To Mr. Rogers' House.**

The fifth and final call in the series of five harassing calls came in on Friday, March 30,

2001, at about 4:00 PM. (T. 60) On March 30, 2001, Mr. Rogers worked until 3:30 PM, and

12

there was no overtime. (T. 144, Co. Ex. 13)

Ms. Whitney was getting ready to leave for the day when there was an incoming call designated on her telephone display as "private caller." (T. 60) This, and the February 1 harassing call, are the only two times Ms. Whitney has seen calls come to her desk phone designated as "private caller." (T. 60 - 61) When Ms. Whitney answered the call, she heard the now familiar sounds of heavy, rapid, escalated breathing, and knew at once that this was the same caller who had made the previous four harassing calls. (T. 61 - 62) She asked a few times, "is there anybody there," or words to that effect, and then hung up.

Ms. Whitney immediately dialed "*57" to activate the call tracing process, and she heard a Verizon recording saying that the call trace had succeeded. (T. 61 - 62) Ms. Whitney then immediately reported these events to JoAnn Murphy, who was in Wareham that day. (*Id.*)

### D.     The Events After the Call Traced To Mr. Rogers' House.

It is Verizon policy to release call tracing information "only to legally empowered authorities." (Co. Ex. 3) Thus, Detective Cabral notified Ms. Whitney on Monday April 2 that the call trace had been successful, and that either he or JoAnn Murphy would get back to her with more details. (T. 63)

JoAnn Murphy followed up on the traced call by contacting Detective Cabral. (T. 117 - 118) Working back and forth between Verizon and Detective Cabral, Ms. Murphy eventually on April 2, 2001 learned from the detective that the March 30 call had been traced to 234 Sandwich Street in Plymouth – Mr. Rogers' address – and the call was traced to his listed number at that address. (T. 118 - 120) Ms. Murphy determined that Mr. Rogers was a Company employee, and that his telephone number and address listed with the Company matched the number and address

to which Verizon traced the March 30 call.

Ms. Murphy then contacted Ms. Whitney, and asked if she knew a James Rogers. (T. 119) Ms. Whitney did not immediately recognize this name, but she looked up Mr. Rogers in the Company's computerized personnel records, and learned that he was an electrical lineworker working out of the Plymouth Service Center. (T. 63 - 64, 119 - 120) Ms. Whitney also verified that the number and address to which the call had been traced matched Mr. Rogers' telephone number and address in the Company's personnel records. (T. 63 - 65, *and see* Co. Ex. 4) Searching her memory to try to make some kind of connection with Mr. Rogers, Ms. Whitney eventually recalled that she was present at the meeting in the Plymouth Service Center on July 31, 2000, together with other members of the human resources staff, to introduce the Company's policies against workplace violence, intimidation and harassment. (T. 66 - 68) Mr. Rogers was in attendance on July 31, 2000, and he admitted that as of this meeting (about one month before the first of the five harassing calls) he knew who Ms. Whitney was. (T. 66 - 68, 195 - 196, *and see* Co. Ex. 5)

JoAnn Murphy eventually obtained a copy of the Verizon call tracing records from Detective Cabral. (T. 121 - 124, Co. Ex. 9) The records were accompanied by an affidavit from a Verizon employee, declaring under the pains and penalties of perjury that records were "true and complete records of the Verizon Unlawful Call Center;" that the records were "kept in the regular course of business ... made in good faith ... [and] that it is the regular course of business to make these records ..." (Co. Ex. 9) The Verizon records show that at 4:05 PM on March 30, 2001, a call was placed from the telephone number listed to Mr. Rogers at his address at 234 Sandwich Street in Plymouth, to Ms. Whitney's individual telephone number at her Wareham office. (Co.

14

Ex. 9; *see also* Co. Ex. 12) It is not disputed that the Verizon records "do not necessarily identify the person(s) making [a call], but rather provide the identity of the subscriber of the telephone service." (Co. Ex. 9, at p. 1)

On the basis of the traced call to his home, the Company suspended Mr. Rogers on April 3, 2001. (Jt. Ex. 3A and B)

### E.    Mr. Rogers' Repeated Inability to Produce Alibi Witnesses.

A notable fact is Mr. Rogers' repeated inability to produce apparently available and obvious alibi witnesses for the time period of the traced call on March 30, 2001. As discussed below, Mr. Rogers contends that during the critical period when the call was traced to his home, he was not at home but instead was elsewhere with at least one and possibly additional co-workers.

James McGuire, a Senior Labor Relations Consultant for Nstar, conducted the suspension hearing concerning Mr. Rogers' discipline, where the penalty was ultimately converted to a discharge. (T. 147 - 152, Co. Ex. 14) Before the hearing, the Company had checked into Mr. Rogers' reported whereabouts (using the Company's Work Management Information System – a work tracking system) on the dates and times of the five harassing telephone calls. (T. 139 - 141, 147 - 148, *and see* Co. Ex. 13) From those records, as discussed above, it appeared that Mr. Rogers was not at work when four of the five calls were placed, including the traced call on March 30, 2001. On December 5 or 6, 2000, at the approximate time of the second in the series of calls, Mr. Rogers was on reported breaks. In addition, on December 6, he was in the vicinity of his home and his girlfriend's home during the workday. (T. 158, *and see* Co. Ex. 13)

Mr. McGuire conducted the Company's suspension hearing on April 23, 2001. (T. 147 -

152, Co. Ex. 14) At the suspension hearing, Mr. Rogers admitted that he knew Ms. Whitney and

had first seen her at the meeting on July 31, 2000, when he was informed about the new Code of

Conduct and the "zero tolerance" policy. (T. 148 - 149, 151 - 152, 195 - 197, Co. Ex. 14) ) When

asked, Mr. Rogers said he knew about call blocking and that he had, in fact, used this process at

times. (T. 150, 198 - 199, Co. Ex. 14) Mr. Rogers denied he had made any harassing calls on the

five days in question. (T. 151, Co. Ex. 14)

      At one point during the Company's suspension hearing, the Union asked to take a break

because Mr. Rogers had an alibi witness who could corroborate that Mr. Rogers was not at his

home at the time of the traced call on March 30, 2001. (T. 149) Mr. McGuire recalled, and his

notes of the April 23 meeting reflect, that Mr. Rogers explained he was meeting two co-workers

("J. Knight and R. Sherwood or Bob Lane", according to Mr. McGuire's notes from the meeting)

after work that day at an American Legion parking lot, and from there they were going to look at

a new puppy purchased by one of the co-worker's brothers. (T. 149 - 150, *and see* T. 185, Co.

Ex. 14, at p. 2) Mr. McGuire recalled clearly that the sequence of events was for the co-workers

to meet at the American Legion and then travel on to see the new dog. (T. 218 - 219) At the

Company's suspension hearing, by Mr. McGuire's recollection, Mr. Rogers never explained that

he and any of the others had actually gone to see the new dog. (*Id.*)

      Mr. Rogers testified at the arbitration hearing somewhat differently. He claimed that he

and a co-worker, Jeff Knight, left work in separate cars and drove directly to Knight's house to

see Knight's brother's new puppy. (T. 185 - 186, 213) After a brief visit there, according to Mr.

Rogers, he drove to the American Legion Hall parking lot to wait for two other friends and co-

workers, Bobby Laine and Mr. Sherwood. They were supposed to meet at the American Legion

for a few drinks, according to Mr. Rogers, but he claims he simply waited in the parking lot and never went into the hall that day. When Laine and Sherwood never showed up, according to Mr. Rogers, he drove on to Kingston (T. 184 - 186)

Setting aside, for the moment, the discrepancies between Mr. Rogers' recollection and Mr. McGuire's, it is uncontested that during the April 23 hearing the Union requested a short break to produce Jeff Knight as an alibi witness for Mr. Rogers. (T. 150) If Mr. Rogers is telling the truth, he was with Mr. Knight looking at a puppy at about the time the March 30 harassing call was made, and not at home using the phone to which the call was traced. Mr. Knight came to the hearing site on April 23, met privately with the Union representatives who were attending the hearing, but did not testify on behalf of Mr. Rogers, and left. (T. 150, Co. Ex. 14, at p. 2)

This notable absence of alibi witnesses continued at the instant arbitration hearing. Though all are still employed by Nstar, Jeff Knight, Bobby Laine and Mr. Sherwood did not testify in this proceeding, either. (T. 205, 215)

**F.    The Location of the Puppy, the Weather, and Other Important Factual Issues Pertaining to March 30, 2001.**

In addition to the notable lack of alibi witnesses, there are other important factual issues pertaining to Mr. Rogers' testimony about his whereabouts for the first hour after work on March 30, 2001.

As discussed above, Mr. Rogers' story at the arbitration hearing was that he and Jeff Knight drove separately after work on March 30 to see a new puppy belonging to Knight's brother. (T. 185, 205 - 209, 212 - 215) Mr. Rogers first testified unambiguously, on direct examination, that he drove to Jeff Knight's house to see the puppy. (T. 185 – "Q: And where did

17

you go after work? A: I went to *my buddy Jeff's house* to see his brother's puppy, new dog. Q: And where is *Jeff's house* in relation to the service center? ... A: I would say approximately two miles..." ) (emphasis supplied)

A short while later, Mr. Rogers volunteered unambiguously on cross examination, without being led by a question, that he went to Jeff Knight's *brother's* house to see the puppy. (T. 205 – "Q: Now, you said that you and Mr. Knight were going to a friend's house to look at a new puppy, right? A: *No, his brother's house.* Q: I'm sorry, brother's house. Your brother or his brother? A: *His brother's.*") (emphasis supplied) And later during cross examination, Mr. Rogers again said it was the brother's house, not Jeff Knight's house. (T. 213 - 214 – "Q: So let me get this straight. You left with Mr. Knight from work, right? A: No. Q: Both in separate cars? A: Right. Q: Okay. And you drove to his brother's house? A: Which is – yes.")

Whichever house it was – Jeff Knight's or Jeff Knight's brother's house – they allegedly arrived there soon after 3:30 PM and spent 15 to 20 minutes fulfilling the mission to see the puppy. (T. 185, 206) At first, Mr. Rogers said he, Mr. Knight, and apparently Mr. Knight's brother let the puppy out in the back yard so the dog could run around. (T. 206) Mr. Knight testified unambiguously that he spent 15 minutes there, and that they were all standing outside in the yard while the puppy "did its thing." (T. 206)

March 30, 2001 was an exceptionally cold, rainy, windy, early Spring day in Plymouth, Massachusetts. (T. 207, Co. Ex. 16) It rained all day, and the high temperature was only 39 degrees. (Co. Ex. 16) There is no doubt that this was a notably harsh weather situation – it was an inclement weather day for the Plymouth Service Center, meaning that the employees did not even leave the garage. (T. 207) But especially during a solid hour between 3:52 PM and 4:52 PM –

18

exactly when Mr. Rogers said he and the other gentlemen visited the puppy and went out into the

yard – in Plymouth there was heavy rain, 39 degree temperatures, steady wind in the

neighborhood of 20 MPH at all times, and gusts between 25 and 30 MPH. (Co. Ex. 16)

Reminded of these weather details, Mr. Rogers then testified that he and the others "briefly"

stood out in the rain, and that the puppy "went pretty quick because it was raining and he was a

puppy." (T. 207)

After this puppy visit, Mr. Rogers says he then drove to the American Legion Hall to

meet the other two co-workers, Laine and Sherwood, for some drinks. (T. 186, 212) Even though

it had been an inclement weather day and the employees never left the garage all day, there was

apparently some kind of mis-communication between 3:30 PM, when the workday ended, and

about 4:00 PM, when Mr. Rogers says he arrived at the American Legion Hall parking lot.

According to Mr. Rogers, he arrived at the American Legion around 4:00 PM expecting to meet

his friends, then waited for his friends in his vehicle in the cold, rainy parking lot until about 4:20

– never going inside the hall where they had planned to meet for drinks – and then left. (T. 213 -

214)

## V.    Argument.

### A.    The Standard of Proof Is Relevant, But Not Crucial To The Existence of Just Cause For Mr. Rogers' Discharge.

In some discharge arbitration cases there can be an issue concerning the standard of proof.

Here, this question is largely academic; there is overwhelming evidence that Mr. Rogers made

sexually harassing telephone calls to Kim Whitney, and any standard of proof will suffice.

Nonetheless, anticipating that the Union will argue for the most difficult standard possible, it is

important at least to address the issue.

One can anticipate a union contending that to sustain a discharge decision, the employer must prove "just cause" *beyond a reasonable doubt* – like the State in a criminal proceeding. Employers, and a large amount of arbitral authority, support the more lenient civil trial standard prevail – by which the employer must prove "just cause" for the discharge only by a *preponderance of the evidence.*

There is little doubt, as the present arbitrator has already recognized, that the standard of proof in a criminal matter differs from the standard of proof in an arbitration proceeding. (*See* T. 167.) A labor arbitration has few elements in common with a criminal prosecution. Even in the most serious discharge arbitration cases, a grievant's liberty is not at stake; and the immense and inexhaustible might of the State, mustered against a lone criminal defendant, does not compare to an employer presenting a case for discipline against an employee or ex-employee, who in most cases (and certainly here) is ably represented by his labor union.

Because arbitration is a non-criminal proceeding, and indeed, arbitration is neither criminal nor civil litigation, where well defined burdens of proof exist, the Company contends that the appropriate standard of proof should be no more than the civil standard. There is ample precedent that arbitrators should apply only the "preponderance of the evidence" standard in deciding fact issues in discharge cases. *See* Elkouri and Elkouri, *How Arbitration Works,* at 906 - 908 (5th ed. 1997)

However, there is also no denying that some arbitrators apply a heightened standard of proof in discharge cases, especially those involving charges that could be recognized and punished by criminal law. (*See id.*) Even then, these arbitrators rely only upon a "clear and

20