convincing" standard of proof, not the more heightened criminal standard of proof "beyond a reasonable doubt." (*Id.*)

In the present case, the overwhelming proof of Mr. Rogers' guilt will meet any arbitral standard, so this issue is essentially moot. In the end, perhaps it is best for the arbitrator not to dwell upon technical proof standards like "preponderance of the evidence" versus "clear and convincing evidence," and instead, simply to make the decision based on the evidence, witnesses' credibility, their demeanor, their motivations, reasonable inferences, and simple common sense. *See George Koch Sons,* 102 LA 737, 742 (1994)(rejecting union's call for application of the "clear and convincing" standard)

### B. There Was Just Cause For Mr. Rogers' Discharge.

There are an infinite number of arbitral formulations for evaluating "just cause." In simple terms, a "just cause" standard prohibits discipline that is unfair, unreasonable, or discriminatory. Many arbitrators evaluate "just cause" with an inquiry into several factors, which generally reduce to the following five inquiries:

> **(1)  Was there a fair and reasonable rule related to the orderly, efficient and safe operation of the enterprise?**

This question examines whether there was a workplace rule, policy or practice identifying the misconduct in question as improper and subject to discipline, in this case discharge. As an initial matter, it is well-recognized that employers need not promulgate specific rules against some levels of misconduct. No employee needs a rule to be warned that anonymous, frightening, harassing, masturbatory telephone calls to a co-worker are forbidden and will be met with strict discipline.

As it turns out, the evidence left no doubt that there were well-published rules applicable to Mr. Rogers' wrongdoing, and further, that he was specifically aware of them. The Company had announced a "zero tolerance" policy with respect to workplace harassment and violence. Mr. Rogers himself recalled the July 31, 2000 meeting in which this was announced, only a month before the first of the five harassing calls was placed to Kim Whitney. The Code of Conduct, which Mr. Rogers admitted he had read, prohibits sexual harassment and warns that the consequences for this kind of conduct can be discharge. These policies are unquestionably fair and reasonable, and related to the orderly, efficient and safe operation of the Company's business.

(2) **Was the investigation by the employer fair and objective, producing the requisite quantum of proof?**

This is the key element in the "just cause" inquiry in this case – the Union challenges the sufficiency of the Company's evidence that Mr. Rogers was the harassing caller. The Union attempts to minimize the evidence to the one telephone call traced to Mr. Rogers' home number, with respect to which Mr. Rogers improbably but simply denies that he was the caller. Despite his denial, the circumstantial evidence is overwhelming that Mr. Rogers placed the traced call and the other harassing phone calls to Kim Whitney. Consider the following web of evidence, which, in its entirety, soon becomes seamless:

(A) **The traced telephone call is a powerful beginning to the Company's evidence.**

The traced call, of course, is the cornerstone of the Company's case. Mr. Rogers lives alone at the address to which the call was traced. He left work on March 30, 2001 at 3:30 PM and had ample time to get home and place the call to Ms. Whitney at 4:05 PM. (The false alibi will

be discussed, below)The call tracing records admittedly do not show who actually made the call, but there is only one reasonable inference – it was Mr. Rogers.

Mr. Rogers and the Union struggled to provide explanations for how another person might have made the call by using telephone service equipment (a headset used by telephone repair personnel) to tap randomly and coincidentally into Mr. Rogers' line. (T. 203 - 204) There was no evidence of such tampering at Mr. Rogers' house. (T. 204) Any person using this equipment, either outside Mr. Rogers' house, or even more preposterously, on a ladder or in a bucket truck, would have been standing in a 39 degree, windy, drenching rainstorm at 4:05 PM on March 30, 2001. (T. 209) Kim Whitney heard no sounds from the out-of-doors in any of the harassing calls, including the last one. (T. 26)

Any person randomly tapping into Mr. Rogers' line, in addition to being outside in a cold, early Spring downpour, also would have had to make the effort to apply "call blocking" before making the call to Ms. Whitney's line, by hitting "*67" (T. 210 - 211)(remember that Ms. Whitney saw the "private caller" indication in her telephone's caller ID display, meaning either that this was an individually blocked call, or a call from an unlisted number – but Mr. Rogers' number is *listed* and would not display "private caller" unless call block had been applied. (T. 199 - 203) The idea of a random caller tapping into Mr. Rogers line and using call blocking, of course, is completely nonsensical. A random caller tapping into telephone lines and using someone else's number would be utterly unconcerned about applying call blocking, and indeed, logically would not even want to thwart caller ID (because it would shift the blame elsewhere).

The Union introduced no evidence to challenge the accuracy of the Verizon tracing records. Call tracing records are commonly used in criminal prosecutions, and thus are accepted

as reliable. *See, e.g., Commonwealth v. Cove,* 427 Mass. 474, 475 - 476 (1998); *Commonwealth v. Farley,* 1996 WestLaw 1186936 (Massachusetts Superior Court, October 18, 1996)(police officer traced call by using "*57" method); *and see A.B. Chance,* 57 LA 725, 730 (1971)(discharge sustained in part on basis of "pen register" evidence [an earlier form of call tracing device]; arbitrator concluded that: "The pen register has been accepted as an accurate recording device in criminal proceedings, and it cannot be assumed that the telephone company will take its responsibility of applying the device lightly.")

Though the Company introduced a photocopy of the original Verizon business records, even under the Federal Rules of Evidence a photocopy is admissible in lieu of the original documents. (Fed. R. Evid. 1001(4); 1003; *U.S. v. Wagner,* 713 F.2d 1371 (8th Cir. 1983)) (accurate reproductions of telephone billings are admissible as duplicate originals) The affidavit accompanying the Verizon documents established that the records were true and complete and kept in the regular course of Verizon's business, so they are admissible as an exception to evidentiary rule prohibiting hearsay evidence. (Fed. R. Evid. 803(6))

Thus, it is true that the Company's case *begins* with this single traced telephone call, but this call alone is powerful evidence of Mr. Rogers' guilt. He may deny that he was the caller, but this denial is hollow, the contrary evidence is reliable, and no other reasonable explanations have been offered. Even if, by some awful coincidence, Mr. Rogers was the victim of faulty equipment, or a malfunction caused by seismic activity – the remainder of the evidence seamlessly supports the accuracy of the call trace to Mr. Rogers' home, and the conclusion that he made the call that was traced – plus all the others.

   **(B) The Company's evidence includes Mr. Rogers' false alibi.**

As damning as the electronic evidence is, it is wholly complemented by the fact that Mr. Rogers lied about his alibi on March 30, 2001. In the realm of the fantastic, Mr. Rogers could be the victim of a nightmarish electronic mistake. But if that were true, why won't his alibi witnesses testify as to his alleged whereabouts? And, for that matter, why is he concocting a notably false story about his whereabouts?

As many as *four* available witnesses – two and possibly three of Mr. Rogers' co-workers, plus a co-worker's brother who lives in Plymouth – apparently could verify Mr. Rogers' story about his whereabouts after work on March 30, 2001. None testified. One came to the Company's suspension hearing and turned away without offering any statement to the Company.

It is well-established that a party's failure to use witnesses who should be knowledgeable creates an inference against that party; and a failure to call a witness who is available gives rise to a presumption that the witness's testimony would be adverse to the position of the party having the ability to call the witness. Elkouri & Elkouri, *How Arbitration Works*, at 428 (5th ed. 1997); *Amoco Oil Co.*, 87 LA 493, 500 (1986) To be more direct – the absence of Mr. Rogers' alibi witnesses means only one thing – *they would not have provided the alibi*. The absence of the alibi witnesses means that Mr. Rogers' entire story about the puppy visit is false.

If Mr. Rogers had provided a credible, consistent story, then perhaps the absence of the alibi witnesses would not create so powerful an inference. However, Mr. Rogers' story was facially implausible, contradicted by other testimony, and it changed from one telling to the next, fueling the strength of the adverse inference.

Most obviously, this entire, unsubstantiated alibi tale is not credible. Why, of all days and times, would three men choose to go see a new puppy in someone's yard during a 39 degree,

drenching rainstorm? Mr. Rogers provided this dubious alibi before he understood how truly inclement the weather was on March 30 at the exact time he said he and his friends were checking out a new puppy. The weather was no surprise, it had been bad all day. Why, of all days, and with the weather getting worse, would three men take the time after work to go visit a puppy?

The story about Mr. Rogers then proceeding to the American Legion parking lot is also incredible. Why, after Mr. Rogers and his co-workers worked together all day in the service center, was there some confusion about a meeting arrangement barely a half hour after work ended? If, as Mr. Rogers plainly testified (T.212 - 213), he was meeting his friends for drinks, why did he sit in his vehicle in the rainy parking lot, and never go into the American Legion hall? This part of Mr. Rogers' story, like the tale of the puppy visit, is facially dubious.

There were more detailed problems with Mr. Rogers' alibi. Mr. McGuire recalled vividly that Mr. Rogers originally said he was going to meet co-workers at the American Legion to proceed to see the new puppy, but they never showed, so he went on elsewhere. By the time of the arbitration hearing, Mr. Rogers was now recalling that he had indeed gone to see the new puppy and romped around for awhile in the yard.

The inconsistencies do not end with differences between Mr. McGuire's memory and Mr. Rogers'. Mr. Rogers' own version of his story was flawed and suspicious. First the puppy was at his co-worker's house. Then the puppy was at the co-worker's *brother's* house. First the three men spent 15 minutes standing in the yard with the puppy. Then, when Mr. Rogers realized that this would have supposedly occurred during a cold, windy downpour, he claimed that the puppy "did its thing" quickly. (Any dog owner knows that this tardy re-positioning does not comport

26

with common experience – how likely is it that a new puppy would rush to accomplish its natural functions outside in a cold, drenching rain?)

The contradictions, improbabilities and inconsistencies in Mr. Rogers' own various versions of his alibi give rise to an especially compelling inference about the absence of the alibi witnesses. There is no alibi. Mr. Rogers is lying about where he was after work on March 30, 2001. The traced call now seems even less likely to have been a freakish, inexplicable coincidence.

### (C) The Company's evidence includes Mr. Rogers' opportunity to have made all five calls.

The Union contended in opening argument that there is insufficient reason to conclude that all five harassing calls to Ms. Whitney resembled each other, or were even harassing in nature. There is no need to belabor a response – the Union's argument disappears in the face of Ms. Whitney's decent, candid and unambiguous testimony. Based on Ms. Whitney's testimony, it is unassailable that a single caller made all five calls, that Ms. Whitney was specifically targeted, that the calls essentially had the same content, that the caller was probably engaged in masturbation each time, that the caller knew how distressing this experience was to Ms. Whitney – and kept calling. There was no random caller placing calls into the Wareham office. (*See* T. 131 - 132) No other women employees reported being harassed like this. (*Id.*) To reach Ms. Whitney after the telephone switch between the third and fourth calls, the caller had to dial Ms. Whitney's old number and follow the voice mail directions by dialing the new, direct dial phone.

Given the fact that the same person made all five harassing calls, the evidence about Mr. Rogers' opportunity to make *all* the calls then looms very large. For example, even though the

27

fifth call was traced to Mr. Rogers' home, where he lives alone, and even though Mr. Rogers offered a suspiciously false story about where he was when the fifth call was traced, what if it were nonetheless true that Mr. Rogers had no opportunity to have made any of the first four calls? The Company's case would be very different if Mr. Rogers had solid alibis for the first four calls, but he doesn't.

Instead, three of the first four calls (August 30, 2000, January 2, 2001, and February 1, 2001) are easy situations – Mr. Rogers was off work when they were placed. Mr. Rogers was at work when the second call was made, but in view of all the other evidence, a logical and reliable inference arises that Mr. Rogers had the opportunity to make this call, as well.

On December 6, 2000 – the more likely date of the second call – Mr. Rogers was working in Plymouth with a crew. Ms. Whitney recalled that the second harassing call came into her desk phone at about 12:30 PM. It is uncontested that Mr. Rogers' crew had significant down time at the noon hour that day, officially reported as a combined 30 minute lunch break and 30 more minutes of travel time to the next job. (Co. Ex. 13)

Mr. Rogers has a cell phone, and could have placed the second harassing call from any quiet place – a restroom at a restaurant? – during this down time. (T. 216)[2] In addition, the crew was working within a few minutes' drive of either Mr. Rogers' house or his girlfriend's house in Plymouth. It is entirely possible the crew stopped by either of the two houses in the middle of that day, and that Mr. Rogers had the opportunity to make the second call to Ms. Whitney.

Knowing that his mid-day whereabouts on December 6, 2000 (or December 5) are an

---

[2]Even on December 5, 2000, the less likely day of the second harassing call, Mr. Rogers' crew reported lunch break of 12:00 noon to 12:30 PM. (Co. Ex. 13) With his cell phone Mr. Rogers had the opportunity to place the second harassing call on December 5, as well.

28

important factor in this case, Mr. Rogers did not produce available co-workers to refute the inference that he might have stopped at a place where he could use his cell phone, or that he might be dropped off at home (or at his girlfriend's home) when the crew is working nearby in Plymouth. This again raises the inference that such testimony would be unfavorable.

Mr. Rogers' opportunity to have made all five calls undercuts still further the already remote possibility that the call trace information for the March 30, 2001 call has improperly damned him.

### (D) The Company's evidence includes the fact that the calls have stopped.

Another fact lends strong credence to the circumstantial evidence pointing to Mr. Rogers as the harassing caller who targeted Ms. Whitney. The calls have stopped since March 30, 2001, after the fifth call was traced to Mr. Rogers' home number and he was accused by the Company and the police. Is this yet another improbable and colossal coincidence? Of course not. If the calls were being placed by someone else, someone who might have technical knowledge and equipment to tap into telephone lines, or if the March 30 traced call was simply a technological accident, then how likely is it that the calls would have stopped altogether for the last year?

### (E) The Company's evidence includes Mr. Rogers' admitted knowledge of obscure telephone functions.

Mr. Rogers did not dispel the cloud of suspicion brought about by the March 30, 2001 traced call when he repeatedly displayed knowledge of obscure telephone functions that would aid a harassing caller in his wrongdoing. Mr. Rogers admitted to the Company, and again in his testimony, that he knew how to activate call block. (T. 150, 197 - 198) He knew that he must dial "*67" before dialing the number, not after. (T. 198) He even knew how to use call blocking from

29

a rotary telephone. (T. 211) He knew that for a forwarded call, caller ID will identify the original telephone from which a call was placed, instead of the telephone from which the call was forwarded. (T. 216 - 217)

The fourth and fifth harassing calls to Ms. Whitney were identified on her newly installed caller ID only as "private caller." It is uncontested that this means either that the incoming phone number is unlisted, or that the caller has activated call blocking. The fifth call was traced to Mr. Rogers' number, which is a published number, so the caller had to have activated call blocking. It is hardly a great leap to assume that the fourth call, so similar to all the others, and also identified as "private caller", was also originated by a caller who knew how to activate call blocking. It is hardly a great leap to assume that Mr. Rogers, familiar as he was with these telephone functions, made the "private caller" call that was traced to his house, and the similar "private caller" call a month earlier – plus the other three similar calls over the previous months.

**(F)     Conclusion – the evidence in its entirety is seamless and conclusive that Mr. Rogers made the harassing calls.**

Thus, the quantum of proof in this case is far more than one telephone call traced to Mr. Rogers' house. The evidence includes the fact that Mr. Rogers knew who Ms. Whitney was, and remembered seeing her at a meeting only a month before the first harassing call. The evidence includes not just one traced call but five similar calls. For all five Mr. Rogers remarkably had the opportunity to have placed the call, and for none can he be ruled out. The evidence includes Mr. Rogers lying about his alibi for the traced call, and the compelling inferences about easily available witnesses failing to appear to support his alibi – because it is false. The evidence includes the absence of any reasonable explanation for the traced call coming from Mr. Rogers'

home phone line, just preposterous speculation. The evidence includes Mr. Rogers' notable expertise in obscure telephone functions, and the fact that the calls to Ms. Whitney stopped when Mr. Rogers was identified as the caller. The Company had the requisite quantum of fair and objective proof to sustain this discharge.

    (3)    **Was the discipline consistent with previous discipline of other employees in similar circumstances?**

This next "just cause" inquiry plays no role here. There was no evidence presented that Mr. Rogers was the victim of disparate treatment.

    (4)    **Was the rule adequately communicated to the employee, so that he was forewarned of the possible consequences for the misconduct?**

As discussed earlier, Mr. Rogers knew the possible consequences of harassing conduct toward a co-worker. He admitted that he knew the contents of the Code of Conduct and attended a meeting to discuss the Company's "zero tolerance" policy for workplace violence and harassment. Moreover, it is an accepted principle of labor arbitration that some major offenses require no specific forewarning of possible disciplinary consequences. Sexual harassment is among this class of severe offenses. *See City of Havre, Montana,* 100 LA 866, 871 (1992)("arbitrators already consider sexual harassment to be a much more serious infraction than mere offensive or abusive language. It is a very serious offense indeed; it is the type of 'major' offense giving rise to suspension or discharge for a first offense.")

    (5)    **Was the level of discipline assessed appropriate, considering the seriousness of the proven offense, and any mitigating factors?**

As mentioned, sexual harassment is a "major" offense that can warrant immediate discharge. Mr. Rogers' behavior was also an aggravated form of sexual harassment. He made

repeated, frightening, anonymous calls to a targeted co-worker, knowing the effect he had to be having. There is no basis for mitigating the discharge penalty, even though Mr. Rogers is a relatively long-service employee with no disciplinary record. Mr. Rogers lied to the Company and continued to lie to the arbitrator about his wrongdoing. He is plainly in denial about the extreme nature of his misconduct, and is in no way seeking to take responsibility, correct his behavior, or attempt to make amends. The penalty of discharge was appropriate.

## V.     Conclusion.

Based upon all the foregoing and on the record as a whole, there was just cause for the discharge of James Rogers, and the grievance should be denied.

Respectfully submitted,

Nstar Electric & Gas Corporation,

By its attorneys,

_Keith H. McCown_
Keith H. McCown, Esq.
MORGAN, BROWN & JOY, LLP
One Boston Place
Boston MA 02108
(617) 523 - 6666

### Certificate of Service

I certify that on this day by regular mail I served a copy of the Employer's Brief upon counsel for the Union, Paul Kelly, Segal, Roitman & Coleman, 11 Beacon Street, Suite 500, Boston MA 02108.

_Keith H. McCown_
Keith H. McCown

Date: March 29, 2002